UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

FEB 1 1 2009

J. T. NOBLIN, CLERK
BY_____ DEPUTY

NATIONAL SERVICE INDUSTRIES, INC., )
F/D/B/A NORTH BROTHERS, INC., )
)
**Plaintiff** )
)   Civil Action No. 3:09Cv83HTW-
v. )   LRA
)
JAY T. SEGARRA, M.D. )
RESPIRATORY TESTING SERVICES, INC. )
CHARLES E. FOSTER )
J. MICHAEL FITZGERALD, ESQ. )
CHRISTOPHER LINN TAYLOR )
JAMES W. BALLARD, M.D. )
PHILLIP H. LUCAS, M.D. )
JOHN DOE DEFENDANTS 1-20 )
)
**Defendants** )

## COMPLAINT AND REQUEST FOR JURY TRIAL

COMES NOW Plaintiff, National Service Industries, Inc., f/d/b/a North Brothers, Inc., by

and through counsel, Forman Perry Watkins Krutz & Tardy LLP, and for its Complaint against

Defendants states and alleges as follows and requests a trial by jury:

### Introduction

1.      This is a complex civil action asserting claims for fraud, misrepresentation and

violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") based upon and

in response to a long-standing scheme by Defendants to defraud Plaintiff, **National Service**

**Industries, Inc.,** (hereinafter "Plaintiff" or "NSI") **f/d/b/a North Brothers, Inc.,** out of millions

of dollars.  Plaintiff seeks remedies authorized by federal statute at 18 U.S.C. 1961 *et seq.* for

actual, consequential and exemplary damages, treble damages and attorneys' fees and costs as

authorized by statute and for all other relief which this Honorable Court deems just and proper

1

under all circumstances which have occasioned this Complaint. 18 U.S.C. §§ 1964(a) and (c) ("Civil RICO"). As used in this Complaint, and except as otherwise specified, "Defendants" refers to the named Defendants, Jay T. Segarra, M.D., Respiratory Testing Services, Inc., Charles E. Foster, J. Michael Fitzgerald, Esq., Christopher Linn Taylor, James W. Ballard, M.D., and Phillip H. Lucas, M.D., and the "John Doe Defendants" described below in Paragraphs 37 and 38. The primary cause of this action is a widespread unlawful enterprise engaged in a pattern of racketeering activity across state lines and a conspiracy to engage in racketeering activity involving numerous RICO predicate acts during the past ten (10) calendar years. The predicate acts alleged herein contain fraud and intentional misrepresentations and include mail fraud and wire fraud, 18 U.S.C. §§ 1341 and 1343 respectively, in furtherance of Defendants' scheme. This Complaint also alleges state claims of fraud, aiding and abetting fraud, and negligent misrepresentation.

## I.    Nature of the Action

2.      From approximately 1992 through the present day, Defendants, along with unknown co-conspirators, schemed to recruit asbestos personal injury claimants and generate false medical documentation to substantiate mass tort litigation involving allegations of asbestos-related disease for tens of thousands of such claimants against Plaintiff and other similarly situated companies. Defendants engaged in this unlawful scheme for the purpose of monetary gain by creating fraudulent medical documentation to make the recruited and "screened" individuals appear to suffer from asbestos-related disease to extract money from Plaintiff and others through the court system and/or out of court settlements.

3.      Defendants were in the business of recruiting individuals as potential claimants for personal injury law firms and attorneys and conducting mass assembly-line screenings of

persons suspected of work-related exposure to products containing asbestos, once distributed by Plaintiff, doing business as North Brothers, Inc. These mass screenings principally involved the generation of asbestos exposure histories, chest x-rays (with accompanying interpretations referred to as "B reads" or "ILO Classifications"), physical examinations, pulmonary function tests ("PFTs") and diagnoses of asbestos-related disease by Defendants for various asbestos personal injury law firms and attorneys. These law firms and attorneys then used the purported "medical evidence" to file and/or settle thousands of asbestos-related injury claims against NSI, other companies and/or bankruptcy trusts.

4.    Defendants' screenings were massive recruitment programs carried out for personal injury law firms and individual attorneys on targeted populations of current and former industrial and construction workers with the sole purpose of generating a phenomenal volume of potential claimants as clients for these law firms. Defendants spent millions of dollars aggressively marketing the screening services to their personal injury law firm and attorney "customers" and on mass advertisements soliciting individual subjects for screenings. The screenings were motivated by financial profit for Defendants and their law firm customers who paid for the screenings and were not for medical or healthcare purposes. The individuals screened were not considered to be patients. No treating physicians referred the individuals to Defendants. There was no physician-patient privilege, and no rendering of medical treatment. The purported "medical" records and diagnostic reports generated in the screenings were provided to the law firms and attorneys that "sponsored" and paid for the screenings and not to the individuals screened and diagnosed with disease.

5.    Defendants solicited personal injury law firms and individuals using mass mailings, local trade unions and organizations, and television, radio and newspaper

3

advertisements. Often, Defendants targeted local union members, operating with local union and former union officials to generate mass numbers of screening subjects to create mass tort litigation claimants for their law firm customers.

6.      Certain personal injury law firms and attorneys, including many John Doe Defendants, specialized in representing plaintiffs making asbestos-related personal injury claims based on the fraudulent medical evidence generated in these mass screenings. Some such firms and attorneys made a practice of inundating the judicial system and defendants with voluminous claims on behalf of large numbers of claimants, most of whom have little, if any, injury. These firms and attorneys asserted claims against scores of tort defendants. The selected defendants were determined by the particular asbestos personal injury firm filing the claims based not on the alleged exposures or injuries but on the likelihood of extracting settlements from such defendants. This scheme often had the effect of extracting mass nuisance-value settlements from asbestos litigation defendants, such as NSI, because the judicial system and defendants, including NSI, lacked the resources to examine the merits of each of the tens of thousands of individual claims as they would in "traditional" tort litigation.

7.      While an individual claimant may receive a relatively modest compensatory settlement, many asbestos personal injury law firms, which retained 30% - 40% or more of the settlement proceeds on a contingency fee basis (as well as expenses, including payments for the screenings), have become enormously wealthy, with many individual attorneys becoming multi-millionaires. Such immense financial reward provided incentive to inflate the numbers of potential asbestos claimants to amass settlements from NSI, other asbestos litigation defendants, and asbestos bankruptcy trusts.

8.    Defendants made millions of dollars by fabricating this bogus "medical evidence" for asbestos litigation claims in their assembly-line-style enterprise.  In conjunction with their law firm and attorney customers, Defendants used common marketing ploys to recruit claimants and then fabricated medical records and reports for the prospective claimants with x-ray interpretations, exposure histories and lung impairment assessments to "substantiate" their false diagnoses.  Defendants' personal injury law firm and attorney customers then packaged the cases into mass tort filings and, using the false medical records, overwhelmed the courts, NSI, other asbestos litigation defendants and asbestos bankruptcy trusts with voluminous claims supported by the false records, reports and diagnoses, resulting in massive settlements.

9.    In thousands of these cases, Defendants, with the intent to defraud and injure NSI, as well as other companies, systematically, intentionally and/or recklessly deviated from medically sound and universally established standards for medical testing, evaluation and diagnosis of asbestos-related disease to create false "positive" results, i.e., results which falsely indicate the presence of asbestos-related disease.  Specifically, Defendants systematically, intentionally and/or recklessly disregarded well-established standards and regulations for interpreting chest x-rays, taking and recording asbestos exposure/work histories and medical and smoking histories, and administering x-rays, PFTs, and other medical tests, for diagnosing and assessing asbestos-related diseases.  In doing so, Defendants generated false x-ray reads, false test results, false medical reports and false diagnoses (hereinafter "False Medical Reports and Diagnoses") which are not *bona fide* or accurate statements of the medical condition of the individuals recruited and screened by Defendants.  Defendants delivered and submitted, or caused and reasonably could foresee the delivery and submission of the False Medical Reports and Diagnoses with the intent to extract payments from NSI, as well as other companies.

10. Plaintiff, NSI, paid millions of dollars to defend and/or settle asbestos-related injury claims of malignant and nonmalignant lung disease which were supported by Defendants' False Medical Reports and Diagnoses. Defendants fraudulently represented that these claims against NSI involving Defendants' False Medical Reports and Diagnoses were based on the claimants' physicians' legitimate x-ray reads, medical tests, medical reports and *bona fide* diagnoses of asbestos-related disease with the intent that NSI and other companies would rely on the False Medical Reports and Diagnoses and pay money to settle the bogus claims. In reliance upon Defendants' False Medical Reports and Diagnoses, NSI defended and/or settled thousands of false asbestos-related disease claims. Thus, Defendants' fraudulent scheme and reckless disregard for the truth caused direct injury to NSI.

11. Defendants successfully concealed the nature and scope of their fraudulent activities in several ways, including but not limited to (a) refusing to comply with proper subpoenas and court orders for the production of documents about Defendants' litigation screening operations, (b) giving false and misleading testimony under oath about the validity of methods and means employed to generate medical reports and diagnoses, and (c) refusing to answer questions under oath about their mass litigation screening operations by invoking their rights under the Fifth Amendment of the U.S. Constitution against self-incrimination. It was not until the landmark "Daubert" decision in the Federal Silica Multi-District Litigation MDL1553 (to which Plaintiff was not a party) and the production of documents through the enforcement of additional subpoenas issued in MDL1553 and thereafter in the Federal Asbestos Multi-District Litigation, MDL875, to which Plaintiff later obtained access, that Plaintiff ascertained facts sufficient to begin to discover Defendants' complex fraudulent scheme that caused Plaintiff's injuries. Attached as Exhibit A is Judge Janis Graham Jack's June 30, 2005, ruling in *In re*

*Silica Products Liability Litigation*, No. MDL 1553, 398 F.Supp.2d 563 (S.D. Texas 2005) (hereinafter, the "MDL1553 Ruling"), which makes findings on the conduct of the Defendants Respiratory Testing Services, Inc., Charles Foster, and Dr. James. W. Ballard specifically and litigation screenings in general, of which this Honorable Court is requested to take judicial notice.

## II.    Jurisdiction and Venue

12.    Jurisdiction in this action is predicated upon Title 18, United States Code, Section 1964 and Title 28, United States Code, Sections 1331 and 1332. Plaintiff is a corporation incorporated under the laws of Delaware with its principal place of business in Georgia. Defendants are citizens of Mississippi, Alabama and Virginia. The amount in controversy exceeds $75,000.

13.    This Court has jurisdiction of pendent state claims pursuant to *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. § 1367(a), because those claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy.

14.    Venue for this action is predicated upon Title 18, United States Code, Section 1965 and Title 28, United States Code, Section 1391(b) (2) and (3), because a substantial part of the events giving rise to this action occurred in this District and because some of the Defendants reside, are found or transacted their affairs in this District and the ends of justice require that the other Defendants be brought before this Court.

15.    Plaintiff invokes the expanded service of process provisions of Title 18, United States Code, Section 1965(b).

7

### III.    Background

**A.    Asbestos Personal Injury Litigation**

16.    Asbestos is a generic name given to a group of natural, fibrous minerals.  Because asbestos has several valuable properties, including resistance to heat and fibrous strength, it was used for a number of years in numerous commercial applications, including the production of high-temperature insulation and other similar products

17.    NSI's involvement in asbestos litigation, including the cases generated by Defendants, arose from its distribution and sales of asbestos products, under the company name North Brothers, Inc. from approximately 1966 through 1972.

18.    Asbestos personal injury litigation is premised upon the type of injury suffered: nonmalignant asbestos-related disease (asbestosis, pleural thickening or asbestos-related pleural plaques) and pulmonary impairment; and malignancies (lung cancer, mesothelioma and certain other cancers [primarily esophageal and laryngeal, hereinafter collectively referred to as "other cancers"]).  The vast majority of the claims filed against NSI involved allegations of non-malignant asbestos-related disease.

19.    The effects of long-term exposure to asbestos products generally do not develop until after many (usually at least twenty) years after the initial exposure.  Lung scarring or "interstitial fibrosis" (scarring of the parenchyma of the lung) generally will not be visible on a chest x-ray for decades following initial exposure.  Bilateral pleural plaques, another common marker of asbestos exposure, also take years to manifest to be visible on a chest x-ray.  Plaques are benign and generally have no effect on pulmonary function.

20.    In certain malignancy cases, findings on chest x-rays consistent with asbestosis or similar medical determinations that the malignancy (usually lung cancer or "other cancer") is

caused by exposure to asbestos, based on a reliable history, are used to support claims against Plaintiff and others, whether in the court system, in settlement or in bankruptcy trust claims.

**B.    Diagnostic Criteria for Asbestos-Related Disease**

21.    It is universally accepted that the diagnosis of asbestos-related disease requires: (a) evidence of structural pathology consistent with asbestos-related disease as documented by imaging (e.g., chest x-ray) or histology; (b) evidence of causation by asbestos as documented by the occupational and environmental history, markers of exposure (usually pleural plaques), recovery of asbestos bodies, or other means; and (c) exclusion of alternative plausible causes for the findings (through physical exam, including medical, smoking and exposure histories, and an assessment of lung function impairment).

22.    Evidence of structural pathology consistent with asbestos-related diseases as seen on a chest x-ray is generally reported in accordance with a classification system developed by the International Labour Office ("ILO") on a "B read" form based on a reading of the chest x-ray film by a "B reader" physician. B read reports are also used to classify x-rays as consistent with other dust-caused pneumoconiosis diseases, including silicosis and coal workers' pneumoconiosis.

23.    The National Institute for Occupational Safety and Health ("NIOSH") of the Centers for Disease Control and Prevention ("CDC") issues B reader certifications to physicians who meet a specified level of proficiency in classifying chest x-rays according to the ILO scale. NIOSH certifies these B readers as qualified physicians with expertise in classifying chest x-rays according to the ILO system. B readers must be re-certified at four-year intervals.

24.    A NIOSH B read uses the ILO scale developed to systematically record the radiographic abnormalities in the chest provoked by the inhalation of dusts. On the ILO scale,

9

chest x-rays are classified according to the number of abnormalities (termed "opacities") in a given area of the chest as seen on film. Small opacities are described by profusion (the concentration of opacities in the affected lung zone), affected zones of the lung (upper, middle and lower), shape and size (irregular [designated as "s" "t" or "u"] or rounded [designated as "p" "q" or "r"]).

25. The ILO profusion of small opacities is based on comparisons with standard chest x-ray films (radiographs) provided by ILO. There are four (4) categories of profusion designated under the ILO system:

| Increasing profusion of small opacities $\longrightarrow$ | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Categories | 0 | | | 1 | | | 2 | | | 3 | | |
| Subcategories | 0/– | 0/0 | 0/1 | 1/0 | 1/1 | 1/2 | 2/1 | 2/2 | 2/3 | 3/2 | 3/3 | 3/+ |

Category 0 represents the absence of abnormalities or the presence of abnormalities (small opacities) that are less concentrated than category 1. The profusion category is recorded by writing the symbol (0, 1, 2, 3) followed by an oblique stroke (i.e. 0/, 1/, 2/, 3/). If no alternative profusion category was seriously considered, the x-ray is classified with an identical subcategory (i.e. 0/0, 1/1, 2/2, 3/3). However, a reported subcategory 2/1 refers to a radiograph depicting a profusion of small opacities evaluated similar in appearance to a subcategory 2/2 standard radiograph, but category 1 (less profuse/concentrated) was seriously considered as an alternative. Epidemiologically, an exposed population would be expected to have a broad spectrum of ILO profusion categories among the workers.

26. The exclusion of other possible causes of the radiographic findings and/or symptoms is also critical in evaluating whether disease is related to asbestos exposure because

radiographic findings consistent with asbestos-related disease are also consistent with over 150 other disease processes. Well-established, medically sound and universally accepted methods for excluding other causes include reliable and accurate medical and exposure histories taken by a medically qualified professional; a physical examination conducted by a physician; and the assessment of lung function impairment through PFTs.

27.    Evidence of causation in asbestos-related nonmalignant disease is based in large part on a reliable and accurate history of exposure to asbestos dust. The taking of a reliable and accurate exposure history is critical to the diagnosis of asbestos-related disease due to the latency of disease onset and alternative causation of symptoms. The diagnosing physician must be able to assess the nature, frequency, duration, and intensity of exposures. Thus, a simple job title is inadequate to attribute causation of radiographic findings and physical symptoms to asbestos exposure.

28.    Asbestosis is a nonmalignant diffuse irregular interstitial pulmonary fibrosis caused by inhalation of asbestos fibers over long periods of time in concentrated doses. Abnormal lung function associated with asbestosis usually involves restrictive impairment, characterized by a reduction in lung volumes, as well as, at times, a decrease in diffusion capacity that is a measure of the lung's ability to transfer gases. PFTs, including spirometry, lung volume, and diffusion capacity tests, provide objective, quantifiable measurements of lung function to determine if an individual is impaired and the nature of any impairment (restrictive or obstructive), and are an important factor in valuing asbestos related personal injury claims. The American Thoracic Society ("ATS") has promulgated well-established, universally accepted, medical standards governing the administration of PFTs, designed to ensure the integrity of the testing process and the accuracy of PFT results. An individual diagnosed with asbestosis whose

11

test results demonstrate pulmonary (restrictive) and/or diffusion capacity ("DLco") impairment can obtain greater compensation than one who has no evidence of lung impairment or is unimpaired.

### IV.    The Parties

29.    Plaintiff, **NATIONAL SERVICE INDUSTRIES, INC., f/d/b/a North Brothers, Inc.** is a Delaware Corporation with its principal place of business in Atlanta, Georgia. (Hereinafter, **"NSI"** or **"Plaintiff"**).

30.    Defendant **JAY T. SEGARRA, M.D.,** is a pulmonologist, certified B reader and resident of Ocean Springs, Mississippi. He was a former B reader and diagnosing physician for Pulmonary Function Laboratory ("PFL"), a now-defunct asbestos litigation screening entity, a former medical director of Defendant, Respiratory Testing Services, Inc., and a medical director of Holland Bieber & Associates ("Holland Bieber"), also an asbestos (and silica) litigation screening entity. He performed B reads, ordered x-rays, interpreted PFTs, conducted physical examinations and rendered diagnoses for several screening litigation companies, including PFT Services, Inc. ("PFT Services"), Workers Disease Detection Services, Inc. ("WDDS"), InnerVisions Medical, Inc. ("InnerVisions") and others, as well as directly for personal injury law firms and attorneys.    (Hereinafter, **"DR. SEGARRA"**).

31.    Defendant **RESPIRATORY TESTING SERVICES, INC.** was an Alabama corporation engaged in asbestos (and silica) litigation screenings and recruitment of claimants for personal injury law firms and attorneys. It had its principal offices in Mobile, Alabama but operated and transacted business in several states, including Mississippi. **RESPIRATORY TESTING SERVICES, INC.** was administratively dissolved by the Alabama Secretary of State on or about October 18, 2008. (Hereinafter, **"RTS"**).

32.     Defendant **CHARLES E. FOSTER** is a resident of Alabama and was the owner of **RTS** and was a former employee of Pulmonary Testing Services, Inc. ("PTS"), an asbestos litigation screening company. (Hereinafter, **"FOSTER"**).

33.     Defendant **J. MICHAEL FITZGERALD, ESQ.** is a resident of Virginia and a personal injury plaintiffs' attorney engaged in asbestos litigation. He used **RTS** for screenings in several states, including Mississippi. (Hereinafter, **"FITZGERALD"**).

34.     Defendant **CHRISTOPHER LINN TAYLOR** is a resident of Alabama and was the screening organizer and road manager who marketed and set up screenings for **RTS**. He is also **FOSTER's** son-in-law. Upon information and belief, he attended screenings in Mississippi. In about 2001, he left **RTS** to work for another screening company, N&M, Inc., a Mississippi corporation. (Hereinafter, **"TAYLOR"**).

35.     Defendant **JAMES W. BALLARD, M.D.** is a radiologist and a resident of Alabama. He rendered B reads, issued blanket x-ray orders and provided diagnostic services for **RTS** and other litigation screening companies, including PFL and Healthscreen, Inc., as well as directly for personal injury plaintiffs' law firms and attorneys. (Hereinafter, **"DR. BALLARD"**).

36.     Defendant **PHILLIP LUCAS, M.D.,** is a radiologist and resident of Mississippi. He rendered B reads, issued blanket x-ray orders, and provided diagnostic services for **RTS** and other screening companies, including PFL, PTS, InnerVisions, and N&M, Inc., as well as directly for personal injury law firms and attorneys and/or other Defendants. (Hereinafter, **"DR. LUCAS"**).

### V.     John Doe Defendants

37.     In addition to the Defendants named herein, there are Defendants whose identities are presently unknown to Plaintiff, or whom Plaintiff is currently unable to identify without

further discovery about their participation, management or acts as part of their conduct in and/or their intent or reckless disregard with respect to Defendants' fraudulent scheme, but who caused injury to Plaintiff as set forth herein.  Plaintiff names these unidentified Defendants as "John Doe" Defendants 1-20 pursuant to Federal Rule of Civil Procedure 9(h).  Every allegation in the Complaint is an allegation and a filing as of this date against each "John Doe" Defendant and references to Defendants include the "John Doe" Defendants.  Upon information and belief, Defendants conspired with these unknown "John Doe" Defendants to perpetrate the fraud described herein and these "John Doe" Defendants participated, directly or indirectly, in the operations of the illegal enterprise alleged in this Complaint ("John Doe Defendants").

38.    John Doe Defendants knowingly and intentionally, or with reckless disregard, agreed to and assisted and actively participated in, conducted and/or directed the activities of an illegal enterprise, and include the following:

a.   Personal injury law firms and attorneys that directly hired **DR. SEGARRA, RTS, DR. BALLARD, DR. LUCAS** and/or one or more other Defendants, including "broker firms" and attorneys, to generate False Medical Reports and Diagnoses to support asbestos-related personal injury claims against NSI, as well as other personal injury asbestos tort defendants and bankruptcy trusts.  The participation of these John Doe Defendant law firms and individual attorneys included, but was not limited to, (i) hiring **DR. SEGARRA, RTS, DR. BALLARD, DR. LUCAS** and/or one or more other Defendants, (ii) knowing or recklessly disregarding that the enterprise achieved desired high positive rates and necessary exposure by using the "right doctors," (iii) providing financial support and supplying individuals for screenings, (iv) directing the types of tests to be administered, the exposure criteria to be created and the specific disease to be

14

diagnosed, and (v) concealing Defendants' fraudulent scheme, all for the purpose of generating personal injury cases to obtain lucrative fees based on settlements of the fraudulent cases.

b. Personal injury law firms and attorneys that indirectly hired **DR. SEGARRA, RTS, DR. BALLARD, DR. LUCAS** and/or one or more of the Defendants through the purchase of asbestos-related injury claims inventories from another personal injury law firm (a "broker firm") or attorney which directly hired **DR. SEGARRA, RTS, DR. BALLARD, DR. LUCAS** and/or one or more other Defendants.   The participation of these John Doe Defendant law firms and individual attorneys included, but was not limited to, providing financial support by paying for Defendants' fraudulent scheme for the purpose of generating personal injury cases against NSI and other personal injury tort defendants and bankruptcy trusts to obtain lucrative fees based on settlements of such fraudulent cases.

c. One or more other asbestos (and silica) litigation screening companies that Defendants **DR. SEGARRA, FITZGERALD, TAYLOR, DR. BALLARD, DR. LUCAS** and/or other Defendants hired, or for whom they worked, for purposes of recruiting claimants and generating False Medical Reports and Diagnoses to support fraudulent asbestos-related personal injury claims.  The participation of these John Doe Defendant screening companies and their owners included, but was not limited to, recruiting and screening claimants, generating false exposure history documentation, administering chest x-rays, providing false B reads, physical examinations and false diagnoses by hired physicians, administering and manipulating PFTs for Defendants for the purpose of generating personal injury cases against NSI and other personal injury tort

defendants and bankruptcy trusts and generating massive income for the John Doe Defendant litigation screening companies and owners.

d. One or more other medical doctors, including but not limited to B readers, contracted by personal injury law firms and attorneys, **RTS** and/or by one or more other of the Defendants, who fabricated False Medical Reports and Diagnoses to support asbestos personal injury claims against NSI and other personal injury tort defendants and asbestos bankruptcy trusts. The participation of the John Doe Defendant medical doctors included, but was not limited to, fabricating such False Medical Reports and Diagnoses in return for payment and the provision of future work from the illegal enterprise.

e. X-ray and PFT technicians, intake personnel, secretaries, local union contacts, facilitators and other personnel employed by or contracted with **RTS** and/or other Defendants. The participation of the John Doe Defendants contracted or employed personnel included, but was not limited to, recruiting claimants and supplying False Medical Reports and Diagnoses to the personal injury law firm and attorney customers of the illegal enterprise to support asbestos personal injury claims against NSI and other personal injury defendants and bankruptcy trusts in return for compensation and future employment.

## VI.    The Segarra Enterprise

### A. Composition of the Enterprise

39.    At all times material to this Complaint, Defendants, together with John Doe Defendants, collectively have constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce. The enterprise continuously and systematically generated

some legitimate but mainly False Medical Reports and Diagnoses to serve as "evidence" of injuries caused by asbestos for asbestos personal injury claims made on behalf of thousands of individuals by Defendants' personal injury law firm and attorney customers against NSI, and other companies, in the manner and means described herein.    Defendants knowingly, intentionally and/or recklessly, participated in and/or directed the affairs of this enterprise through a pattern of racketeering activity.

40.    The enterprise through which Defendants operated is a continuing enterprise, whose members and participants and the methods and means of perpetrating its fraudulent scheme have, at times, varied and become more sophisticated, but whose purpose in generating and using False Medical Reports and Diagnoses for pecuniary gain through mass claims litigation has remained constant.

41.    The enterprise through which Defendants operate and control is directed and managed by **DR. SEGARRA**.  This enterprise used several different asbestos (and silica) mass screening companies, including **RTS** and/or other John Doe Defendant screening companies. Defendants operated these screening companies through a pattern of racketeering activity as assembly-line mass litigation screening operations to generate False Medical Reports and Diagnoses to produce asbestos personal injury claims for personal injury law firms or individual attorneys.  Moreover, many of the screening companies used by the enterprise employed or contracted with some of the same doctors, testing technicians, secretaries, nurses and other personnel.

42.    **DR. SEGARRA** is the putative "Godfather" of the enterprise, who in his role as medical director, B reader, examining physician, diagnosing physician, and one who shared in the profits, together with the other named Defendants and John Doe Defendants 1-20, are

hereinafter referred to as the "Segarra Enterprise."  Exhibit B, **FOSTER** proposal for **DR.**

**SEGARRA** to review medical charts of individuals at **RTS** for $200 per day up to $1,000 in

gross sales and an additional 25% of gross sales over $1,000 per day.  The Segarra Enterprise is

illustrated as follows:



43.    The Segarra Enterprise used **RTS** and/or other John Doe Defendant screening

companies, along with some of its personnel, including a small group of non-treating physicians

that included defendants **DR. SEGARRA, DR. BALLARD, DR. LUCAS** and others, to provide

some legitimate but mostly False Medical Reports and Diagnoses to asbestos personal injury law

firms and individual attorneys to whom Defendants were financially beholden, such as Reaud,

Morgan & Quinn; Morris, Sakalarios & Blackwell; Porter & Malouf, the John Doe Defendant

law firms and attorneys, and others.

44.    Some of the law firms associated with the Segarra Enterprise by filing of asbestos personal injury claims supported by False Medical Reports and Diagnoses that resulted in payments by Plaintiff are shown in the following chart:



## Law Firms Associated With Segarra Enterprise With Over $200,000 Paid In Settlements by NSI

**Defendant DR. SEGARRA**

45.    **JAY T. SEGARRA, M.D.,** is a pulmonologist and certified B reader from Ocean Springs, Mississippi.  **DR. SEGARRA** directed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise, including acting as medical director of **RTS** and other screening companies, supervising screening company personnel and operations, providing false B reads, conducting physical examinations, and providing false diagnoses of asbestos-related disease, and by concealing the Defendants' fraudulent scheme from NSI and others.  **DR. SEGARRA** retired from the Air Force in 1993 and entered the Reserves, and has not had a full-

time clinical practice since. **DR. SEGARRA** is the epitome of a screening physician in the asbestos (and silica) litigation, who not only shared in the profits but even described himself as an "opportunist." **DR. SEGARRA** has read approximately 150,000 x-rays and rendered tens of thousands of diagnoses supporting asbestos-related (and silicosis) claims. **DR. SEGARRA** was the diagnosing physician for nearly 40,000 asbestos injury claims filed with Johns Manville (Asbestos) Personal Injury Trust ("JM Trust"). In each of the tens of thousands of diagnoses he rendered, **DR. SEGARRA** acted only as a litigation doctor and not as a treating physician providing healthcare.

46.    While **DR. SEGARRA** claims that he kept a copy of his diagnosing reports in his files, which he refuses to produce, he mailed the original reports to the attorneys/firms hiring him and/or the screening companies. He did not mail copies of his reports to the claimants he diagnoses with asbestos-related disease.

47.    **DR. SEGARRA** did not follow up with individuals on whom he conducts screenings, nor did he have any contact with the individuals' treating physicians and treating physicians do not refer their patients to **DR. SEGARRA** for screenings.

48.    **DR. SEGARRA** began his career as an "expert" and litigation screening doctor in the early 1990s, working initially for the now-discredited screening company, PFL, where he met and worked with William Spence, a PFT technician and David Miller, a subcontractor administering chest x-rays. Mr. Spence and Mr. Miller subsequently started InnerVisions, which **DR. SEGARRA** worked with at least during some screenings in Ohio.

49.    **DR. SEGARRA** has made at least $10 million issuing B reads and diagnoses, not for any valid medical reason, but solely for profit for asbestos (and silica) litigation. Furthermore, **DR. SEGARRA** conducted screenings including B reads, PFT interpretations,

physical examinations and rendered diagnoses, in over 20 different states without a medical license.  At least one state court has excluded him as a witness when "he performed examinations, rendered diagnoses, and recommended treatment without being licensed in Washington, a criminal offense.  He also relied for his diagnoses on radiology reports from unregistered and uncertified technicians or radiologists using unregistered and uncertified equipment."  Exhibit C, King County Superior Court Order, October 15, 2002.

50.    **DR. SEGARRA** admitted that with the possible exception of Florida, where he also owns a home and Mississippi where he lives, the reason for obtaining medical licenses in multiple states was for the purpose of conducting screenings for law firms and attorneys.

51.    **DR. SEGARRA** provided services for and/or is associated with several asbestos (and silica) litigation screening companies and performed services for over 100 law firms or attorneys.  **DR. SEGARRA** was recruited in the asbestos (and silica) litigation screening business by a plaintiffs' personal injury attorney and began working for PFL, conducting on-site screenings, including, directly supervising and interpreting PFTs, and rendering diagnoses, frequently based on B reads by **DR. BALLARD**, **DR. LUCAS** and/or other B readers and physical examinations by Dr. Michael Conner and/or other examining doctors.  In 1992, **DR. SEGARRA** obtained his NIOSH B reader certification and also conducted B reads for PFL. **DR. SEGARRA** performed an estimated 10,000 B reads for PFL.  Despite his prior testimony that he always takes a claimant's work and exposure history himself, **DR. SEGARRA** in fact relied upon exposure histories generated by PFL personnel or attorneys who **DR. SEGARRA** assumed had pre-screened individuals for asbestos exposure.

52.    Personal injury law firms and attorneys associated with **DR. SEGARRA** in his work with PFL included Bill Lewis with Environmental Litigation Group, the Reaud Morgan

Law Firm, Gerald Dickerson, the Pritchard Law Firm, and others. Eventually, **DR. SEGARRA** started billing attorneys directly to conceal his association with PFL.

53.     In about 1997, Owens Corning sued PFL and others for racketeering alleging, *inter alia,* that defendants systematically and continuously generated false medical test results used to substantiate the filing and settlement of approximately 10,000 nonmalignant, asbestos-related cases against Owens Corning involving allegations of pulmonary impairment. In 1998, the JM Trust banned PFL reports.

54.     In approximately 1994, **DR. SEGARRA** started working with **RTS** and **FOSTER** as RTS' medical director, responsible for all aspects of "medical" screening services, including x-rays, B reads, physical examinations, PFTs, and diagnoses. **DR. SEGARRA** read at least 22,000 x-rays for **RTS**. **DR. SEGARRA** examined, on average, about fifty individuals per day when screening with **RTS**. Exhibit D, 1999 contract with revisions for guarantee of 50 people per day. Despite his prior testimony that he always takes a claimant's work and exposure history himself, **DR. SEGARRA** in fact relied upon exposure histories generated by medically untrained **RTS** personnel or attorneys.

55.     The law firms and attorneys associated with **DR. SEGARRA's** work for **RTS** include: Anthony Bruscata; Barton & Williams; Bill Lewis; Brent Coon & Associates; Charles Blackwell; Campbell, Cherry, Harrison, Davis & Dove; Charles Gibson; David Nutt; Guy Fisher; John Deakle; Jon Swartzfager; Jackson Taylor Martino & Hedge; Alwyn Luckey; Maples & Lomax; Michael Papantonio; Motley Rice; Ratiner, Reyes & O'Shea; Richard Fountain; Richard Schwartz; Robles & Gonzalez; Tom Rhoden; Stephen Shackelford; Tom Scott; Stacie Foster Taylo, William Roberts Wilson, and others.

56.    Several asbestos bankruptcy trusts have banned **RTS** reports and courts in Washington and Florida have excluded **RTS** reports.  Judge Jack, in the federal silica MDL, found that the screening methods engaged in by **RTS** resulted in unreliable diagnoses manufactured for money rather than for any health care concern.

57.    From 1994 to 1995, **DR. SEGARRA** also worked with PFT Services, owned by Gerald Fitzgerald, with its principal place of business in Birmingham, Alabama.  PFT Services primarily worked for the law firm of Baron & Budd, among others.

58.    Between 1995 and 2002, **DR. SEGARRA** also worked with WDDS, which frequently worked for the LeBlanc Waddell, Cooper Mitch, Shelby Cartee, the Wallace & Graham law firm, and others.

59.    **DR. SEGARRA** was excluded as an unreliable expert witness in the State of Tennessee because **DR. SEGARRA**, while working with WDDS, based his diagnosis of asbestosis in the case "solely on his view of the x-ray film."

60.    In 2003, **DR. SEGARRA** worked with N&M, Inc. at screenings in Texas for attorney Jim Zadeh.  Judge Jack in the federal silica MDL1553 Ruling excoriated the operations of N&M, Inc., as well as **RTS**, finding the methods both companies used in generating medical evidence resulted in unreliable diagnoses they were not in accordance with accepted medical practice.

61.    From about 1999 to at least 2007, **DR. SEGARRA** worked with Holland Bieber. **DR. SEGARRA's** work with Holland Bieber is associated with the following law firms and attorneys:  Baron & Budd; Brent Coon & Associates; Environmental Litigation Group; Franklin, Cardwell & Jones; Heard, Robins, Cloud & Lubel; Hissey, Kientz; Lanier, Parker & Sullivan; McCurdy & McCurdy; Edward O. Moody; McPherson, Monk, Hughes, Bradley & Wimberley;

Breugger & McCullough; Heygood, Orr & Reyes; Michael Serling; Silber, Pearlman; Zamler, Mellen & Shiffman and others.

62.    **DR. SEGARRA** is a medical director for Holland Bieber and directly supervises technicians performing PFTs and is responsible for all medical aspects of the screening process.

63.    **DR. SEGARRA** performed as many as 30 evaluations in a single day with Holland Bieber and averaged 15-18 per day.  **DR. SEGARRA** generally screened with Holland Bieber once per month for two to three days per screening.

64.    In 2005, **DR. SEGARRA** testified that he has been doing "re-evaluations" (previously screened individuals with a positive x-ray) for the last five years, for the work he did primarily with Holland Bieber and PFT Services.

65.    **DR. SEGARRA** performed B reads in Ohio with InnerVisions, using x-rays that were administered by David Miller, a former subcontractor for PFL, and PFTs administered by William Spence, a former PFT technician employed by PFL.

66.    **DR. SEGARRA** knew or recklessly disregarded that the methods that Defendants employed, including his own, did not meet accepted medical practices and were unreliable, resulting in False Medical Reports and Diagnoses.

67.    **DR. SEGARRA** knew or could reasonably foresee that Defendants' False Medical Reports and Diagnoses would be used to support claims against NSI and others.

**Defendant RTS**

68.    **RTS** directed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise, including providing claimant recruiting and screening services, and generating False Medical Reports and Diagnoses. **RTS** is a successor of another litigation screening company, Pulmonary Testing Services ("PTS").  PTS was owned by Jewel "Jerry"

Pitts. In or about June 1996, Owens Corning sued Jerry Pitts, PTS, and others, alleging fraud and violations of RICO for engaging in a scheme to generate false medical test results. The lawsuit was eventually settled. **FOSTER**, the owner of **RTS,** is a former employee of PTS. **FOSTER** performed public relations, marketing, and screening recruitment, before leaving PTS and starting **RTS** in late 1994. **FOSTER** had no formal medical training qualifying him to operate a screening business. Before working for PTS, **FOSTER** was a pipe fitter who was active in trade unions. **FOSTER** used his close ties with union officials to troll for potential claimants and bolster **RTS'** business.

69.     To continue the enterprise, **FOSTER** started **RTS** and brought **DR. SEGARRA** on board as medical director. **RTS** was a full-service asbestos (and silica) litigation screening operation based out of Mobile, Alabama, but it screened in at least 35 states without obtaining proper licensing and using unlicensed x-ray and PFT technicians, including Mississippi, Arizona, Florida, Kentucky, Iowa, Louisiana, Tennessee, Texas, Georgia, Oklahoma, Virginia, Minnesota, Missouri, Montana, Illinois, Indiana, Washington, Ohio, Oregon, Wisconsin and New Mexico. **RTS** provided x-rays, B reads, physical exams, pulmonary function tests and diagnostic reports for over 75 different law firms and attorneys. **RTS** screened over 40,000 individuals for asbestos (and silica) personal injury litigation and grossed over $23 million.

70.     The **RTS** "business plan" was developed by **FOSTER** with **DR. SEGARRA** and **FITZGERALD**. The "plan" was to recruit and screen at least 50 individuals per screening and generate positive diagnoses for a minimum of 20 individuals to obtain a 40% - 60% positive rate. Unlike PFL and PTS that reported most of the individuals screened as positive, **RTS, FOSTER, FITZGERALD** and **DR. SEGARRA** limited the positive rate to about 40% to 60% to avoid detection of their fraudulent scheme. **FOSTER, DR. SEGARRA** and **FITZGERALD** also

adjusted the business plan as necessary.  Exhibit E, December 14, 1998 **FITZGERALD** letter to **FOSTER/RTS** regarding plan to develop a two-step plan of B read only screenings and then subsequent examinations and PFTs, much like what **DR. SEGARRA** eventually did with Holland Bieber.

71.    In 2006, **DR. SEGARRA** produced to the United States Congress his analysis of his own records for a period of about two and one-half years demonstrating that he had approximately a 40% positive rate while working for multiple attorneys and screening companies.  **DR. SEGARRA** later produced these records during a civil litigation deposition in June 2006, but only after removing pages identifying law firms and attorneys for whom he worked and the amount of money he received.

72.    Holland Bieber produced electronic PFTs and other records in late 2007 that also demonstrated that **DR. SEGARRA** had approximately a 40% positive rate.

73.    Upon information and belief, **DR. SEGARRA's** and John Doe Defendants' records will demonstrate that **DR. SEGARRA** consistently achieved his targeted 40% to 60% positive rate regardless of the populations screened, the attorneys involved, the disease for which he screened, the location or work sites involved or the screening company involved.

74.    **RTS** worked exclusively with personal injury attorneys screening for asbestosis and silicosis claims, including Fitzgerald & Associates (controlled by Defendant **FITZGERALD**, who brokered claims to numerous law firms); Campbell, Cherry, Harrison, Davis & Dove; Barton & Williams; Ratiner, Reyes & O'Shea; Jackson, Taylor, Martino & Hedge; Tom Rhoden; the Nix Law Firm; Alwyn Luckey; Ness Motley (Motley Rice); Provost Umphrey; and Williams Bailey, among others.

75.    **RTS** used medically untrained personnel to administer PFTs, obtain asbestos exposure histories, smoking and medical histories and only reported the results of its "testing" to its law firm and attorney customers rather than the individuals screened or their treating physicians.

76.    **RTS** paid physicians more money for positive results, encouraging **DR. SEGARRA**, **DR. BALLARD** and others to generate false positive diagnoses.   Additional physicians associated with **RTS** include Drs. Robert Altmeyer, Dominic Gaziano, James Krainson, Robert Mezey, Gregory Nayden, Walter Oaks, Alvin Schonfeld, Jose Roman and others.

77.    After Judge Jack found **RTS'** methods unreliable in the MDL1553 Ruling (Exhibit A), numerous asbestos bankruptcy trusts banned **RTS** reports:  the JM Trust (in or about September 2005); the Celotex and Eagle-Picher trusts (in or about October 2005); the Keene trust (in or about April 2006); the Babcock and Wilcox trusts (in or about July 2006), the Plibrico trust (in or about October 2006); and the Owens Corning, U.S. Gypsum, Armstrong and DII Industries trusts (in or about May 2008).

**Defendant FOSTER**

78.    Defendant **FOSTER** was the owner of **RTS**.  **FOSTER** used his position as owner of **RTS** to direct and participate in the illegal activities of the Segarra Enterprise.  As owner of **RTS, FOSTER** was responsible for virtually every aspect of **RTS'** screening activities, including marketing, recruiting, personnel hiring and training, accounting, and screening logistics and procedures.  **FOSTER** intentionally concealed Defendants' fraudulent scheme from NSI and others.

79.    **FOSTER** learned the screening business at PTS, where he was previously employed.    While at PTS, **FOSTER** marketed PTS' services to law firms and attorneys promising at least a 75% positive rate.  A former pipe fitter, **FOSTER** used his connections with trade union officials and his marketing experience from PTS in soliciting business for **RTS.**

80.    **FOSTER** denies that **RTS** provided healthcare and denies that the individuals **RTS** screened are patients or had any physician-patient relationship with **RTS** or the physicians that worked for **RTS**.  In MDL875, the Court issued a "HIPAA Order" stating that **RTS** was hired by attorneys to generate diagnoses for litigation rather than medical purposes.

81.    Despite having no medical training or qualifications, **FOSTER** supervised, directed and oversaw the administration of x-rays and PFTs at **RTS**, including hiring and training technicians.

82.    **FOSTER**, together with **TAYLOR** and **FITZGERALD**, marketed screenings and recruited screening subjects for the Segarra Enterprise, which involved, among other things, the solicitation of personal injury law firms and attorneys who paid millions of dollars to Defendants for False Medical Reports and Diagnoses.

83.    Following Judge Jack's MDL1553 Ruling, **FOSTER** regularly asserts his Fifth Amendment rights not to incriminate himself when questioned about his litigation screening activities.

84.    **FOSTER** knew, or recklessly disregarded, that the methods that Defendants employed did not meet accepted medical practices and were unreliable, resulting in False Medical Reports and Diagnoses.

85.    **FOSTER** knew or could reasonably foresee that the False Medical Reports and Diagnoses that Defendants generated would be used to support claims against NSI and others.

**Defendant FITZGERALD**

86.    **FITZGERALD** was at all times relevant to this Complaint a personal injury attorney who directed, managed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise, including directing the solicitation of local union members to undergo screenings with **RTS**, and possibly other screening companies, and to file personal injury claims supported by False Medical Reports and Diagnoses; paying for screenings while making it appear as though screenings were sponsored by trade unions and by concealing Defendants' fraudulent scheme from NSI and others. **FITZGERALD** also recruited physicians, such as Dr. Alvin Schonfeld, to perform work with **RTS**.

87.    **FITZGERALD** together with **FOSTER** and/or other Defendants attended union meetings and provided gifts and meals to union contacts to persuade them to have the union members attend screenings with **RTS** so Defendants could generate claimants using Defendants' False Medical Reports and Diagnoses for support of asbestos personal injury cases.

88.    **FOSTER** and/or **TAYLOR** approached and solicited union contacts on behalf of **RTS** and **FITZGERALD** to avoid ethical complications for **FITZGERALD**, an attorney prohibited from direct solicitation of clients. **FOSTER** had union contacts complete a "request" form prepared by **FITZGERALD** for the screening and portraying it as a union-sponsored event, when, in fact, it was designed by **FOSTER** and **FITZGERALD** and/or **TAYLOR**, **RTS** and/or other Defendants for their own benefit and the benefit of member of the Segarra Enterprise.

89.    In about 2001, **RTS** sued **FITZGERALD** to recover unpaid fees for screening services. **FITZGERALD** contended that he had a conditional payment arrangement with **RTS**, pursuant to which he was obligated to pay **RTS** only if he received settlement funds from the

now bankrupt asbestos defendant Babcock & Wilcox, based, however, on false asbestos personal injury claims supported by the False Medical Reports and Diagnoses generated by Defendants.

90.     **FITZGERALD** knew, or recklessly disregarded, that the methods that Defendants employed did not meet accepted medical practices and were unreliable, resulting in False Medical Reports and Diagnoses.

91.     **FITZGERALD** filed, caused to be filed, knew or could reasonably foresee, false asbestos personal injury claims supported by the False Medical Reports and Diagnoses generated by Defendants, against NSI and others.

**Defendant TAYLOR**

92.     **TAYLOR** directed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise through his marketing and solicitation of customers, personal injury law firms and attorneys, and individual screening subjects. **TAYLOR** oversaw and directed the screening process for the Segarra Enterprise, facilitated the submission of False Medical Reports and Diagnoses for the purpose of generating litigation claims, and concealed Defendants' fraudulent scheme from NSI and others.

93.     **TAYLOR** agreed with Defendants **DR. SEGARRA**, **FOSTER** and/or others to help market **RTS'** screening business to law firms and attorneys, recruit screening subjects, and participate in and direct the illegal activities of the Segarra Enterprise including, but not limited to, marketing specific positive rates which **TAYLOR** knew, or recklessly disregarded, were achieved through Defendants' assembly-line process of generating False Medical Reports and Diagnoses.

94.     **TAYLOR** managed travel arrangements, marketing and communicating with law firms, and recruitment of screening subjects for **RTS**.

95.     **TAYLOR** is **FOSTER's** son-in-law.  **TAYLOR** also worked for N&M, Inc., another screening company owned and operated by former PTS employee, Heath Mason, the step-grandson of PTS owner, Jerry Pitts.  **TAYLOR** is married to **FOSTER's** daughter, Stacie Foster Taylor, a personal injury attorney formerly employed by asbestos/silica litigation firms, including Campbell Cherry Harrison Davis & Dove and Motley Rice, among others. **TAYLOR's** wife paid and promoted **RTS** and N&M, Inc. and/or other screening companies, to screen claimants whom she herself represented in asbestos and silica litigation or whose claims she "brokered" to other law firms.

96.     **TAYLOR** knew, or recklessly disregarded, that the methods that Defendants employed did not meet accepted medical practices and were unreliable, resulting in False Medical Reports and Diagnoses.

97.     **TAYLOR** knew or could reasonably foresee that the False Medical Reports and Diagnoses that Defendants generated would be used for claims against NSI and others.

**Defendant DR. BALLARD**

98.     **DR. BALLARD** is a radiologist and certified B-reader from Birmingham, Alabama.  **DR. BALLARD** directed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise, including supervising screening company personnel and operations, providing false B reads, providing false diagnoses of asbestos related disease, and concealing Defendants' fraudulent scheme from NSI and others.  **DR. BALLARD** has not had an active hospital practice since 1998.  **DR. BALLARD** performed litigation screening, diagnostic and B read services for **RTS**, as well as other screening companies and directly for over 75 different law firms and attorneys from at least February 1999 through May 2005, including Environmental Litigation Group, Morris Sakalarios & Blackwell, Norris Phelps, Ronald Parrish,

Frazer, Davidson, Nix, Patterson & Roach, and others.  **DR. BALLARD** performed several thousand B-reads per year.

99.    Although **DR. BALLARD** was not licensed to practice medicine in Arkansas, Louisiana or Mississippi, he traveled to those states with **RTS** to interpret x-rays and to generate B read reports and diagnoses.

100.    When diagnosing individuals for litigation purposes, **DR. BALLARD** simply accepted the information provided to him by the law firms and attorneys or screening companies with respect to exposure and medical histories, which were taken by individuals medically unqualified to do so.  **DR. BALLARD** did not conduct physical examinations.  Exhibit F, July 29, 2004 Letter from Frazer Davidson requesting diagnostic reports based on **DR. BALLARD's** previous B reads enclosing "an Exhibit A that this office has prepared based on information provided by the client."  Frazer Davidson further provided proposed language to include in his reports.

101.    Before **DR. BALLARD** interpreted an x-ray, he knew what disease the law firms wanted him to "find."  As Judge Jack found in the MDL1553 Ruling:

> Dr. Ballard testified that "either ... the testing service or the law firm" provided him with the work history for the clients. This "work history" amounted to a simple statement from the lawyers or RTS that there "is *610 exposure history that's consistent with asbestosis." This meant to Dr. Ballard that the lawyers and/or RTS "want[ed] [Dr. Ballard] to look for asbestosis." Dr. Ballard acknowledged that this "could sway" his reading.

Exhibit A at 35-36, 398 F.Supp.2d at 609-610 (cites omitted).  Law firms and attorneys requested, often by letter, that **DR. BALLARD** read certain x-rays for asbestos-related disease only or silica only disease and even "mixed-dust" disease and informed **DR. BALLARD** of the asbestos exposure histories when requesting these specific interpretations.  Exhibit G, September 29, 2000 Letter from J. Ronald Parrish, Esq. requesting **DR. BALLARD** read 103 x-rays for

32

asbestos disease and advising him that the "clients have experienced exposure at multiple work sites." Exhibit H, May 1, 2001 Letter from the Farragut Law Firm requesting **DR. BALLARD** read x-rays for clients who "were previously diagnosed with asbestosis, but [the attorneys] are having trouble with the way the doctor worded the medical reports" and advising that "a complete work history sheet" is included for **DR. BALLARD** to "make note of the clients' asbestos exposure history in the medical reports." Exhibit I, July 8, 2002 Letter from the Law Office of Jim Zadeh requesting **DR. BALLARD** read three groups of x-rays:

> Substantial silica exposure = 47 x-rays
> Substantial silica & asbestos exposure = 19 x-rays; and
> Substantial asbestos exposure = 12 x-rays

**DR. BALLARD** followed the directives of his customers and the screening companies' customers (the law firms and attorneys), without regard for the actual condition of claimants' lungs reflected on the x-rays, reporting only the diagnoses requested and even tailoring his reports as directed by the customers. Exhibit J, October 10, 2002 Letter from **DR. BALLARD** to Wallace & Graham, Attorneys At Law, stating "Per your request, these are being read for asbestosis only. If you office need b-readings for silicosis, then I will be happy to accommodate you."

102.    **DR. BALLARD's** practice of disregarding the actual condition of lungs depicted on x-ray films for the purpose of generating the predetermined outcome as requested often resulted in complete asbestosis/silicosis reversals in the same individuals as Judge Jack found in the MDL1553 Ruling.

103.    Following Judge Jack's MDL1553 Ruling, **DR. BALLARD** has refused to answer questions about his screening and litigation activities invoking his Fifth Amendment rights not to incriminate himself acknowledging that he was the subject of a grand jury

investigation by the United States Attorney's Office for the Southern District of New York. Exhibit K, Opposition to Motion to Compel Regarding James W. Ballard, M.D., MDL1553, November 29, 2005.

104.     Numerous asbestos bankruptcy trusts banned **DR. BALLARD** reports:  the JM Trust (in or about September 2005); the Celotex and Eagle-Picher trusts (in or about October 2005); the Keene trust (in or about April 2006); the Babcock and Wilcox trusts (in or about July 2006), the Plibrico trust (in or about October 2006); and the Owens Corning, U.S. Gypsum, Armstrong and DII Industries trusts (in or about May 2008).

105.     **DR. BALLARD** knew, or recklessly disregarded, that the methods that Defendants employed did not meet accepted medical practices and were unreliable, resulting in False Medical Reports and Diagnoses.

106.     **DR. BALLARD** knew or could reasonably foresee that the False Medical Reports and Diagnoses that Defendants generated would be used for claims against NSI and others.

**Defendant DR. LUCAS**

107.     **DR. LUCAS** is a radiologist and former B reader from Madison, Mississippi. **DR. LUCAS** directed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise, including supervising screening company personnel and operations, providing false B reads, performing physical examinations, and providing false diagnoses of asbestos related disease. **DR. LUCAS** was a choice B reader for many law firms and attorneys, including Morris, Sakalarios & Blackwell; Wallace & Graham; Foster & Sear; Taylor & Sire; Lanier, Parker & Sullivan; and others, and has performed tens of thousands of B reads and thousands of physical examinations for law firms and attorneys in asbestos litigation.

108.    **DR. LUCAS** also rendered diagnoses at the request of screening companies and/or law firms and attorneys.

109.    Although **DR. LUCAS** insisted he only performed litigation services for attorneys, he admitted that he accepted payment from screening companies and performed worked with N&M, Inc., PFL, PTS and InnerVisions.

110.    **RTS** produced NIOSH B read reports authored by **DR. LUCAS** for approximately 300 plaintiffs.  The diagnostic reports associated with these individuals were authored by other physicians, including **DR. SEGARRA** and Drs. Dominic Gaziano, Robert Altmeyer, Robert Mezey and James Krainson, relying upon **DR. LUCAS'** B reads.

111.    Between approximately September 1996 and December 1998, **DR. LUCAS** read over 13,000 x-rays for law firms and attorneys.

112.    **DR. LUCAS** testified that he only recorded what he thought was important when performing B reads for law firms and attorneys and did not record certain information (calcifications in thoracic aorta; degenerative changes in skeletal tissue) as it was unimportant to what he was being asked to report, claiming that while such information may be important to a physician treating the patient, it means nothing to the attorneys asking him to report specific findings.

113.    In reading x-rays for litigation, **DR. LUCAS** does not rule out any of the more than 150 other diseases which may cause interstitial fibrosis or similar markings on a chest x-ray. However, in his medical practice, he reads films for any and all diseases.  In rendering a "presumptive diagnosis" of asbestosis for litigation, **DR. LUCAS** does not rule out other causes for the conditions he observes.

114.    In his regular medical practice, **DR. LUCAS** does not prescribe x-rays.  However, **DR. LUCAS** prescribed x-rays in his litigation work for attorneys wanting orders to have their clients x-rayed.  The law firms and attorneys decided who would receive an x-ray.  **DR. LUCAS** then issued a "blanket" x-ray order without limitation as to time, location or the number of individuals who could be screened.  He performed no prior review of records or examination of the individuals before he issued the x-ray order.  The State of Texas cited **DR. LUCAS** for issuing a blanket x-ray order to the Tomblin, Carnes & McCormack law firm.

115.    **DR. LUCAS** charged and made more money for positive B reads ($70 each) than for negative B reads (only $35 each).

116.    **DR. LUCAS** knew, or recklessly disregarded, that the techniques that Defendants employed did not meet accepted medical practices and were unreliable, resulting in False Medical Reports and Diagnoses.

117.    **DR. LUCAS** knew or could reasonably foresee that the False Medical Reports and Diagnoses that Defendants generated would be used for claims against NSI and others.

**B.      Methods and Means**

118.    Defendants have unlawfully, knowingly, intentionally or recklessly participated, directly or indirectly, in and/or directed the conduct of the affairs of the Segarra Enterprise through a pattern of racketeering activity through the methods and means set forth below.

119.    At all times relevant to this Complaint Defendants, in operating the Segarra Enterprise, engaged in systematic, deliberate and/or reckless departures from accepted medical standards in the evaluation and diagnosis of asbestos related diseases.  They did so to manipulate exposure and medical histories, chest x-ray interpretations and PFTs for the purpose of manufacturing false diagnoses of asbestos (and silica) related disease, and thus produce False

Medical Reports and Diagnoses for the Defendants' law firm and attorney customers, including

John Doe Defendant law firms, for asbestos (as silica) litigation and settlement of personal injury

claims, with the intent that NSI and others, including bankruptcy trusts, would rely on the False

Medical Reports and Diagnoses and pay millions of dollars in settlements.  As Judge Jack found

in MDL1553:

> [T]hese diagnoses were about litigation rather than health care.  And yet this
> statement, while true, overestimates the motives of the people who engineered
> them.  The word "litigation" implies (or should imply) the search for truth and the
> quest for justice.  But it is apparent that truth and justice had very little to do with
> these diagnoses – otherwise more effort would have been devoted to ensuring
> they were accurate.  Instead, these diagnoses were driven by neither health nor
> justice: they were manufactured for money.  The record does not reveal who
> originally devised this scheme, but it is clear that the lawyers, doctors and
> screening companies were all willing participants.

Exhibit A at 53-54, 398 F.Supp.2d at 635.

### Marketing and Solicitation

120.    Defendants used aggressive marketing and solicitation techniques for the Segarra

Enterprise, spending millions of dollars to generate customers (personal injury law firms and

attorneys) and recruit subjects to screen to generate claimants for their customers.  Defendants

sent solicitation materials, including marketing brochures, using the United States mails to

various targeted law firms and attorneys, which contained false claims related to the quality of

testing, certifications of screening personnel, and compliance with testing and regulatory

standards.

121.    For example, **RTS** mailed out brochures through the U.S. mails, that falsely stated

**RTS** provided "complete medical evaluations by Board Certified, NIOSH (National Board *(sic)*

of Occupational Safety and Health) approved Physicians, Radiologic Technologists, Respiratory

Therapists and/or Technicians" and that "a board certified Respiratory Therapist/Technician will

perform a Pulmonary Function Test . . . that are performed by the American Thoracic Society standards." See Exhibit L, **RTS** brochure.

122.    Defendants also directly solicited individuals.  One of the more successful solicitation ploys involved working certain local trade union members.  Specifically, **FOSTER** and/or **TAYLOR** and/or other **RTS** representatives attended union meetings providing gifts and meals to local union contacts to solicit screenings of the local's members.  **RTS** and **FITZGERALD** split these solicitation costs.  Exhibit M, **RTS** contract for testing, April 24, 2000.

123.    **FOSTER** and/or **TAYLOR (RTS)** approached and solicited local union contacts on **FITZGERALD's** behalf.  However, to avoid ethical complications for **FITZGERALD**, **FOSTER** and/or **TAYLOR** had local union leaders complete a "request" form prepared by **FITZGERALD**.  This request form portrayed the screening as sponsor by the local union, when, in fact, it was designed by **FOSTER, TAYLOR, FITZGERALD** and/or other Defendants for their own benefit.  Exhibit N, March 4, 1999 letter to **RTS** with proposed and executed local union screening requests.  Exhibit O, local union notice letter to members with law firm sponsoring language.

124.    **FITZGERALD's** letter (Exhibit N) describes the union solicitation scheme:

As you know, it is permissible for a law firm to set up a health screening for members of a union, if the union itself asks for that assistance. I am enclosing a form letter asking for that assistance. Please have each union put the letter on its own letterhead and send it to me before any screening. Without such a letter in the file, one or more of the potential defendants might create unwanted problems.

I am also enclosing a notice letter that the unions should provide to their members.  It differs slightly from the letter that has been previously used.  We have deleted any language that would lead to the impression that the law firm is sponsoring the screening.  The law firm is assisting the union in setting up the screening.  The union itself is the sponsor.

125.    Additionally, Defendants used mass media, television commercials and radio advertisements to recruit individuals for screenings sponsored by law firms and attorneys and to generate claimants for Defendants' law firm and attorney customers.  Exhibit P, **RTS** television commercial clip.

126.    Defendants' practice of soliciting thousands of personal injury lawsuit clients for their law firm and attorney customers violated Mississippi's statutory prohibition against champerty, which provides as follows:

> Champerty and maintenance; solicitation and stirring up of litigation prohibited.

> It shall be unlawful for any person, firm, partnership, corporation, group, organization, or association, either incorporated or unincorporated, either before or after proceedings commenced: (a) to promise, give, or offer, or to conspire or agree to promise, give, or offer, (b) to receive or accept, or to agree or conspire to receive or accept, (c) to solicit, request, or donate, any money, bank note, bank check, chose in action, personal services, or any other personal or real property, or any other thing of value, or any other assistance as an inducement to any person to commence or to prosecute further, or for the purpose of assisting such person to commence or prosecute further, any proceeding in any court or before any administrative board or other agency, regardless of jurisdiction; provided, however, this section shall not be construed to prohibit the constitutional right of regular employment of any attorney at law or solicitor in chancery, for either a fixed fee or upon a contingent basis, to represent such person, firm, partnership, corporation, group, organization, or association before any court or administrative agency.

Miss. Code Ann. § 97-9-11.

**The Screening Process**

127.    The screening process generally starts when a law firm or attorney who sponsors a screening hires a screening company such as **RTS** and the law firm or the screening company places an advertisement in a local newspaper, on the radio and/or on television, setting forth certain demographic information as the threshold requirement for the screening.

128.    Members of the public are directed to call the telephone number listed in the advertisement.  The screening company staff, including Defendants, answered the phone and, as usually directed by its law firm customers, asked if callers were exposed to asbestos at targeted job sites and job titles approved by the law firms and attorneys for a specified range of employment dates.  Those who indicated any, even nominal, exposure would be encouraged to attend a mass screening and arrange for an appointment to have chest x-rays taken.

129.    These potential claimants then travel to a motel, union hall, parking lot, or some other equally unsuitable site for screening in an assembly-line process.   When a potential plaintiff attended an **RTS** screening, he/she first spoke with **FOSTER**, **TAYLOR** or other **RTS** testing manager, who determined whether the individual met the sponsoring law firm's criteria for that screening.

130.    The potential claimant then speaks with a "sign-in girl," lacking any medical training or qualifications, who obtained the work exposure history to be used in generating a diagnosis.  The claimant then entered **RTS'** mobile trailer and was administered a chest x-ray. Exhibit Q, photo of **RTS** screening trailer.  Claimants were also administered PFTs in the mobile units, which were administered by employees or temporary contract workers with little, if any, formal medical training.    Following testing, a doctor administered a cursory physical examination and rendered a diagnosis.

131.    Defendants would tailor this process to the wishes of their customers, the personal injury law firms or attorneys.  Defendants would arrange and conduct the screenings, including the components of screening services used, the exposure requirements and the disease to be diagnosed to falsely substantiate whichever disease the customer requested.

132.    Most customers arranged for full screenings, performed in a single day, including exposure, smoking and medical histories, physical examinations, chest x-rays, B reads, PFTs and diagnostic reports.

133.    **RTS** charged **FITZGERALD** and/or other customers approximately $775 per individual screened for a complete screening, including an x-ray, B read, PFT, physical exam and diagnosis if the result was positive but only $175 per individual screened if the result was negative. Exhibit R, July 23, 2002 letter regarding **RTS** agreement with **FITZGERALD**.

134.    **RTS** also paid the physicians it hired, including **DR. SEGARRA**, **DR. BALLARD, DR. LUCAS** and/or other Defendants and John Doe Defendant doctors more for positive diagnoses than negatives. Exhibit S, invoice for Ohio March 14-16, 2000 screenings.

**Exposure and Medical Histories**

135.    Individuals who took exposure/occupational or medical (including smoking) histories, whether hired by a law firm or hired by a screening company like **RTS** and/or others, had no medical training and were not instructed by any medical professionals as to how to take an appropriate history.

136.    Defendants acquiesced to screening criteria established by their customers, the personal injury law firms and attorneys that usually involved targeted questions seeking cursory information about targeted job sites and exposure dates, rather than relying on any medical professionals and medically accepted standards.   Judge Jack found the histories generated through mass litigation screenings did not even merit such a label:

> [i]n these cases, the "histories" are so deficient as to not even merit the label. Some doctors pretend that this was not true, pointing to the cursory "A-sheet" and treating it as an appropriate history – in essence, refusing to acknowledge that the emperor has no clothes.

Exhibit A at 46, 398 F.Supp.2d at 624.

137.    Unlike legitimate medical screenings, where the recording of an exposure history is considered crucial and taken by trained medical staff to prevent errors in the interpretation of x-rays and subsequent diagnoses, the asbestos screening companies, including **RTS** and/or others, typically hire persons who lack any qualifications or training to gather this vital information.  In fact, **FOSTER** is of the opinion that a six-year old child is capable of asking exposure questions.

### Administering X-Rays

138.    X-rays administered to prospective claimants were rarely ordered or prescribed by a physician as required in every state.  Moreover, **RTS** had no regulatory authorization for a "healing arts" screening.  Defendants used unlicensed technicians to administer x-rays on individuals who had not been seen by a physician prior to the administration of an x-ray:

> Moreover, no medical professional actually ordered the x-rays; Mr. Foster testified that he viewed the client as "requesting" the x-ray for him-- or herself. This is despite the fact that, according to Dr. Ballard (an RTS B-reader), in normal medical practice, a doctor orders an x-ray before it is performed on a patient.

Exhibit A at 28, 398 F.Supp.2d at 598-99 (cites omitted).

139.    Occasionally, physicians, including Defendants, **DR. SEGARRA, DR. BALLARD, DR. LUCAS** and/or others, would issue "blanket" x-ray orders, for use by plaintiffs' law firms and attorneys without regard or limitation as to scope, time, location, or number of individuals.  Upon information and belief, this practice is prohibited in every state.

140.    Moreover, there was rarely, if ever, any medical supervision of the x-ray process during asbestos (or silica) litigation screenings despite requirements that the physician on site be responsible for all "medical" procedures. Defendants, including **DR. SEGARRA, DR. BALLARD, DR. LUCAS** and/or others, knew that the x-rays administered by **RTS** and/or other

John Doe screening companies were not for medical purposes but solely to generate "medical" evidence for asbestos (or silica) litigation.

**X-Ray Interpretations**

141.    Clinical studies and medical literature consistently demonstrate that, in an asbestos exposed population, at most 15% of individuals on average demonstrate lung scarring on radiographs at an ILO profusion level of 1/0 or greater.  Based on approximately 25,000 B reads from various B readers for individuals that **RTS** did not produce until mid-2006, approximately 14,000 (or 56%) were reported as consistent with a positive diagnosis of an asbestos-related disease.  Further, over 90% of the individuals diagnosed as positive for asbestosis received an ILO profusion of 1/0 or 1/1.  Such an impossibly high positive rate with an abnormal concentration at the ILO profusion rating of 1/0 and 1/1 can only result from fraudulent B reads.

142.    **DR. SEGARRA, DR. BALLARD, DR. LUCAS** and other John Doe Defendant B readers, each intentionally or recklessly interpreted chest x-rays falsely and created fraudulent reports of false positive findings to support diagnoses of asbestos-related disease.  Examples of the Defendants' fraudulent x-ray interpretation practices are further described below.

**PFTs**

143.    PFTs are comprised of several tests that measure flow and volume of air in and out of the lungs (spirometry testing); lung volumes (Total Lung Capacity or "TLC"); and the transfer of oxygen into the blood (diffusion capacity or "DLco" testing).  Defendants used the Segarra Enterprise to generate false PFTs at **RTS** and/or other John Doe Defendant screening companies that purported to evidence pulmonary impairment that could be attributed to asbestosis.  Such evidence of impairment could dramatically increase the value of the cases

43

(sometimes twice the value or more) to the Segarra Enterprise's law firm and attorney customers. "Impaired cases" helped motivate asbestos litigation defendants, including Plaintiff and bankruptcy trusts, to settle cases rather than risk trial. Impairment consistent with asbestosis can establish that chest x-ray abnormalities are caused by such exposure rather than another non-compensable cause.

144.    Upon information and belief, the majority of **RTS'** income, something in excess of $20 million, came from administering PFTs. Additionally, law firms and attorneys have made and continue to make millions of dollars from claims supported by **RTS'** fabricated PFTs purporting to confirm asbestos-related disease and evidence of impairment.

145.    Approximately 80% of about 17,000 electronic PFT records **RTS** produced in mid-2006 were identified as "impaired" by **RTS**. Most (90%) of these PFTs were performed on individuals whom Defendants in the Segarra Enterprise classified with ILO profusions of 1/0 or 1/1. In contrast, clinical studies of asbestos-exposed populations at the ILO profusion levels of 1/0 and 1/1 consistently have found on average no impairment.

146.    **RTS'** extraordinary impairment rate is driven by the high rate of impairment on its PFTs for diffusion capacity testing called "DLco." DLco PFTs require that the alveolar sample should not be in the dead space. The dead space (washout area) is the part of the respiratory system where gas exchange or diffusion does not occur. Sampling gas from the dead space results in contaminated samples which lead to false underestimation of true carbon monoxide uptake, resulting in a lower DLco value and a falsely higher rate of impairment.

147.    Of the approximately 17,000 PFTs **RTS** produced in MDL875 in mid-2006, about 6,000 (35%) reported a DLco value. The reported best DLco on these 6,000 tests fell below 80% of the expected normal range for individuals of the same age, height, weight and ethnicity (the

predicted value) or were "impaired" in about 5,300 (85%) cases, an unsupportable impairment rate.

148.    **RTS** PFT technicians generally had no formal training to conduct DLco PFTs. Moreover, most technicians were not licensed or certified to conduct PFTs.  **RTS, FOSTER, TAYLOR, DR. SEGARRA** and/or other Defendants hired inexperienced PFT technicians so Defendants' means of manipulating PFTs would not be detected.

149.    In addition, each of the PFT machines that Defendants used to generate false medical documentation was equipped to render clearly visible error codes and quality messages that were triggered during PFTs and flashed across the computer screens of these machines.  The Defendants' PFT machines were also capable of printing DLco sample bar graphs.  Defendants intentionally omitted error codes and/or failed to print or produce pages containing error codes and DLco sample bar graphs for thousands of PFTs that Defendants conducted and supervised which violated well-established PFT requirements, and further fraudulently concealed Defendants' manipulation of PFTs.

### Physical Examinations

150.    During the screening process, **DR. SEGARRA** or another on-site physician performed an abbreviated physical examination, taking only a few minutes per claimant.  During this sole meeting with the prospective claimant, the doctor rarely asked the client about his or her exposure or medical history relying solely upon the information gathered by screening staff as provided on an "A-sheet."  Exhibit T, **RTS** A-sheet example.  After the abbreviated physical examination and positive x-ray interpretation, **DR. SEGARRA** and/or other Defendants, issued a diagnostic report sent to the law firm or attorney customer along with the x-ray films and various reports.

**Diagnostic Reports**

151.    **DR. SEGARRA, DR. BALLARD, DR. LUCAS** and/or other Defendants intentionally or recklessly disregarded well-accepted diagnostic criteria for asbestos-related disease to generate false diagnostic reports for the Segarra Enterprise to supply to its law firm and attorney customers, and for monetary gain for themselves and the Segarra Enterprise.

152.    Defendants' diagnoses generated for the Segarra Enterprise rested predominantly upon a positive B read.   The exposure and medical histories were devoid of meaningful information, PFTs were manipulated to generate false evidence of impairment, and the physical examinations were perfunctory at best.  Exhibit U, contains a typical diagnostic reports generated by Defendants.

153.    In Defendants' mass screenings and/or mass B readings for the Segarra Enterprise, B readers, including **DR. SEGARRA, DR. BALLARD, DR. LUCAS** and/or other Defendants, had prior knowledge of the specific disease (asbestos-related disease or silicosis) for which the law firm customer wanted to file claims.  Defendants were directed and instructed and agreed to "find" abnormalities on x-rays, as dictated to **RTS, FOSTER, TAYLOR, DR. SEGARRA, DR. BALLARD, DR. LUCAS** and/or others by the law firm customers.  Exhibits F, G, H, I and J above.

**Attorney Referral and Payment For Screenings**

154.    Following a positive diagnosis, if the individual was not already represented by counsel, **FOSTER, TAYLOR** and/or other Defendants advised the individual that he/she could choose any lawyer for representation in a potential claim, but specified that if the individual chose the designated sponsoring attorney or firm, the individual would not have to pay for the

screening.  Attorneys or paralegals with the law firm paying for the screening were generally on site at the screening or at a nearby offsite location waiting to meet the individuals screened.

155.    **RTS'** agreement with **FITZGERALD** specifically required **FITZGERALD** to have "[p]ersonnel at test site to sign in clients and answer legal questions."  Exhibit M, above, Contract for Testing, April 24, 2000.

156.    As a practical matter, the cost for a screening was prohibitive to the majority of individuals screened, resulting in nothing more than a façade that gave the false appearance of choice to agree to pursue a legal claim or lawsuit.  Based on records **RTS** produced in mid-2006, upon information and belief, **RTS** did not bill any individuals for its services but only law firms or attorneys.

### Use of False Medical Evidence To Obtain Settlements

157.    Defendants, through the Segarra Enterprise, submitted or caused and could reasonably foresee the submission of the False Medical Reports and Diagnoses they generated for their personal injury law firm and attorney customers as support for thousands of asbestos-related personal injury claims against, and settlements from, Plaintiff and others to induce settlements from them.

158.    When law firms, including John Doe Defendants, specialize in representing individuals asserting personal injury claims based on exposure to asbestos, this practice of inundating the judicial system and Plaintiff, NSI, and others with claims for the purpose of extracting mass nuisance-value settlements worked effectively as NSI entered into settlement agreements as provided in Exhibit V, NSI list of settled claims, with identified plaintiffs' firms, dates and amounts paid detailed therein.

159.    In each of the cases identified on Exhibit V, Plaintiff paid a monetary settlement and/or attorney fees and other costs to defend and settle the cases, based in whole or in part upon the Defendants' False Medical Reports and Diagnoses submitted to Plaintiff or Plaintiff's agents pursuant to a settlement agreement entered into on the claimant's behalf by a personal injury law firm or individual attorney.   In these thousands of cases, Plaintiff paid settlements ranging from $50.00 up to $150,000.

160.    Once each law firm's or attorney's settlement submission, including False Medical Reports and Diagnoses, was accepted under the applicable settlement agreement, Plaintiff issued payment to the personal injury law firm or individual attorney.  These payments generated lucrative contingent fees for the law firms and attorneys.

### Examples of False X-Ray Reports and Exposure Histories

161.    Defendants' fraudulent x-ray interpretation practices included not only over reading of x-rays as positive of for evidence of asbestos (or silica) related abnormalities, but also a scheme of having B readers read the same film several years apart or a series of x-ray films over the course of time, a phenomenon now known as "re-treading."  See also, Exhibit A, MDL1553 Ruling.  First, a B reader would "find" irregular opacities and/or pleural plaques or thickening, consistent with asbestos-related disease.  Defendants then used this finding and generated a "diagnosis" of asbestosis or other nonmalignant asbestos-related disease with supporting False Medical Reports and Diagnoses.  Several years later, the same B reader would read the same x-ray film only having been told to find silicosis and would "find" rounded opacities and no plaques, consistent with silicosis.  Defendants then generated a "diagnosis" of silicosis with supporting False Medical Reports and Diagnoses.  Upon information and belief,

the predicate acts alleged in Exhibit V were the result of the same or similar "re-treading" scheme.

162.    An example of this scheme would be the claim of plaintiff Willie Jones. **DR. SEGARRA** diagnosed Mr. Jones with both asbestosis and silicosis or "mixed dust" (silicosis and asbestosis). Most telling is the manner in which **DR. SEGARRA's** B reads and subsequent diagnoses correspond with the disease the attorney paying **DR. SEGARRA** directed him to diagnose. Mr. Jones was x-rayed on at least four different occasions: March 14, 2002, September 9, 2002, February 27, 2003 and June 27, 2003. On the March 14, 2002 and February 27, 2003 x-rays, **DR. SEGARRA** reported only rounded opacities (P/Q) in the upper and middle zones and diagnosed Mr. Jones with only silicosis. **DR. SEGARRA** even stated there was "no radiographic evidence for pulmonary asbestosis" in his diagnostic report dated February 27, 2003. The attorney code used by **DR. SEGARRA** for these two reports indicates he was hired by the McCurdy & McCurdy law firm. Exhibit W, Willie Jones April 9, 2002 report regarding March 14, 2002 x-ray. Exhibit X, Willie Jones February 27, 2003 reports.

163.    On the x-ray dated September 9, 2002 (taken between the 3/14/02 and 2/27/03 x-rays) and the June 27, 2003 x-ray, **DR. SEGARRA** reported Mr. Jones had "mixed" (rounded and irregular) opacities (P/S) in all lung zones and diagnosed him with "mixed-dust" pneumoconiosis (silicosis and asbestosis). The attorney code on the September 9, 2002 reports was for attorney Jason Cansler of Brent Coon & Associates. The attorney code on the June 27, 2003 reports was for Heygood, Orr & Reyes. Mr. Jones then filed silicosis claims in *Conaway v. Aearo Co.*, No. 022928C, Smith County, Texas, filed by Brent Coon & Associates and in *Cleveland v. Air Liquide Amer. Corp.*, No. CC-03-18132-E, Dallas County Texas, filed by Heygood, Orr & Reyes. Mr. Jones also filed an asbestosis claim in *Moya v. AMF Inc.*, No. 03-

2543-B, Dallas County, Texas, filed by Brent Coon & Associates.  Exhibit Y, Willie Jones October 25, 2002 reports regarding September 9, 2002 x-ray.  Exhibit Z, Willie Jones June 27, 2003 reports.  Exhibit AA, comparison chart of Willie Jones reports.

164.    An additional example of the "re-treading" of claimants is John Netter.  On November 9, 2004, **DR. SEGARRA** interpreted x-rays of John Netter taken November 9, 2004 and reported that Mr. Netter had rounded opacities of size and shape P/Q in all lung zones with an ILO profusion of 1/0 and diagnosed him with pulmonary silicosis (mild chronic simple silicosis).  The attorney code on the November 9, 2004 reports was for Brent Coon & Associates for screening performed in Laurel, Mississippi with Holland Bieber.  Exhibit BB, John Netter silicosis records.

165.    On  May 12, 2005, **DR. SEGARRA** interpreted x-rays for John Netter taken May 12, 2005 and reported that Mr. Netter had irregular, linear opacities of size and shape T/S in the lower lung zones with an ILO profusion of 1/0.  **DR. SEGARRA** further stated in his report that there were "no rounded opacities in the upper lung zones and nothing to suggest the presence of silicosis."  **DR. SEGARRA** diagnosed Mr. Netter with mild pulmonary asbestosis. The attorney code on the May 12, 2005 reports was for Brent Coon & Associates for screening performed in Jackson, Mississippi with Holland Bieber.  Exhibit CC, John Netter asbestosis records.

166.    On or about November 26, 2000, **DR. BALLARD** performed a B read of x-rays for Mr. Lanier James taken May 3, 2000 and reported the x-rays showed irregular opacities, shape and size S/T in the mid and lower lung zones with an ILO profusion of 1/0 and bilateral *en face* pleural plaques, extent 2 and pleural thickening in the minor fissure.  **DR. BALLARD**

stated Mr. James' x-rays were consistent with asbestosis.  Exhibit DD, Lanier James asbestosis reports.

167.    On or about October 5, 2004, Plaintiff paid a settlement on Mr. James' claim in the amount of $237.

168.    On or about June 6, 2002, **DR. BALLARD** performed a B read of x-rays for Mr. Lanier James taken April 27, 2002 and reported the x-rays showed irregular and rounded opacities, shape and size S/P in all lung zones with an ILO profusion of 1/1 and no pleural plaques, but pleural thickening in the minor fissure.  **DR. BALLARD** stated that Mr. James' x-rays were consistent with asbestosis/mixed-dust disease.    **DR. BALLARD's** report states "Representing Silicosis Only!" on the face of the report.    Exhibit EE, Lanier James asbestosis/mixed-dust reports.

169.    Lanier James' reports from 2002 with asbestosis/mixed-dust findings were produced in MDL1553 by attorney, Scott Hooper, in 2005.  Plaintiff was not a party to and did not have access to Mr. James' 2002 reports until thereafter.

170.    Another example of this "re-treading" diagnosis scheme is Ms. Angelean Ball. On or about February 14, 2000, **DR. BALLARD** performed a B read of Ms. Ball's x-ray dated October 15, 1999 and reported the x-rays showed small irregular primary and secondary opacities, shape and size "S"  and "T" respectively, with an ILO profusion of 1/0.  **DR. BALLARD** also reported the x-ray demonstrated bilateral *en face* pleural plaques, extent 3.  **DR. BALLARD** diagnosed Ms. Ball with only asbestosis.  Exhibit FF, Angelean Ball asbestosis reports.

171.    On or about June 7, 2004, **DR. BALLARD** performed a B read on the same October 15, 1999 x-ray of Ms. Ball but reported the x-ray showed small rounded primary and

secondary opacities, shape and size "P" and "Q" respectively, with an ILO profusion of 1/0. Furthermore, **DR. BALLARD** stated in his diagnostic report that there "are no pleural plaques, pleural thickenings or pleural calcifications." **DR. BALLARD** diagnosed Ms. Ball with only silicosis. Exhibit GG, Angelean Ball silicosis reports.

172.    **DR. LUCAS** also participated in this "re-treading" scheme of inconsistent B reads as demonstrated in his Willie Kuhn reports. On or about July 5, 2000, **DR. LUCAS** performed a B read on a chest x-ray for Mr. Kuhn taken June 14, 2000 and reported irregular primary and secondary small opacities, size "S" and "T" respectively, with an ILO profusion of 1/0 and bilateral pleural plaques in profile, extent A1. **DR. LUCAS** concluded Mr. Kuhn's x-rays were consistent with asbestosis. Exhibit HH, Willie Kuhn asbestosis reports.

173.    On or about January 17, 2002, **DR. LUCAS** performed a B read on a chest x-rays for Willie Kuhn taken November 12, 2001 and reported irregular primary opacities, size "T," and rounded opacities, size "P" with an ILO profusion of 1/1 and bilateral pleural plaques in profile, extent A1. **DR. LUCAS** concluded that Mr. Kuhn's x-rays were consistent with mixed pneumoconiosis including silicosis and asbestosis. Exhibit II, Willie Kuhn mixed dust/silicosis reports.

174.    Also, on or about July 22, 1999, **DR. LUCAS** performed a B read on x-rays for Percy Barnes without a date taken identified. **DR. LUCAS** reported Mr. Barnes' x-rays showed irregular opacities, shape and size T/T in the mid and lower lung zones with an ILO profusion of 1/0. **DR. LUCAS** found Mr. Barnes' x-rays were consistent with asbestosis. Exhibit JJ, Percy Barnes asbestosis reports.

175.    On or about May 15, 2000, **DR. LUCAS** performed a B read on x-rays for Percy Barnes taken April 20, 2000. **DR. LUCAS** reported the x-rays showed rounded opacities,

shape and size Q/P in the upper and mid lung zones with an ILO profusion of 1/0. **DR. LUCAS** stated that Mr. Barnes' x-rays were consistent with silicosis. Exhibit KK, Percy Barnes silicosis reports.

176.    Upon information and belief, the predicate acts alleged herein include claims that were generated through this and similar schemes. Plaintiff settled and paid false claims in excess of $80 million in reliance on False Medical Reports and Diagnoses generated by Defendants using this and other schemes.

177.    Defendants withheld from Plaintiff in the asbestos litigation information of the silicosis diagnoses in hundreds or thousands of cases of alleged asbestosis with the intent to conceal the fraudulent scheme and further the purpose of the Segarra Enterprise.

178.    Additionally, Defendants generated false and inadequate exposure histories. **DR. SEGARRA, DR. BALLARD, DR. LUCAS** and/or other diagnosing physicians knowingly or recklessly relied on false, inadequate and/or inaccurate exposure histories generated by law firms and attorneys, and/or **RTS,** WDDS or other screening companies and their medically untrained personnel.

**C.    Defendants' Concealment of Their Fraudulent Conduct**

179.    Discovery of the fraud committed by the members of the Segarra Enterprise required the acquisition and then analysis of the records and screening practices of Defendants. **RTS** produced records in its possession, pursuant to subpoena and federal court order in approximately mid-2006 in the federal asbestos MDL875 litigation. Most other Defendants have produced little documentation, claiming either intentional or accidental destruction or non-retention of records, and still other Defendants, like **DR. SEGARRA, DR. BALLARD** and **DR. LUCAS** continue to refuse to produce documents in their possession. **DR. BALLARD** refuses

to produce records invoking his Fifth Amendment rights against self-incrimination. Exhibit K, above.

180.    The gross discrepancies between Defendants' positive x-ray and diagnostic rates, exposure history results, and pulmonary impairment rates, as compared to epidemiological and clinical studies of asbestos exposed populations, cannot be uncovered until production to asbestos litigation defendants, including NSI, of a large volume of records, primarily electronic PFT records, financial records and complete claimant files. Generally, the screening companies and physicians in asbestos litigation intentionally or recklessly do not retain copies of B reads, diagnostic reports and other screening records to avoid disclosure of information about their litigation screening activity and methods.

181.    **RTS** produced its records, which were still incomplete, in the federal asbestos MDL875 litigation in mid-2006. Prior to this production, the defendants in the asbestos, including Plaintiff, had no reasonable means or opportunity for access to the necessary volume of records to expose Defendants' pattern and practice of generating False Medical Reports and Diagnoses. Defendants concealed their fraudulent activities by avoiding disclosure of records of screening activities, including medical, financial and business records and through affirmative actions, omissions and statements, including the following:

182.    Defendants positioned themselves to make production of many of the individual screening subjects' files impossible by delivering their entire screening files on individuals diagnosed with disease to the law firms and individual attorneys that hired them and/or other physicians, including Defendants. By delivering such files to law firm customers and associated physicians, and failing to maintain copies, in particular the files of screened subjects with "negative" x-ray B reads (ILO profusion 0/0 and 0/1), no diagnosis of asbestos

related disease, or non-asbestos related B reads, records and diagnostic reports, Defendants intentionally concealed the records and information from which their phenomenal false "positive" B read and diagnosing rates could be determined.

183.    Defendants also disposed of and/or intentionally failed to maintain copies of, their billing and payment records and other accounts receivable and payable records, to prevent Plaintiff and other asbestos tort defendants from discovering such records in the lawsuits filed based on False Medical Reports and Diagnoses Defendants generated through the Segarra Enterprise.

184.    Many attempts have been made in the asbestos and silica litigation to discover the fraudulent conduct of Defendants through depositions and production of documents pursuant to subpoena.  For example, **DR. SEGARRA** is under subpoena in MDL875 and has filed a motion to quash and is still refusing to produce his records.  **DR. SEGARRA** was required to produce documents to the United States Congress for its inquiry into silicosis litigation in mid-2006, but instead produced only a summary of data based on his own internal "audit" of records and refused to produce the actual records supporting his "audit."  In a Mississippi state silica litigation, *Daniel Fairley, Jr. v. Pulmosan Safety Equipment Co., et al*, No. CI-2004-00 I-S1 (Jackson Co., Miss. Cir. Ct.), **DR. SEGARRA** was subpoenaed to produce records and only produced partial records, and only after several attempts to quash the subpoena and appeal the Special Master's rulings recommending **DR. SEGARRA** be ordered to produce.

185.    In the federal asbestos MDL875, **DR. SEGARRA** filed a sworn affidavit stating that Holland Bieber does not perform screenings but is involved "exclusively" in re-evaluations.  Contrary to **DR. SEGARRA's** sworn assertions, records that Holland Bieber produced in MDL875 in late-2007 indicate that **DR. SEGARRA** was in fact the "previous"

screener or B reader for those individuals that Holland Bieber "re-evaluated" with diagnoses by **DR. SEGARRA**.

186.    **DR. SEGARRA** performed this "two-step" type screening to further conceal the fraud committed against NSI. **DR. SEGARRA** first performed a B read of x-ray films sent to him. Later, those individuals whose x-rays **DR. SEGARRA** reported positive for x-ray changes consistent with asbestosis, were sent to Holland Bieber for a full screening, including new x-rays, a physical examination, a PFT, and a diagnosis from **DR. SEGARRA**.

187.    Moreover, **DR. SEGARRA** intentionally omitted his association and work for PFL in his sworn affidavit submitted to the federal court in MDL875 to conceal from the Court and others his association with the discredited screening operation. **DR. SEGARRA** stated under oath that while at **RTS**, he "examined patients, took histories, interpreted x-rays and read pulmonary function studies." This statement directly contradicts earlier testimony by **DR. SEGARRA** that **RTS** and PFL personnel and **FOSTER's** testimony that **RTS** personnel took histories and that **DR. SEGARRA** only "assumed" the population had been pre-screened for exposure.

188.    **FOSTER** concealed the Defendants' fraudulent scheme by refusing to produce records other than specific plaintiffs at issue until ordered to do so by the federal asbestos MDL875 judge in mid-2006. **FOSTER** now refuses to answer questions about **RTS'** screening operations asserting his rights under the Fifth Amendment to the U.S. Constitution against self-incrimination. **FOSTER** did so in hearings before the United States House of Representatives Committee on Energy and Commerce on or about March 8, 2006, again in a civil litigation deposition in Indiana silicosis cases on or about August 28, 2006, in a civil litigation deposition

in the WR Grace bankruptcy proceedings on or about October 27, 2006 and again in Louisiana civil litigation for asbestos cases on or about October 24, 2007.

189.    **DR. SEGARRA** also stated under oath in his affidavit to the court in MDL875 that he only worked with N&M, Inc. to "re-evaluate" patients. However, nowhere in **DR. SEGARRA's** diagnostic reports associated with those screenings does **DR. SEGARRA** mention any prior evaluation or screening or diagnosis. Upon information and belief, there were no prior evaluations.

190.    **DR. BALLARD** likewise concealed Defendants' fraudulent scheme by refusing to answer questions about his screening activities and asserting his right under the Fifth Amendment to the U.S. Constitution against self-incrimination. **DR. BALLARD** did so in hearings before the United States House of Representatives Committee on Energy and Commerce on or about March 8, 2006, again in a deposition in the WR Grace bankruptcy estimation proceedings on or about December 15, 2005 and again in deposition in an Arkansas state asbestos litigation case on or about March 3, 2007.

191.    **DR. BALLARD** also abided by his law firm and attorney customers to "read no more than twenty [x-ray films] per day" to avoid detection of the high volume of B reads he performed. Exhibit LL, February 4, 2000 Letter from Ness, Motley, Loadholt, Richardson & Poole.

192.    **DR. SEGARRA, DR. LUCAS, FOSTER,** and/or other Defendants also gave false, vague and misleading testimony with the intent to conceal Defendants' fraudulent scheme. **DR. SEGARRA** falsely testified that he spends between sixty and ninety minutes diagnosing individuals; that he personally takes occupational and medical histories for individuals he screens, that he almost never relies on another B reader's interpretation of x-ray films, and that he

does not issue blanket x-ray orders. Furthermore, **DR. SEGARRA** testified in 2006 that the words "diagnosis" and "impression" in his reports are synonymous. Later during that same deposition, however, **DR. SEGARRA** testified that a diagnosis captioned as an "impression" is not really a "diagnosis." Additionally, the misleading nature of **DR. SEGARRA's** reports is revealed by his subtle terminology distinctions in his reports as he attempted to explain to attorney Alwyn Luckey that the phrase "interstitial changes consistent with mild pulmonary asbestosis in a subject *with* an appropriate environmental exposure history and an adequate latent period" is a diagnosis to a reasonable degree of medical probability versus the phrase " interstitial changes consistent with pulmonary asbestosis, *assuming* an appropriate environmental history and an adequate latent period" which is a conditional radiographic diagnosis. Exhibit MM, August 5, 2003 letter from **DR. SEGARRA** to Law Offices of Alwyn H. Luckey (italics added).

193.    Defendants concealed conflicting diagnoses in numerous cases by withholding reports, diagnoses and B reads for inconsistent conflicting diagnoses and instead submitted only the B reads and diagnoses which Defendants wanted Plaintiff to know about with the intent that Plaintiff would rely on the omission of conflicting reports and settle claims against it.

194.    The PFT equipment Defendants use has the capability to print "error codes" that inform operators and persons relying on the test reports whether the tests have been performed consistent with accepted quality standards, and DLco sample bar graphs that show whether sampling in the "dead space" occurred. Defendants deliberately printed, or caused to be printed, PFT reports without error codes and/or DLco sample bar graphs to prevent assessment of the extent of compliance or noncompliance with testing standards and prevent detection of manipulated tests.

195.    Defendants' further took advantage of the sheer volume of claims generated and filed, intentionally overwhelming the court system and asbestos defendants, including Plaintiff, to prevent discovery of Defendants' fraudulent practices.  In the MDL1553 Ruling, Judge Jack described the impact of the volume of claims filed:

> The Court finds that filing and then persisting in the prosecution of silicosis claims while recklessly disregarding the fact that there is no reliable basis for believing that every Plaintiff has silicosis constitutes an unreasonable multiplication of the proceedings. When factoring in the obvious motivation--overwhelming the system to prevent examination of each individual claim and to extract mass settlements--the behavior becomes vexatious as well.

Exhibit A at 82, 398 F.Supp.2d at 676.

196.    Plaintiff has also been prevented from discovering the fraudulent practices of Defendants because of discovery limitations in case management orders applicable to mass consolidations of asbestos cases, and/or high volume dockets limiting discovery to small groups of cases, such that Plaintiff was unable, prior to the **RTS** production that occurred in mid-2006 in the asbestos MDL 875 and after and to which Plaintiff later obtained access, to obtain and analyze tens of thousands of records, still incomplete, generated by Defendants through the Segarra Enterprise which revealed the fraudulent practices described in this Complaint. Defendants intentionally concealed their fraudulent scheme by taking advantage of the limitations on discovery available to defendants in the asbestos and silica tort system.

197.    Defendants also intentionally took advantage of the ability of their law firm and attorney customers in the asbestos (and silica) litigation to leverage, for purposes of settlement, large numbers of screened non-malignancy cases set in trial groups with malignancy cases, whereby the risk and expense of proceeding to trial in malignancy cases compelled tort defendants to settle nonmalignancy cases supported by False Medical Reports and Diagnoses

when confronted with the personal injury attorneys' refusal to settle malignancy cases unless the nonmalignancy cases were settled as well.

198.    Due to the nature of the Defendants' fraud and misrepresentations, and the Defendants' concealment of their fraud and misrepresentations, Plaintiff did not discover the fraud and misrepresentations, and could not have reasonably been expected to do so, until at earliest after mid-2006.  Plaintiff still does not know the full extent of Defendants' fraud and misrepresentations as Defendants continue to thwart efforts to discover the truth.

**D.    Injury to Plaintiff**

199.    Defendants fraudulently recruited individuals to be screened and generated False Medical Reports and Diagnoses in the form of false and misleading records and reports, including medical and smoking histories, exposure and occupational histories, x-ray reports including B read reports, PFT reports and diagnostic reports.  Defendants knew, intended or could reasonably foresee that the False Medical Reports and Diagnoses would be used as evidence by their law firm and attorney customers to support the filing and settlement of asbestos-related personal injury claims against Plaintiff and others through the Segarra Enterprise.

200.    Defendants' fraudulent scheme was designed to enrich Defendants and caused substantial injury to Plaintiff's business and property in excess of $80 million.  The injuries that were proximately caused by Defendants' scheme include, but are not limited to:

a.    Payments by Plaintiff of millions of dollars to settle false claims based on the False Medical Reports and Diagnoses generated by the Defendants for its law firm and attorney customers, and the costs incurred in administering the settlements;

b.    Costs incurred of millions of dollars in the defense of the claims brought against Plaintiff based on the False Medical Reports and Diagnoses generated by the Defendants.

## COUNT ONE
## VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1962 (c)

201.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 200 of this Complaint as though fully set forth here.

202.    At all times relevant to this Complaint, Defendants, including John Doe Defendants, each satisfied the definition of a "person" as set forth in Title 18, United States Code, Sections 1961(3) and 1962(c).

203.    At all times relevant to this Complaint, Defendants, including John Doe Defendants, collectively constituted an "enterprise" (the Segarra Enterprise) within the meaning of that term as used in Title 18, United States Code, Sections 1961(4) and 1962(c).

204.    Each Defendant, including John Doe Defendants, participated, directly and/or indirectly, in the unlawful affairs of the Segarra Enterprise, which was engaged in and the activities of which affected interstate commerce, through a pattern of racketeering activity consisting of the acts of racketeering alleged below in Paragraph 205, in violation of Title 18, United States Code, Section 1962(c).

205.    In furtherance of the scheme to defraud as described herein, Defendants, including John Doe Defendants, engaged in a "pattern of racketeering activity" within the meaning of that phrase as used in Title 18, United States Code, Sections 1961(5) and 1962(c). Specifically, Defendants, including John Doe Defendants, committed the following acts of mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, to further the purpose of the Segarra Enterprise and for personal monetary gain, each of which constitutes a separate racketeering predicate act:

a.      In furtherance of the Segarra Enterprise, Defendants, including the John Doe Defendants, devised and executed a scheme and system of artifice to defraud, and obtain money and property by means of false and fraudulent pretenses, representations and promises, by intentionally generating False Medical Reports and Diagnoses to: (i) support false personal injury claims against Plaintiff; and (ii) induce settlements of such false claims on favorable monetary terms.

b.      The purpose of the Segarra Enterprise's scheme was to defraud Plaintiff of millions of dollars in personal injury settlements by generating bogus medical test results, false medical reports and false diagnoses for use in support of bogus asbestos-related claims against Plaintiff.

c.      The manner and means by which Defendants, including John Doe Defendants, accomplished and attempted to accomplish the Segarra Enterprise's scheme was by generating and enhancing the settlement value of bogus asbestos-related claims against Plaintiff through the production of Defendants' False Medical Reports and Diagnoses. These fraudulent records and reports, as detailed as to time and claimant in Exhibit V, were submitted through the U.S. mails, private couriers, and/or interstate wire transmissions with the intent that Plaintiff would accept them as legitimate medical evidence of asbestos-related disease caused by Plaintiff.

d.      Pursuant to and in furtherance of the scheme to defraud, Defendants, including John Doe Defendants, generated, and caused to be submitted to Plaintiff or Plaintiff's agent(s), False Medical Reports and Diagnoses as previously described, containing false medical information. Among the records and reports containing false information are the records and reports generated by **DR. SEGARRA, RTS, FOSTER,**

**TAYLOR, FITZGERALD, DR. BALLARD, DR. LUCAS** and/or other Defendants in thousands of cases, including the cases by and settled with the individuals listed on the attached Exhibit V. Exhibit V contains some, but not all, of the bogus asbestos cases Plaintiff settled that have caused injury to Plaintiff in one or more of the ways described in Paragraph 200 of this Complaint. The records and reports in each of these cases contain one or more separate false statements in furtherance of Defendants' scheme.

   e.  Defendants, including John Doe Defendants, made or caused and could reasonably foresee the frequent use of the United States mails, private couriers and interstate wire services as part of the ordinary course of their conduct in furtherance of the Segarra Enterprise's fraudulent scheme. Specifically, Defendants, including John Doe Defendants, used or caused and could reasonably foresee the use of the U.S. mails, private couriers and interstate wire services for:

     i.  mailing and/or interstate wire delivery of marketing and solicitation material to law firms and individual attorneys;

     ii.  mailing and/or interstate wire services solicitation information to individuals to recruit potential claimants;

     iii.  use of television and radio wire transmissions to recruit potential claimants;

     iv.  mailing and/or courier and interstate wire delivery of correspondence, A-sheets, chest x-rays, B read reports, PFTs and diagnostic reports among the Defendants in the Segarra Enterprise and to their law firm and attorney customers;

> v.   mailing and/or courier delivery of chest x-rays for review by B readers;
>
> vi.   mailing and/or interstate wire delivery of bills and invoices for services rendered;
>
> vii.   mailing and/or interstate wire delivery of payments from Defendants to their employees, agents and independent contract workers;
>
> viii.   mailing and/or interstate wire delivery of payments by law firms to Defendants for services rendered;
>
> ix.   mailing and/or courier or interstate wire delivery of False Medical Reports and Diagnoses sent to Plaintiff or Plaintiff's agents by personal injury law firms or individual attorneys; and
>
> x.   mailing and/or courier or interstate wire delivery of settlement payments by and on behalf of Plaintiff to personal injury law firms and attorneys.

206.   Defendants' normal business practices included mailing, and/or interstate wire services of marketing and advertising material and information, records and reports, billing, and payments relating to the individuals set forth on Exhibit V hereto in at least one of the foregoing manners set forth in the preceding paragraph.   Each of use of the mails and interstate wire services constitutes a separate violation of the mail and/or wire fraud statutes pursuant to Title 18, United States Code, Section 1341 and/or 1343.

207.   Plaintiff, NSI, entered into agreements to settle numerous claims based on False Medical Reports and Diagnoses, which agreements were entered into upon reasonable reliance on representations made by the law firm and attorney customers of Segarra Enterprise that the

claims were legitimate for which the settlements are detailed in Exhibit V with respect to date of settlement, law firm, and settlement amount.

208.    Plaintiff was injured in its business and property by reason of Defendants' violation of Title 18, United States Code, Sections 1962(c) and (d).

### COUNT TWO
### CONSPIRACY TO VIOLATE
### TITLE 18, UNITED STATES CODE, SECTION 1962 (c)

209.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 208 of this Complaint as though fully set forth here.

210.    Defendants, including John Doe Defendants, each of whom was associated with or employed by the Segarra Enterprise, unlawfully and willfully combined, conspired and agreed with each other, and unknown others, to violate Title 18, United States Code, Section 1962(c), by conducting, directing, and/or participating in, directly or indirectly, the affairs of the Segarra Enterprise, which was engaged in and the activities of which, affected interstate commerce, through a pattern of racketeering activity, by committing at least two predicate acts as described above, all in violation of Title 18, United States Code, Section 1962(d).

211.    It was part of the conspiracy that Defendants, including John Doe Defendants, agreed to commit two or more fraudulent and illegal racketeering acts, namely, acts of mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1341 and 1343, and conducted and agreed to conduct the affairs of the Segarra Enterprise through a pattern of racketeering activity, in furtherance of and for the purpose of making money from repeated illegal activity, all in violation of Title 18, United States Code, Section 1962(d).

212.    Plaintiff, NSI, entered into agreements to settle numerous claims based on False Medical Reports and Diagnoses, which agreements were entered into upon reasonable reliance

on representations made by the law firm and attorney customers of Segarra Enterprise that the claims were legitimate for which the settlements are detailed in Exhibit V with respect to date of settlement, law firm, and settlement amount.

213.    Plaintiff was injured in its business and property by reason of Defendants' violations of Title 18, United States Code, Section 1962(d).

## COUNT THREE
## COMMON LAW FRAUD

214.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 213 of this Complaint as though fully set forth here.

215.    As described above, Defendants, including John Doe Defendants made false and fraudulent representations of fact, namely false and misleading records and reports, including medical and smoking histories, exposure and occupational histories, x-ray reports including B read reports, PFT reports and diagnostic reports, which were generated through fraudulent practices and procedures.

216.    At the time Defendants made such false and fraudulent representations, Defendants were aware of the falsity of the representations.

217.    Defendants made the misrepresentations with the intent to deceive both the individuals who were the subjects of the false records and reports, as well as companies such as Plaintiff.

218.    Plaintiff, NSI, entered into agreements to settle numerous claims based on False Medical Reports and Diagnoses, which agreements were entered into upon reasonable reliance on representations made by the law firm and attorney customers of Segarra Enterprise that the claims were legitimate for which the settlements are detailed in Exhibit V with respect to date of settlement, law firm, and settlement amount.

219.    The individuals who were the subject of the false records and reports relied upon the results of the records and reports in pursuing personal injury claims against Plaintiff, and Plaintiff relied, and had a right to rely, on these records and reports in connection with asbestos litigation of such claims, resulting in injury to Plaintiff, insofar as Plaintiff defended and settled these bogus asbestos-related claims, proximately caused by Defendants' fraud.

220.    In fact, asbestos personal injury attorneys, representing of thousands of claimants, either knowingly, recklessly or without knowledge of the falsity of the test results, medical reports and false diagnoses generated by Defendants, but relying on same, asserted bogus claims against Plaintiff and others alleging liability for asbestos-related personal injuries.

221.    Plaintiff reasonably relied upon what were then thought to be legitimate test results, medical reports and diagnoses provided to it by licensed attorneys in support of personal injury claims and purportedly authored by licensed medical doctors and other medical personnel or individuals supervised by medically trained and licensed personnel.

222.    In reliance on the representations of claimants and the claims asserted for asbestos-related personal injuries against Plaintiff supported by the False Medical Reports and Diagnoses, Plaintiff entered into settlement agreements with various claimants and the asbestos personal injury attorneys who represented them for payment of bogus personal injury claims.

223.    Defendants' conduct was wanton, reckless, oppressive, and constituted a willful disregard of Plaintiff's rights.

## COUNT FOUR
## NEGLIGENT MISREPRESENTATION

224.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 223 of this Complaint as though fully set forth here.

225.    As described above, Defendants, including John Doe Defendants, have made false representations of material fact, namely false and misleading records and reports, including medical and smoking histories, exposure and occupational histories, x-ray reports including B read reports, PFT reports and diagnostic reports, as a result of practices and procedures that violated applicable and well-established standards governing the evaluation and diagnosis of asbestos-related disease.   Defendants made such false representations and generated False Medical Reports and Diagnoses because of their failure to exercise due care in the course of rendering professional services, including intentional or reckless disregard of well-established standards and requirements for the diagnosis of asbestos-related disease, the interpretation of x-rays, and the administration of PFTs.

226.    Defendants knew and intended that these false records and reports would be provided to asbestos litigation defendants like Plaintiff as well as to the individuals who were the subjects of the records and reports.  As such, Defendants undertook and were under a duty to provide true and accurate medical information, including medical and smoking histories, exposure and occupational histories, x-ray reports including B read reports, PFT reports and diagnostic reports, to Plaintiff and to the individuals who were the subjects of these records and reports.

227.    Defendants knew and intended that Plaintiff and other asbestos litigation defendants would rely and act on the False Medical Reports and Diagnoses.  Defendants also knew and intended that the individuals who were the subjects of the False Medical Reports and Diagnoses would rely and act on those False Medical Reports and Diagnoses.

228.    Plaintiff and other asbestos (and silica) litigation defendants, as well as the individual subjects of the False Medical Reports and Diagnoses, reasonably relied on these False

Medical Reports and Diagnoses in connection with asbestos (and silica) litigation of these claims. Plaintiff's reasonable reliance on the False Medical Reports and Diagnoses directly resulted in injury to Plaintiff in the defense and settlement of asbestos-related claims which was proximately caused by Defendants' misrepresentations. The individuals who were the subjects of the False Medical Reports and Diagnoses relied upon the records and reports in pursuing asbestos-related claims against Plaintiff, resulting in injury to Plaintiff which was proximately caused by Defendants' misrepresentations.

**COUNT FIVE**
**AIDING AND ABETTING FRAUD**

229.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 228 of this Complaint as though fully set forth here.

230.    Each of the Defendants, including John Doe Defendants, knew that the other Defendants' and John Doe Defendants' conduct was in violation of duties owed to Plaintiff and others not to commit fraud and misrepresentation in the generation of False Medical Reports and Diagnoses and gave substantial assistance and encouragement to such other Defendants and John Doe Defendants in their acts.

231.    The aiding and abetting of fraud and misrepresentation by the individual Defendants proximately caused injury to Plaintiff in the defense and settlement of asbestos-related claims.

232.    Defendants' conduct was wanton, reckless, oppressive, and constituted a willful disregard of Plaintiff's rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, National Service Industries, Inc. respectfully requests a jury trial and respectfully requests the following relief against all Defendants, jointly, severally, and collectively as follows:

    a.   An award to Plaintiff, National Service Industries, Inc., of its actual damages, including prejudgment interest, trebled pursuant to Title 18, United States Code, Section 1964(c);

    b.   An award to Plaintiff, National Service Industries, Inc., of full reimbursement of its costs and expenses relating to this action, including reasonable attorneys' fees, as provided in Title 18, United States Code, Section 1964(c); and

    c.   Such other relief, including punitive damages, as the Court deems appropriate and the law provides.

THIS, the 12th day of February, 2009.

RESPECTFULLY SUBMITTED:

NATIONAL SERVICE INDUSTRIES, INC.
f/d/b/a NORTH BROTHERS, INC., PLAINTIFF

_____
MARCY B. CROFT
ATTORNEY FOR PLAINTIFF

MARCY B. CROFT, MS. BAR NO. 10864
WALTER G. WATKINS, JR., MS. BAR NO. 6988
ASHLEY E. CALHOUN, MS. BAR NO. 101303
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
200 SOUTH LAMAR STREET, SUITE 100
JACKSON, MISSISSIPPI 39201
TELEPHONE:    (601) 960-8600
FACSIMILE:    (601) 960-8613

OF COUNSEL:
DAVID M. SETTER (Pro Hac)
JOHN M. SEEBOHM (Pro Hac)
JEANETTE S. EIRICH (Pro Hac)
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
1775 SHERMAN STREET, SUITE 1900
DENVER, COLORADO 80203
TELEPHONE:         (303) 837-6400
FACSIMILE:          (303) 318-9669