UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

NATIONAL SERVICE INDUSTRIES, INC.,　)
F/D/B/A NORTH BROTHERS, INC.,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Civil Action No. 3:09cv83-HTW-LRA
v.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
JAY T. SEGARRA, M.D.　　　　　　　　)
RESPIRATORY TESTING SERVICES, INC.　)
CHARLES E. FOSTER　　　　　　　　　)
J. MICHAEL FITZGERALD, ESQ.　　　　　)
CHRISTOPHER LINN TAYLOR　　　　　)
JAMES W. BALLARD, M.D.　　　　　　　)
PHILLIP H. LUCAS, M.D.　　　　　　　)
JOHN DOE DEFENDANTS 1-20　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants　　　　　　)

RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT ("RICO")
STATEMENT

COMES NOW Plaintiff, National Service Industries, Inc., f/d/b/a North Brothers, Inc.,

("NSI"), by counsel, Forman Perry Watkins Krutz & Tardy, LLP, pursuant to the Standing Order

of the United States District Court for the Southern District of Mississippi for RICO cases and in

accordance with Fed. R. Civ. P. 11 makes the following RICO statement of facts Plaintiff is

relying upon to initiate its RICO Complaint against the "Segarra Enterprise" as a result of

reasonable inquiry as set forth below:

1.　The alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962 (c) and (d).

2.　Identification of each Defendant, alleged misconduct of each and basis of liability of

each:

1

### a. JAY T. SEGARRA, M.D. ("DR. SEGARRA")

DR. SEGARRA is a pulmonologist and certified B reader from Ocean Springs, Mississippi. DR. SEGARRA started in the asbestos litigation screening business in 1992 with Pulmonary Function Laboratory, Inc. ("PFL"). In 1997 Owens Corning sued PFL and others alleging fraud and violations of RICO for engaging in a scheme to generate false medical test results. The lawsuit was eventually settled.

DR. SEGARRA began providing medical services to RTS and its personal injury law firm and attorney customers in 1994, and has provided medical services to other asbestos (and silica) litigation screening companies. DR. SEGARRA used his position as a physician to direct and participate in the illegal activities of the Segarra Enterprise.

DR. SEGARRA intentionally or recklessly disregarded medical standards for evaluation and diagnosis of asbestos-related disease to generate false positive diagnoses and medical reports for personal injury law firms and attorneys to use as medical evidence to support false personal injury claims against Plaintiff and other companies similarly situated and asbestos bankruptcy trust claims intending that Plaintiff, and others, would rely on the false diagnoses and medical reports and pay money on the false claims.

DR. SEGARRA intentionally or recklessly falsely interpreted chest x-rays as positive for the presence of abnormalities consistent with asbestos exposure, intentionally or recklessly relied other physicians' false positive interpretations of chest x-rays performed contrary to medical standards, intentionally or recklessly

2

relied upon false and/or inadequate histories of exposure to asbestos containing products taken contrary to medical standards by medically untrained and unqualified individuals, intentionally or recklessly performed a cursory and/or inadequate physical examination and medical history contrary to medical standards, intentionally or recklessly relied upon false and/or manipulated pulmonary function tests ("PFTs"), and intentionally or recklessly disregarded medical standards to intentionally or recklessly generate false diagnoses of asbestos-related disease.

DR. SEGARRA knew or could reasonably foresee that the false medical reports (false x-ray reads, false/manipulated PFTs, false medical, exposure and smoking histories, and false diagnostic reports) he generated for personal injury asbestos law firms and attorneys would be used to support personal injury claims for asbestos-related disease against companies, such as Plaintiff, and/or asbestos bankruptcy trust claims.

DR. SEGARRA intended that Plaintiff and others would rely on the false medical reports he and other Defendants generated as legitimate statements of the physical condition of individuals by reliable medical professionals and pay millions of dollars in verdicts, settlements and costs to defend false claims of asbestos-related injuries. DR. SEGARRA made at least $10 million for litigation B reads and diagnoses.

Further, DR. SEGARRA directed and schemed with other Defendants to engage in the same or similar conduct to generate false medial reports for asbestos

litigation to continually generate an "inventory" of potential claimants for the personal injury asbestos law firms and attorneys.

As part of executing the scheme to defraud Plaintiff of millions of dollars through the submission of false claims, DR. SEGARRA used, caused to be used, or could reasonably foresee the use of the U.S. mails, private couriers and interstate wire services to transmit the false medical reports among Defendants (including shipping x-rays, false x-ray reports, false exposure, medical and smoking history reports, false/manipulated PFT reports and false diagnostic reports) as well as correspondence and communication among Defendants relating to the scheme and actions necessary to accomplish the scheme, payment of fees he received for generating the false medical reports, and to transmit the false medical reports to Plaintiff and others and for payment of claims and payment of settlements and costs.

DR. SEGARRA also concealed the Defendants' fraudulent conduct through false, vague and misleading testimony, sworn affidavits and in hearings and depositions.   DR. SEGARRA also refuses to produce his records as repeatedly requested to do so and is currently under subpoena to produce in the federal asbestos multidistrict litigation, MDL875.

**b. RESPIRATORY TESTING SERVICES, INC. ("RTS")**

RTS was an asbestos (and silica) litigation mass screening company based in Mobile, Alabama, with offices in Pascagoula, Mississippi, and Pensacola, Florida.   RTS screened in over 35 states, including primarily Mississippi, Louisiana and Alabama.   It was a successor of another litigation screening

company, Pulmonary Testing Services ("PTS") owned by Jewel "Jerry" Pitts. In 1996, Owens Corning sued Jerry Pitts, PTS, and others, alleging fraud and violations of RICO for engaging in a scheme to generate false medical test results. The lawsuit was eventually settled. The owner of RTS, Defendant FOSTER, was a former employee of PTS. RTS screened over 40,000 individuals for asbestos (and silica) personal injury litigation and grossed over $23 million.

RTS was one of possibly several other screening companies used by the enterprise to conduct asbestos litigation screenings. The RTS business model, developed with DR. SEGARRA and Defendant FITZGERALD, was to get at least 50 individuals attending a screening and generate positive diagnoses for at least 20 (40% positive rate).

RTS aggressively marketed its litigation screening services to personal injury attorney firms, using false statements. RTS mailed out brochures through the U.S. mails that falsely stated it provided "complete medical evaluations by Board Certified, NIOSH (National Board *(sic)* of Occupational Safety and Health) approved Physicians, Radiologic Technologists, Respiratory Therapists and/or Technicians" and that "a board certified Respiratory Therapist/Technician will perform a Pulmonary Function Test . . . that are performed by the American Thoracic Society standards."

RTS intentionally or recklessly used medically untrained personnel to administer false and/or manipulated PFTs, obtain false and/or inadequate asbestos exposure histories, smoking and medical histories and only reported the results of

5

its "testing" to its law firm and attorney customers rather than the individuals screened or their treating physicians.

RTS intentionally and knowingly administered chest x-rays without a physician's order for each x-ray as required by every state's laws or proper approval by state regulatory agencies for "healing arts" screenings as provided for by some states.

RTS intentionally manipulated or recklessly disregarded well-established standards set forth by the American Thoracic Society for the administration of PFTs with the intent to generate results that falsely demonstrated the existence or extent of lung function impairment used to support the false diagnoses of asbestos-related disease.

Further, RTS hired unqualified, untrained and unlicensed PFT technicians to administer PFTs with the intent that its improper methods would not be discovered by persons with skill and knowledge of proper testing methods.

RTS charged more money for positive results (e.g., $775) than negative results (e.g., $175) and in turn paid physicians more money for positive results (e.g., $180) than negative results (e.g., $60), encouraging them to generate positive x-ray reads and diagnoses. In addition to DR. BALLARD and DR. SEGARRA, physicians associated with RTS include Drs. Robert Altmeyer, Dominic Gaziano, James Krainson, Robert Mezey, Gregory Nayden, Walter Oaks, Alvin Schonfeld, and Jose Roman.

RTS also aggressively and directly solicited individuals. One of the more successful solicitation ploys was RTS, and Defendant FITZGERALD and/or

Defendant TAYLOR working the local trade unions. Defendants RTS, FOSTER, and/or TAYLOR approached and solicited current of former local union officials on FITZGERALD's behalf. However, to avoid ethical complications for FITZGERALD, an attorney, FITZGERALD, through FOSTER and/or TAYLOR, had local union officials complete a "request" form prepared by FITZGERALD. This "request" form portrayed the screening as union-sponsored, when, in fact, it was designed by FITZGERALD, FOSTER, TAYLOR, RTS and/or other Defendants for their own benefit. These letters soliciting local union members and "requests" requesting screenings were transmitted through the U.S. Mails.

Additionally, RTS, used mass media, including television commercials and radio advertisements, to reach individuals to recruit them for screenings and generate claimants for its law firm and attorney customers. RTS' practice of soliciting thousands of personal injury lawsuit clients for the law firms and attorneys was in violation of Mississippi's statutory prohibition against champerty. Miss. Code Ann. § 97-9-11.

RTS knew or could reasonably foresee that the false medical reports (false x-ray reads, false/manipulated PFTs, false medical, exposure and smoking histories, and false diagnostic reports) it generated for its personal injury asbestos law firm and attorney customers would be used to support personal injury claims for asbestos-related disease against companies, such as Plaintiff, and/or asbestos bankruptcy trust claims.

RTS intended that Plaintiff and others would rely on the false medical reports he and other Defendants generated as legitimate statements of the physical

7

condition of individuals by reliable medical professionals and pay millions of dollars in verdicts, settlements and costs to defend false claims of asbestos-related injuries.

As part of executing the scheme to defraud Plaintiff of millions of dollars through the submission of false claims, RTS used, caused to be used, or could reasonably foresee the use of the U.S. mails, private couriers and interstate wire services to transmit the false medical reports among Defendants (including shipping x-rays, false x-ray reports, false exposure, medical and smoking history reports, false/manipulated PFT reports and false diagnostic reports) as well as correspondence and communication among Defendants relating to the scheme and actions necessary to accomplish the scheme, payment of fees received for generating the false medical reports, and to transmit the false medical reports to Plaintiff and others and for payment of claims and payment of settlements and costs.

After Federal District Court Judge Janis Graham Jack found RTS' methods unreliable in the federal silica multidistrict litigation, MDL1553, in a ruling dated June 30, 2005 (Exhibit A to the Complaint), numerous asbestos bankruptcy trusts banned RTS reports.

RTS concealed the fraudulent conduct of RTS and the other Defendants by repeatedly refusing to produce records until compelled by a federal judge in MDL875 in mid-2006, which production was incomplete based on the destruction, intentional and/or accidental, of records. Furthermore, RTS, through Defendants FOSTER, DR. SEGARRA, DR. BALLARD, DR. LUCAS and/or

other associated physicians and employees, concealed its fraudulent conduct through false, vague and misleading testimony in depositions and hearings.

Defendants FOSTER and DR. BALLARD continue to conceal the fraudulent conduct of RTS by asserting their Fifth Amendment rights against self-incrimination when questioned about their litigation screening activities.

**c. CHARLES E. FOSTER ("FOSTER")**

Defendant FOSTER is a resident of Theodore, Alabama, and was the owner of RTS. FOSTER used his position as owner of RTS to direct and participate in the illegal activities of the Segarra Enterprise. As owner of RTS, FOSTER was responsible for virtually every aspect of RTS' screening activities, including marketing, recruiting, personnel hiring and training, accounting, and screening logistics and procedures. Prior to establishing RTS, FOSTER was an employee of PTS. FOSTER performed public relations, marketing, and screening recruitment, before leaving PTS and starting RTS in late 1994.

FOSTER knew, or recklessly disregarded, that the methods that RTS and/or other Defendants employed did not meet accepted medical practices and were unreliable.

FOSTER knew or could reasonably foresee that the false medical reports (false x-ray reads, false/manipulated PFTs, false medical, exposure and smoking histories, and false diagnostic reports) RTS and/or other Defendants generated for its personal injury asbestos law firm and attorney customers would be used to support personal injury claims for asbestos-related disease against companies, such as Plaintiff, and/or asbestos bankruptcy trust claims.

9

FOSTER intended that Plaintiff and others would rely on the false medical reports RTS and other Defendants generated as legitimate statements of the physical condition of individuals by reliable medical professionals and pay millions of dollars in verdicts, settlements and costs to defend false claims of asbestos-related injuries.

As part of executing the scheme to defraud Plaintiff of millions of dollars through the submission of false claims, FOSTER used, caused to be used, or could reasonably foresee the use of the U.S. mails, private couriers and interstate wire services to transmit the false medical reports among Defendants (including shipping x-rays, false x-ray reports, false exposure, medical and smoking history reports, false/manipulated PFT reports and false diagnostic reports) as well as correspondence and communication among Defendants relating to the scheme and actions necessary to accomplish the scheme, payment of fees RTS received and paid others in the operation of RTS and for generating the false medical reports, and to transmit the false medical reports to Plaintiff and others and for payment of claims and payment of settlements and costs.

FOSTER concealed the fraudulent conduct of the Defendants by causing RTS to send its screening files to law firm and attorney customers, without retaining a copy, to make production of such files by RTS impossible, by refusing to produce records on other than specific plaintiffs at issue in pending cases until ordered to do so by the federal asbestos MDL875 judge in mid-2006, and by refusing to answer questions about RTS' screening operations by asserting his

rights under the Fifth Amendment to the U.S. Constitution against self-incrimination.

### d. J. MICHAEL FITZGERALD, ESQ. ("FITZGERALD")

FITZGERALD was at all times relevant to this Complaint a personal injury attorney residing in Charlottesville, Virginia, who directed, managed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise.

FITZGERALD together with FOSTER and/or other Defendants attended local union meetings and provided gifts and meals to local officials to persuade them to have the local union members attend screenings with RTS so Defendants could generate claimants in asbestos personal injury cases.

FOSTER and/or TAYLOR actually approached and solicited current or former local union officials on behalf of RTS and FITZGERALD to avoid ethical complications for FITZGERALD, an attorney prohibited from direct solicitation of clients. FITZGERALD, through FOSTER and/or TAYLOR had local officials complete a "request" form prepared by FITZGERALD "requesting" the screening and portraying it as a union-sponsored, when, in fact, it was designed by FOSTER and FITZGERALD and/or TAYLOR, RTS and/or other Defendants for their own benefit.

In about 2001, RTS sued FITZGERALD to recover unpaid fees for screenings services. FITZGERALD contended that he had a conditional payment arrangement with RTS, pursuant to which he was obligated to pay RTS only if he

received settlement funds from defendant Babcock & Wilcox on claims based on the Defendants' false medical reports.

In addition to RTS, FITZGERALD may have hired other screening companies to generate false medical reports and recruit potential claimants who he would then represent as counsel filing false claims against NSI and others, which FITZGERALD knew, should have known, or recklessly disregarded were false due to the intentional or reckless disregard for medical standards and techniques used by RTS and/or others.

FITZGERALD also sold some of his "inventory" of claimants to other personal injury asbestos law firms and attorneys who would then file false claims against NSI and others, demanding money for compensation for false injuries.

FITZGERALD knew, or recklessly disregarded, that the methods that Defendants employed did not meet accepted medical practices and were unreliable.

FITZGERALD filed, caused to be filed, knew or could reasonably foresee, false personal asbestos-related injury claims supported by the false medical reports (false x-ray reads, false/manipulated PFTs, false medical, exposure and smoking histories, and false diagnostic reports) generated by RTS and/or other Defendants and other wrongdoers against NSI and others.

### e. CHRISTOPHER LINN TAYLOR ("TAYLOR")

TAYLOR is a resident of Mobile, Alabama. TAYLOR was an employee of RTS and managed travel arrangements, marketing and communicating with law firms, and recruitment of screening subjects for RTS. TAYLOR is

12

FOSTER's son-in-law. TAYLOR also worked for N&M, Inc., another screening company owned and operated by former PTS employee Heath Mason, the step-grandson of PTS owner, Jerry Pitts. TAYLOR is married to FOSTER's daughter, Stacie Foster Taylor, a personal injury attorney formerly employed by asbestos/silica litigation firms, including the Campbell Cherry Harrison Davis & Dove and Motley Rice law firms, and other law firms. TAYLOR's wife paid and promoted RTS, among others, to screen claimants whom she herself represented in asbestos and silica litigation or whose claims she "brokered" to other law firms.

TAYLOR directed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise through his marketing and solicitation of customers, personal injury law firms and attorneys, and individual screening subjects for RTS.

TAYLOR oversaw and directed the screening process for the Segarra Enterprise through RTS screenings and facilitated the submission of false medical reports (false x-ray reads, false/manipulated PFTs, false medical, exposure, smoking histories, and false diagnostic reports) generated by RTS and/or other Defendants for the purpose of generating litigation claims, and concealed the Segarra Enterprise fraudulent scheme from NSI and others.

TAYLOR agreed with DR. SEGARRA, FOSTER and/or others to help market RTS' screening business to law firms and attorneys, recruit screening subjects, and participate in and direct the illegal activities of the Segarra Enterprise including, but not limited to, marketing specific positive rates which TAYLOR knew, or recklessly disregarded, were achieved through the Segarra

Enterprise assembly-line process of generating false medical reports and diagnoses.

TAYLOR intended that Plaintiff and others would rely on the false medical reports RTS and other Defendants generated as legitimate statements of the physical condition of individuals by reliable medical professionals and pay millions of dollars in verdicts, settlements and costs to defend false claims of asbestos-related injuries.

As part of executing the scheme to defraud Plaintiff of millions of dollars through the submission of false claims, TAYLOR used, caused to be used, or could reasonably foresee the use of the U.S. mails, private couriers and interstate wire services to transmit the false medical reports among Defendants (including shipping x-rays, false x-ray reports, false exposure, medical and smoking history reports, false/manipulated PFT reports and false diagnostic reports) as well as correspondence and communication among Defendants relating to the scheme and actions necessary to accomplish the scheme, payment of fees RTS received and paid others in the operation of RTS and for generating the false medical reports, and to transmit the false medical reports to Plaintiff and others and for payment of claims and payment of settlements and costs.

### f. JAMES W. BALLARD, M.D. ("DR. BALLARD")

DR. BALLARD resides in Birmingham, Alabama. He is a radiologist and certified B-reader. DR. BALLARD performed litigation screening, diagnostic and B read services for RTS, as well as other screening companies and directly for over 75 different law firms. DR. BALLARD performed several thousand B

14

reads per year. DR. BALLARD used his position as a physician to direct and participate in the illegal activities of the Segarra Enterprise.

DR. BALLARD intentionally or recklessly disregarded medical standards for the evaluation and diagnosis of asbestos-related disease to generate false positive diagnoses and medical reports for personal injury law firms and attorneys to use as medical evidence to support false personal injury claims against Plaintiff and other companies similarly situated and asbestos bankruptcy trust claims intending that Plaintiff, and others, would rely on the false diagnoses and medical reports and pay money on the false claims.

Although DR. BALLARD was not licensed to practice medicine in Arkansas, Louisiana or Mississippi, he traveled with RTS to interpret x-rays, generate x-ray reads and diagnoses.

When diagnosing individuals for litigation purposes, DR. BALLARD, contrary to accepted medical standards for diagnosing asbestos-related disease, relied only upon exposure and medical histories provided to him by the lawyers or generated by RTS and/or other screening companies and taken by untrained and unqualified personnel. DR. BALLARD did not conduct physical examinations.

Before DR. BALLARD interpreted an x-ray, he knew what disease the law firms wanted him to "find." Law firms requested, often by letter, that DR. BALLARD read certain x-rays for asbestos-related disease and informed DR. BALLARD of the asbestos exposure histories when requesting these specific interpretations. DR. BALLARD followed the directives of the law firms and attorneys and RTS and/or other screening companies, without regard for the true

15

condition reflected on the x-rays, contrary to accepted medical standards, and reported only the diagnoses requested and even tailored his reports as directed by the law firms or attorneys or RTS.

DR. BALLARD's practice of disregarding the actual condition of lungs depicted on x-ray films for the purpose of generating the predetermined outcome requested often resulted in complete asbestosis/silicosis reversals in the same individuals as Judge Jack found in MDL1553.

DR. BALLARD intentionally or recklessly falsely interpreted chest x-rays as positive for the presence of abnormalities consistent with asbestos exposure, intentionally or recklessly relied other physicians' false positive interpretations of chest x-rays performed contrary to medical standards, intentionally or recklessly relied upon false and/or inadequate histories of exposure to asbestos containing products taken contrary to medical standards by medically untrained and unqualified individuals, intentionally or recklessly failed to perform an adequate physical examination and medical history contrary to medical standards, intentionally or recklessly relied upon false and/or manipulated PFTs, and intentionally or recklessly disregarded medical standards to intentionally or recklessly generate false diagnoses of asbestos-related disease.

DR. BALLARD knew or could reasonably foresee that the false medical reports (false x-ray reads, false/manipulated PFTs, false medical, exposure and smoking histories, false diagnostic reports) he generated for personal injury asbestos law firms and attorneys would be used to support personal injury claims

16

for asbestos-related disease against companies, such as Plaintiff, and/or asbestos bankruptcy trust claims.

DR. BALLARD intended that Plaintiff and others would rely on the false medical reports he and other Defendants generated as legitimate statements of the physical condition of individuals by reliable medical professionals and pay millions of dollars in verdicts, settlements and costs to defend false claims of asbestos-related injuries.

As part of executing the scheme to defraud Plaintiff of millions of dollars through the submission of false claims, DR. BALLARD used, caused to be used, or could reasonably foresee the use of the U.S. mails, private couriers and interstate wire services to transmit the false medical reports among Defendants (including shipping x-rays, false x-ray reports, false exposure, medical and smoking history reports, false/manipulated PFT reports and false diagnostic reports) as well as correspondence and communication among Defendants relating to the scheme and actions necessary to accomplish the scheme, payment of fees he received for generating the false medical reports, and to transmit the false medical reports to Plaintiff and others and for payment of claims and payment of settlements and costs.

DR. BALLARD concealed the Defendants' fraudulent conduct through false, vague and misleading testimony in hearings and depositions. DR. BALLARD produced some records regarding his litigation work in approximately June 2005, under subpoena in the Plibrico bankruptcy matter, in which Plaintiff was not a party and did not have access to the records at the time of production.

Following Judge Jack's Ruling in MDL1553, DR. BALLARD has refused to answer questions about his screening and litigation activities, invoking his Fifth Amendment right not to incriminate himself. Numerous asbestos bankruptcy trusts banned DR. BALLARD reports.

g. **PHILLIP H. LUCAS, M.D. ("DR. LUCAS")**

DR. LUCAS is a resident of Madison, Mississippi. He is a radiologist (not board certified) licensed in Mississippi. DR. LUCAS performed tens of thousands of B reads and thousands of physical examinations for personal injury law firms and attorneys in asbestos litigation. He also rendered diagnoses at the request of screening companies and/or personal injury law firms and attorneys.

Contrary to accepted standards for the interpretation and classification of chest x-rays for the presence of abnormalities associated with asbestos exposure established by the International Labour Office, DR. LUCAS only recorded what he thought was important when performing x-ray reads for personal injury attorneys and did not record certain items (e.g., calcifications in thoracic aorta; degenerative changes in skeletal tissue) as unimportant to what he was being consulted about.

In reading x-rays for litigation, DR. LUCAS did not rule out any of the hundreds of other diseases which may cause interstitial fibrosis. However, in his medical practice, he reads films for any and all diseases. In rendering a "presumptive diagnosis" of asbestosis in litigation, DR. LUCAS does not rule out other causes for the conditions he observes, contrary to accepted medical standards for the diagnosis of disease.

18

In his regular medical practice, DR. LUCAS does not prescribe x-rays. However, DR. LUCAS prescribed x-rays in his litigation work for attorneys requiring orders to have their clients x-rayed. The personal injury attorneys decided who would receive an x-ray. DR. LUCAS issued a "blanket" x-ray order at the request of a law firm or attorney without any prior review of records or examination of individuals. These blanket orders were not limited as to time, location, or number of individuals to be x-rayed.

DR. LUCAS charged more money for positive B reads ($70 each) than for negative B reads (only $35 each).

DR. LUCAS intentionally or recklessly falsely interpreted chest x-rays as positive for the presence of abnormalities consistent with asbestos exposure, intentionally or recklessly relied other physicians' false positive interpretations of chest x-rays performed contrary to medical standards, intentionally or recklessly relied upon false and/or inadequate histories of exposure to asbestos containing products taken contrary to medical standards by medically untrained and unqualified individuals, intentionally or recklessly performed a cursory and/or inadequate physical examination and medical history contrary to medical standards, intentionally or recklessly relied upon false and/or manipulated PFTs, and disregarded medical standards to intentionally or recklessly generate false diagnoses of asbestos-related disease.

DR. LUCAS knew or could reasonably foresee that the false medical reports (false x-ray reads, false/manipulated PFTs, false medical, exposure and smoking histories, and false diagnostic reports) he generated for personal injury

19

asbestos law firms and attorneys would be used to support personal injury claims for asbestos-related disease against companies, such as Plaintiff, and/or asbestos bankruptcy trust claims.

DR. LUCAS intended that Plaintiff and others would rely on the false medical reports he and other Defendants generated as legitimate statements of the physical condition of individuals by reliable medical professionals and pay millions of dollars in verdicts, settlements and costs to defend false claims of asbestos-related injuries.

As part of executing the scheme to defraud Plaintiff of millions of dollars through the submission of false claims, DR. LUCAS used, caused to be used, or could reasonably foresee the use of the U.S. mails, private couriers and interstate wire services to transmit the false medical reports among Defendants (including shipping x-rays, false x-ray reports, false exposure, medical and smoking history reports, false/manipulated PFT reports and false diagnostic reports) as well as correspondence and communication among Defendants relating to the scheme and actions necessary to accomplish the scheme, payment of fees he received for generating the false medical reports, and to transmit the false medical reports to Plaintiff and others and for payment of claims and payment of settlements and costs.

DR. LUCAS concealed the Defendants' fraudulent conduct through false, vague and misleading testimony in hearings and depositions and through his intentional non-retention policy for records by sending the medical reports he

generated back to the law firms or attorneys or screening companies and not keeping any records in his own files.

**h. JOHN DOE DEFENDANTS 1-20**

The John Doe Defendants 1-20 include the following:

i.  Personal injury law firms and/or individual attorneys that *directly* hired Defendants, including "broker firms" and attorneys, to generate false medical reports to support asbestos-related personal injury claims against NSI, as well as other personal injury tort defendants and bankruptcy trusts. The participation of these John Doe Defendant law firms and individual attorneys included, but was not limited to, (a) hiring DR. SEGARRA, RTS, DR. BALLARD, DR. LUCAS and/or one or more other Defendants, (b) knowing or recklessly disregarding that the enterprise achieved desired high positive rates and necessary exposure by using the "right doctors," (c) providing financial support and supplying individuals for screenings, (d) directing the types of tests to be administered, the exposure criteria to be created and the specific disease to be diagnosed, and (e) concealing Defendants' fraudulent scheme, all for the purpose of generating personal injury cases to obtain lucrative fees based on settlements of the fraudulent cases.

ii.  Personal injury law firms and/or individual attorneys that *indirectly* hired Defendants through the purchase of asbestos-related injury claims inventories from another personal injury law firm (a "broker firm") or attorney to file false personal injury claims against Plaintiff and other

21

companies and asbestos bankruptcy trusts. The participation of these John Doe Defendant law firms and individual attorneys included, but was not limited to, providing financial support by paying for Defendants' fraudulent medical reports for the purpose of generating personal injury cases against NSI and other personal injury tort defendants and bankruptcy trusts, to obtain lucrative fees based on settlements of such fraudulent cases.

iii. One or more other asbestos (and silica) litigation screening companies that Defendants hired for purposes of recruiting claimants and generating false medical reports and diagnoses to support fraudulent asbestos-related personal injury claims. The participation of these John Doe Defendant screening companies included, but was not limited to, recruiting claimants, generating false exposure history documentation, administering chest x-rays, performing false x-ray reads through hired B readers, including Defendants, conducting physical examinations through hired physicians, including Defendants, administering and manipulating PFTs and generating false diagnoses through hired physicians, including Defendants, for Defendants' fraudulent scheme for the purpose of generating false personal injury claims against NSI and other personal injury tort defendants and bankruptcy trusts and generating massive income for the companies and owners.

iv. One or more other medical doctors contracted by RTS, and/or by one or more other of the Defendants, who fabricated medical reports and

diagnoses to support false asbestos personal injury claims against NSI and other personal injury tort defendants and asbestos bankruptcy trusts. The participation of the John Doe Defendant medical doctors included, but was not limited to, fabricating such false medical reports and diagnoses in return for payment and the provision of future work from the illegal enterprise.

v. X-ray and PFT technicians, intake personnel, secretaries and other personnel employed by or contracted to RTS and/or other Defendants. The participation of the John Doe Defendant contracted or employed personnel included, but was not limited to, supplying false medical reports and diagnoses to the personal injury law firms and attorneys to use in filing lawsuits and false claims against NSI and other personal injury defendants and bankruptcy trusts.

The John Doe Defendants knew or could reasonably foresee that the false medical reports (false x-ray reads, false/manipulated PFTs, false medical, exposure and smoking histories, and false diagnostic reports) generated would be used to support false personal injury claims for asbestos-related disease against companies, such as Plaintiff, and/or asbestos bankruptcy trust claims.

The John Doe Defendants intended that Plaintiff and others would rely on the false medical reports as legitimate statements of the physical condition of individuals by reliable medical professionals and pay millions of dollars in verdicts, settlements and costs to defend false claims of asbestos-related injuries.

23

As part of executing the scheme to defraud Plaintiff of millions of dollars through the submission of false claims, the John Doe Defendants used, caused to be used, or could reasonably foresee the use of the U.S. mails, private couriers and interstate wire services to transmit the false medical reports among Defendants (including shipping x-rays, false x-ray reports, false exposure, medical and smoking history reports, false/manipulated PFT reports and false diagnostic reports) as well as correspondence and communication among Defendants relating to the scheme and actions necessary to accomplish the scheme, payment of fees he received for generating the false medical reports, and for communication with and transmission of the false medical reports to Plaintiff and others and for payment of false claims and payment of settlements and costs.

3.    Plaintiff is presently unaware of other wrongdoers not listed above.

4.    Alleged victims and how each was injured:

a.    Plaintiff, NSI, was injured by Defendants' wrongful conduct which caused NSI to pay millions of dollars to defend and/or settle thousands of false asbestos personal injury claims supported by the false medical reports and diagnoses generated by Defendants through the Segarra Enterprise.

b.    Individuals falsely diagnosed with asbestos-related disease by the Defendants who believed the false diagnoses and that they suffered from an untreatable respiratory disease, and as a result failed to seek proper medical treatment for other medical conditions (e.g., COPD or asthma) or suffered a decline in cardiopulmonary health because of the psychological effect of the false diagnoses.

c. Individuals who truly have asbestos-related diseases whose compensation for legitimate personal injury claims has been reduced as a result of the financial impact on asbestos personal injury defendants and bankruptcy trusts of the massive numbers of personal injury claims, including the tens of thousands of false claims based on the Defendants' false medical records.

d. Other asbestos litigation tort defendants were injured similarly as Plaintiff, NSI, by Defendants' wrongful conduct because they had to pay money to defend and/or settle thousands of false asbestos personal injury claims supported by the Defendants' false medical reports.  Many companies have been driven into bankruptcy under the weight of massive asbestos personal injury claims, including thousands of false claims generated by Defendants.

e. Asbestos bankruptcy trusts which have paid thousands of false claims based on the Defendants' false medical reports.

f. Individuals who were once employed by companies driven into bankruptcy under the weight of massive false asbestos personal injury claims, including the thousands of claims based on the Defendants' false medical records, and who have lost retirement funds due to bankruptcy and/or have lost their jobs.

g. The state and federal courts in which false claims based on the Defendants' false medical records have been filed, which have been injured by the expense and consumption of scarce judicial resources resulting from the massive number of false claims generated by Defendants.

5. Pattern of Racketeering

a. Predicate acts and specific statutes violated:

Attached to this Statement is Exhibit 1, which provides a list of 31,806 individuals who asserted personal injury claims against NSI for asbestos-related injuries, which claims NSI has settled and paid. Each claim is a separate racketeering predicate act as defined by 18 U.S.C. §1961(a). Each claim involved the use of the U.S. mails or private courier or interstate wire services in violation of 18 U.S.C. §§1341 and 1343.

b.  Dates of predicate acts, participants in predicate acts and description of facts surrounding predicate acts:

   i.  The dates of each predicate act identified in Exhibit 1 are multiple and varied. Dates include:

   ▪ EXHIBIT 1: The "file date" that each lawsuit or claim was filed against NSI is listed on Exhibit 1. Filing dates range from October 15, 1990 to March 16, 2006 (the data contains two file dates in 1972 which are believed to be data entry errors). The "settlement date" is the date that each claim was settled pursuant to an agreement with NSI is provided on Exhibit 1 for each claim. Settlement dates range from February 27, 2001 to October 5, 2007. The "paid date" is the date that NSI paid money on each claim. Paid dates range from January 1, 2001 to July 30, 2008.

   ▪ The date of each predicate act identified on Exhibit 1 includes the dates of mailing, courier or wire transmission by NSI and/or its agents, third party claims processing companies, of settlement payments to claimants' attorneys on the claims identified on

Exhibit 1. The payments were transmitted on or about the paid dates shown on Exhibit 1.

- The date of each predicate act identified on Exhibit 1 includes the dates that the false medical reports were submitted to NSI and/or its agents, third party claims processing companies, via mailings, courier or wire transmissions. The dates of submission were numerous and are not presently recorded in a summary table, but occurred sometime after the settlement date and before the paid date shown on Exhibit 1.

- The date of each predicate act identified on Exhibit 1 includes the dates of misrepresentation by each claimant's attorney via a mailing, courier or wire transmission that claims identified on Exhibit 1 were based on legitimate medical reports and diagnoses. These dates are not known with specificity but were made at least by the file date of the lawsuits or claims against NSI and usually before the settlement date.

- The date of each predicate act includes the dates that the false medical reports and/or x-ray films were transmitted among Defendants by mailing, courier or wire transmission. These dates are not currently known to Plaintiff with specificity because the information has not yet been produced or provided by the Defendants. Upon information and belief, the dates of Defendants' transmissions of reports and/or x-rays are generally close to the

27

dates of the Defendants' B read, PFT or diagnostic reports for the
claimants identified on Exhibit 1, and before the paid dates.

- The date of each predicate act listed in Exhibit 1 includes the dates
of mailing, courier or wire transmission of payments by law firms
to Defendants for services rendered. Plaintiff has obtained only
partial and incomplete information from which to determine these
payment dates which are numerous, and such partial information
has not yet been recorded in a summary table. Upon information
and belief, the transmission of payments by law firms and
attorneys to Defendants for their services generally occurred within
a commercially reasonable time after billing.

- The date of each predicate act listed in Exhibit 1 includes the dates
of mailing or wire transmission of bills and invoices by Defendants
for services rendered. Plaintiff has obtained only partial and
incomplete information from which to determine these billing and
invoice dates which are numerous, and such partial information has
not yet been recorded in a summary table. Upon information and
belief, the transmission of bills and invoices by the Defendants for
their services occurred shortly after the dates of the Defendants' B
read, PFT or diagnostic reports for the claimants identified on
Exhibit 1.

- The date of each predicate act listed in Exhibit 1 includes the dates
of mailing, courier or wire transmission of payments from

Defendants to their employees, agents and independent contract workers for services rendered in the screenings and in the preparation of the false medical reports. These dates are not currently known to Plaintiff with specificity because the information has not yet been produced or provided by the Defendants. Upon information and belief, the transmission of payments by Defendants for services occurred shortly after the dates of the Defendants' B read, PFT or diagnostic reports for the claimants identified on Exhibit 1.

- The date of each predicate act listed in Exhibit 1 includes the dates of mailing and wire transmission of mass marketing and solicitation material to solicit individuals for Defendants' screenings, which dates are not known with specificity at this time because the information has not yet been produced or provided by the Defendants. Upon information and belief, the transmissions occurred prior to the dates of the Defendants' B read, PFT or diagnostic reports for the claimants identified on Exhibit 1.

- The date of each predicate act listed in Exhibit 1 includes the dates of mailing of false marketing and solicitation material to personal injury law firms and attorneys, which dates are not known with specificity at this time because the information has not yet been produced or provided by the Defendants. Upon information and belief, the transmissions occurred prior to the dates of the

29

Defendants' B read, PFT or diagnostic reports for the claimants identified on Exhibit 1.

ii.    Participants in each predicate act are multiple and varied:

- Each predicate act involved at least one participant in the Segarra Enterprise, including Defendants listed in Paragraph 2, above. Additionally, each claim may involve one or more John Doe Defendants. Finally, each act may involve other wrongdoers unknown to Plaintiff at this time. The identity of each participant known to Plaintiff at this time is listed for each claim on Exhibit 1.

iii.    Facts surrounding each predicate act are multiple and varied, but generally involved the same or similar mass assembly-line style of litigation screenings starting with marketing using false material and solicitation of thousands of potential claimants for asbestos screenings. Once at the screenings, claimants underwent chest x-rays often administered in violation of state law. X-rays were then intentionally or recklessly interpreted falsely by Defendants DR. SEGARRA, DR. BALLARD, DR. LUCAS or a John Doe physician Defendant. False and/or unreliable exposure, medical and smoking histories were generated, either by personnel for the screening company like RTS or the asbestos personal injury law firm or attorney. Defendants DR. SEGARRA, DR. LUCAS or a John Doe physician Defendant performed a perfunctory physical examination. The screening company then administered a PFT to claimants with positive x-ray reads. RTS and/or other John Doe screening

company Defendants intentionally or recklessly administered PFTs in violation of established standards established by the American Thoracic Society and/or manipulated PFTs to demonstrate false impairment. DR. SEGARRA, DR. BALLARD, DR. LUCAS and/or other John Doe physician Defendants then issued false diagnoses intentionally or recklessly disregarding the false and/or manipulated test results, and false and/or unreliable exposure, medical and smoking histories. FITZGERALD and/or other law firm and attorney customers, including John Doe Defendants, then used the false medical reports and diagnoses to file claims for each individual listed in Exhibit 1 against NSI. The law firm and attorney customers, including John Doe Defendants, misrepresented to NSI that each claim was legitimate and supported by legitimate medical evidence. NSI reasonably relied on the false representations contained in the false medical reports and false diagnoses as well as false representations made to NSI by the law firms and attorney customers, including John Doe Defendants, in entering into the settlements and making settlement payments. Given the overwhelming volume of claims asserted against it, NSI, was forced to settle thousands of claims that it now knows involve false medical reports and false diagnoses generated by Defendants. Once an "inventory" of claims was settled, the law firms and attorney customers, including John Doe Defendants, submitted the false medical reports and false diagnoses to NSI or it agents. The records submitted were reviewed by non-medical staff for compliance

with the terms of the applicable settlement agreement. NSI tendered payment in amounts ranging from $50 to $150,000 in reliance on the false medical reports.

    iv.    Moreover, Defendants intentionally concealed their fraudulent scheme by refusing to produce records, intentionally failing to retain records or intentionally or recklessly destroying records, including medical records evidencing inconsistent x-ray reads and diagnoses, PFT reports with complete information including error codes and diffusion capacity tests graphs, and medical records and reports on screened subjects who were "negative" for asbestos-related disease, including negative B read reports, and by providing false, vague and misleading testimony or asserting the right not to testify under the Fifth Amendment to the United States Constitution when questioned about their litigation activities.

c.    RICO claims based on predicate offenses of mail fraud and wire fraud: Each predicate act identified on Exhibit 1 includes the acts of mail fraud and/or wire fraud. The "circumstances constituting fraud or mistake" include the false statements in marketing material used to recruit law firm customers and potential claimants, false medical reports, including false positive x-ray reads, false or unreliable exposure, medical and smoking histories, false and/or manipulated PFTs and false positive diagnoses. These documents were submitted to NSI through the U.S. mails or private courier with the intent that NSI would rely on the records in making payment on settled cases. Additionally, Defendants used the wire services and mails to transmit materials and records and associated

32

correspondence and communication to execute their fraudulent scheme. Exhibit 1
identifies various dates (claims/suit filed; claims settled; claims paid) as well as
the state in which claims originated or were settled and the identity of parties,
including Defendants DR. SEGARRA, DR. BALLARD, DR. LUCAS, RTS, and
other physicians associated with RTS as well as the asbestos personal injury law
firm or attorney with whom NSI negotiated and settled each claim. Involvement
of additional parties is unknown at this time.

d.  Upon information and belief, there has been no criminal conviction for the
violation of the predicate acts. Both FOSTER and DR. BALLARD have asserted
their rights against self-incrimination pursuant to the Fifth Amendment of the
U.S. Constitution in refusing to answer questions and/or produce documents about
their litigation screening activities. *See* Paragraph 19 (d) and (e), below,
Additional Information.

e.  Upon information and belief, there has been no judgment in regard to the
predicate acts other than in the underlying personal injury litigation.

f.  The predicate acts listed in Exhibit 1 form a "pattern of racketeering activity" in
that they constitute at least two and more than 31,000 predicate acts, all of which
occurred after the enactment of the RICO statute and the last predicate act as
listed occurred within 10 years of a prior predicate act listed on Exhibit 1.

g.  The predicate acts identified in Exhibit 1 relate to each other as part of a common
plan to defraud NSI and others through the generation of false asbestos personal
injury claims. Furthermore, the predicate acts identified on Exhibit 1 are related
in that they were the result of conduct by persons associated for the purpose of

recruiting and generating claimants and then generating the necessary false evidence to achieve the purpose of defrauding NSI and others. The predicate acts in Exhibit 1 are also related in that they have been ongoing for years and in the method and means of executing an overall scheme. Furthermore, upon information and belief, Defendants are still operating to generate claims.

6.    Enterprise for each RICO claim: The "Segarra Enterprise" is the same enterprise responsible for each RICO claim in the accompanying Complaint and associated with each predicate act identified in Exhibit 1, although not each claim involves each member of the Segarra Enterprise.

    a.  The "Segarra Enterprise" consists of Defendants DR. SEGARRA, RTS, FOSTER, FITZGERALD, TAYLOR, DR. BALLARD, DR. LUCAS, and JOHN DOE DEFENDANTS 1-20.

    b.  The Segarra Enterprise is primarily directed and managed by DR. SEGARRA. DR. SEGARRA was the medical director for RTS, responsible for directing all medical aspects of RTS' asbestos screenings. DR. SEGARRA is also the medical director and/or the *de facto* medical director when working with John Doe screening company Defendants. FOSTER as the owner of RTS, at times directed DR. SEGARRA and other Defendants in accordance with directions or requests from RTS' law firm and attorney customers and at times took direction from DR. SEGARRA on how to conduct screenings. FOSTER also directed and managed the business operations of RTS including personnel hiring and training. FOSTER and TAYLOR together were responsible for marketing of RTS to law firms and attorneys, and solicitation of potential claimants. Upon information and belief,

34

FOSTER directed TAYLOR and RTS regarding aspects of RTS operations related to marketing. Upon information and belief, TAYLOR directed FOSTER and RTS in matters related to screening arrangements and daily operations at screenings. FITZGERALD was both a customer of RTS and at times directed the development of RTS' business plan and marketing methods with FOSTER, TAYLOR, and DR. SEGARRA. DR. BALLARD and DR. LUCAS were responsible for false x-ray reads and false diagnoses in agreement with and at the direction of DR. SEGARRA, RTS, FOSTER, TAYLOR, FITZGERALD and other personal injury law firms and attorneys, including John Doe Defendants. Below is a chart of the structure of the Segarra Enterprise as Plaintiff has been able to ascertain:



35

The structure of the Segarra Enterprise is an ongoing association of the Defendants, including John Doe Defendants, by which medical screening, testing, evaluation and diagnoses are rendered for personal injury law firms and attorneys. The decision-making for the enterprise is at times hierarchical based on decisions by DR. SEGARRA, FOSTER, and/or John Doe Defendant law firms and attorneys, but is otherwise consensual among the enterprise participants.

c.  No Defendants are employees, officers or directors of the enterprise.

d.  All Defendants are associated with the Segarra Enterprise, which does not have a formal legal structure.

e.  Defendants are individuals or entities separate from the enterprise which formed through the association of Defendants. Plaintiff does not allege that any of the Defendants are the enterprise itself, or that any Defendant is a member (such as a shareholder, director or partner) of the enterprise.

f.  No Defendant is alleged to be the enterprise itself.

7.  Plaintiff alleges that the pattern of racketeering activity and the enterprise are separate. Defendants associated for some lawful purposes as well as for mainly the purpose of committing the unlawful acts which comprise the pattern of racketeering activity. Defendants' association in the Segarra Enterprise provides medical screening, evaluation and diagnostic services to personal injury law firms and attorneys in cases of actual or suspected asbestos and silica related disease. The activities of the Segarra Enterprise, formed by the association of the Defendants, provide such medical screening, testing, evaluation and diagnostic services in false claims of alleged asbestos-related disease, including those claims identified as

predicate acts that form the pattern of racketeering activity. The enterprise also provides medical screening, testing, evaluation and diagnostic services for some legitimate cases of asbestos and/or silica related disease.

8.    The activities of the Segarra Enterprise are primarily to provide medical screening, testing, evaluation and diagnosis of asbestos or silica related disease for personal injury law firms and individual attorneys. The Segarra Enterprise provides these services in both some legitimate claims of asbestos or silica related disease, but mainly in illegitimate claims supported by false medical records, reports and diagnoses generated by the Defendants through the enterprise, including the illegitimate claims of asbestos-related disease which are the subject of the Complaint. The Segarra Enterprise provides similar services in legitimate claims as those provided in the illegitimate claims of alleged asbestos-related disease which constitute the pattern of racketeering activity. In both legitimate and illegitimate asbestos-related disease claims, Defendants, through the enterprise, provide the same scope of services, and generate the same or similar documentation. In legitimate claims, the enterprise's medical records, reports and diagnoses are generally consistent with accepted medical standards for the evaluation and diagnosis of asbestos-related disease. However, in the illegitimate cases, the medical records, reports and diagnoses Defendants generated through the enterprise give the false appearance that they are consistent with accepted medical standards, although such records, reports and diagnoses have been generated in disregard of accepted medical standards in the evaluation and diagnosis of asbestos-related disease.

9.    The Segarra Enterprise and its members have benefitted from the pattern of racketeering in that it has received millions of dollars in fees (including charges for screening services, diagnoses and contingent attorney fees). Through its ability to generate massive volumes of claims, the Segarra Enterprise also benefitted from the inability of the court system and Plaintiff NSI to scrutinize each claim individually as occurs in "traditional" tort litigation. Furthermore, the Segarra Enterprise benefitted in its ability to continue, with virtual impunity, its illegal conduct without detection due to its fraudulent concealment of its scheme and the conduct/means to achieve its purpose.

10.    The effect of the activities of the Segarra Enterprise on interstate commerce has been immense. Financially, the Segarra Enterprise has extracted more than $80 million from Plaintiff NSI and undoubtedly similar payments from other defendants similarly situated, as well as from numerous asbestos personal injury bankruptcy trusts. The cost of defending and or settling the false claims generated by the Segarra Enterprise resulted in millions of dollars in defense attorney fees and costs and costs in settled claims administration paid by Plaintiff NSI and upon information and belief, similar costs to other defendants similarly situated, and bankruptcy trusts. The effect of the Segarra Enterprises activities has contributed to the bankrutpcy of numerous asbestos defendant companies, the drain on resources for legitimate claimants and resources of the court system.

11.    The Complaint does not allege violation of 18 U.S.C. §1962(a).

12.    The Complaint does not allege violation of 18 U.S.C. §1962(b).

13.    The Complaint alleges a violation of 18 U.S.C. 1962(c).

    a.  No Defendant is employed by the Segarra Enterprise. Each Defendant, including John Doe Defendants, is associated with the enterprise.

    b.  No Defendant is both a liable "person" and the "enterprise" under § 1962(c).

14.    The Complaint alleges a violation of 18 U.S.C. 1962(d).

Each Defendant, including each John Doe Defendant, is alleged to have violated §1962(d). Each Defendant, including each John Doe Defendant, is a "person" associated with the Segarra Enterprise.

Each Defendant, including each John Doe Defendant, conspired to violate §1962(c). The conspiracy is alleged to have started in or about 1992 when DR. SEGARRA first became a litigation physician with PFL and learned how to manipulate medical screenings to generate massive volumes of asbestos injury claimants for personal injury law firms and attorneys. In 1994, FOSTER, DR. SEGARRA and FITZGERALD agreed to start RTS to conduct asbestos litigation screenings. FOSTER, DR. SEGARRA and FITZGERALD agreed to a "business plan" that would generate approximately 40% to 60% positive diagnoses, which positive rate would be sufficient to generate enormous income with less risk of detection of fraudulent activity such as PFL at 90% and PTS, where FOSTER previously worked, also with a positive rate in excess of 90%. While RTS was dissolved in 2008, Plaintiff alleges that this is a long term, continuing enterprise and conspiracy with various associates from 1992 through present.

FOSTER and FITZGERALD agreed to recruit potential claimants for screening through the local union contacts FOSTER had from his work as a pipe fitter. They agreed to hide FITZGERALD as the actual sponsor of the screening and generated

documentation to conceal the true sponsorship and solicitation of screening recruits. DR. SEGARRA, DR. LUCAS, DR. BALLARD and other John Doe Defendant physicians agreed with DR. SEGARRA and FOSTER to generate false B reads of x-rays films to generate more positive diagnoses than would actually occur in an exposed population. Defendants, including John Doe Defendant x-ray and PFT technicians, agreed with FOSTER, DR. SEGARRA and/or others to disregard medical standards and/or manipulate tests to generate more "positive" results to support false diagnoses. FOSTER, TAYLOR, FITZGERALD, other Defendants, including John Doe Defendant general office staff and personnel agreed to generate false exposure, medical and smoking histories to support false diagnoses. Defendants, including John Doe Defendant personal injury law firms and attorneys, agreed to file asbestos (and silica) injury claims using the false documentation and false diagnoses against Plaintiff, other companies and bankruptcy trusts in massive numbers to force Plaintiff to settle inventories of claims without the benefit or opportunity to review each claim on the merits and avoid detection of the false claims.

The object of the conspiracy was to generate a massive volume of asbestos (and silica) personal injury claims to force asbestos (and silica) litigation tort defendants, including Plaintiff, and asbestos bankruptcy trusts, to settle false claims. Defendants intended to and did overwhelm the civil tort system, Plaintiff, other companies and asbestos bankruptcy trusts, with the volume of claims generated, forcing Plaintiff to settle inventories of claims, including false claims, without the benefit or opportunity of review of the merits of each claim. Defendants' goal was to extract money on false

claims and Plaintiff, relying on Defendants' false documentation and representations, did settle false claims as identified in the Complaint as predicate acts.

The overt acts Defendants engaged in to further the conspiracy include:

- DR. SEGARRA intentionally or recklessly disregarded medical standards for the interpretation of x-ray films for abnormalities consistent with asbestos or silica exposure to generate false positive B reads. DR. SEGARRA intentionally or recklessly relied on false or unreliable exposure histories and medical and smoking histories to generate false positive diagnoses. DR. SEGARRA intentionally or recklessly falsely diagnosed individuals, as identified in the Complaint as predicate acts, with asbestos-related disease.

- DR. BALLARD intentionally or recklessly disregarded medical standards for the interpretation of x-ray films for abnormalities consistent with asbestos or silica exposure to generate false positive B reads. DR. BALLARD intentionally or recklessly relied on false or unreliable exposure histories and medical and smoking histories to generate false positive diagnoses. DR. BALLARD intentionally or recklessly falsely diagnosed individuals, as identified in the Complaint as predicate acts, with asbestos-related disease.

- DR. LUCAS intentionally or recklessly disregarded medical standards for the interpretation of x-ray films for abnormalities consistent with asbestos or silica exposure to generate false positive B reads. DR. LUCAS intentionally or recklessly relied on false or unreliable exposure histories

and medical and smoking histories to generate false positive diagnoses. DR. LUCAS intentionally or recklessly falsely diagnosed individuals, as identified in the Complaint as predicate acts, with asbestos-related disease.

- John Doe Defendant physicians and/or B readers intentionally or recklessly disregarded medical standards for the interpretation of x-ray films for abnormalities consistent with asbestos or silica exposure to generate false positive B reads.    John Doe Defendant physicians intentionally or recklessly relied on false or unreliable exposure histories and medical and smoking histories to generate false positive diagnoses. John Doe Defendant physicians intentionally or recklessly falsely diagnosed individuals, as identified in the Complaint as predicate acts, with asbestos-related disease.

- FOSTER, FITZGERALD, TAYLOR and other Defendants used false marketing and solicitation material to recruit customers (personal injury law firms and attorneys) and screening subjects to process through screenings with FOSTER, FITZGERALD, TAYLOR, DR. SEGARRA, DR. BALLARD, DR. LUCAS and/or other Defendants, including John Doe Defendants, to generate false medical reports and diagnoses for FITZGERALD and John Doe Defendant law firms and attorneys to use in filing claims.

- Defendants, including John Doe Defendants, each concealed the fraudulent activities of the Segarra Enterprise by withholding inconsistent and contradictory diagnoses and medical reports, through false, misleading

or vague testimony, refusals to answer questions or produce documents properly ordered in discovery, and the failure to retain proper records subject to discovery.

■ Each Defendant, including John Doe Defendants, agreed with at least one other Defendant to participate in the conspiracy to generate false claims to extract money from Plaintiff and others similarly situated. Each Defendant, including John Doe Defendants, knew or intentionally or recklessly disregarded that his or her overt acts were part of a pattern of racketeering activity.

15. Plaintiff alleges that it was injured in its business property as a direct result of Defendants' violation of the RICO statute.

Defendants, including John Doe Defendants, violated the RICO statute through a pattern of racketeering activity that involved the frequent use of the U.S. mails, private couriers and interstate wire services to file false personal asbestos injury claims against Plaintiff, which claims were supported by false medical records and reports generated by Defendants with the intent to defraud Plaintiff, and others similarly situated, through the defense and settlement of false claims.

Plaintiff reasonably relied on the false statements by Defendants and entered settlement agreements to settle false claims as detailed in the Complaint and identified predicate acts. Plaintiff was directly injured by having to pay defense costs to defend false claims generated by Defendants, settlement payments and administrative costs for processing settlement claims.

16.    Defendant is liable for damages to Plaintiff for costs to defend the lawsuits and claims
       of the claimants identified in Exhibit 1; settlement payments made upon the claims of
       the claimants identified in Exhibit 1; costs of administering and processing the
       claims; treble damages and punitive damages as provide by statute and state law; and
       attorney fees and costs for bringing this action.    There are in excess of 31,000
       claimants identified on Exhibit 1.  The total of settlement payments on the claims of
       the claimants identified on Exhibit 1 is between $80 million and $90 million.

17.    No other federal causes of action are alleged.

18.    Pendent state claims include Common Law Fraud, Aiding and Abetting Fraud, and
       Negligent Misrepresentation.

19.    Additional information:

       a.  The reports and diagnostic practices of Defendants DR. SEGARRA, DR.
           BALLARD and DR. LUCAS were evaluated and found to be unreliable by Dr.
           Steven E. Haber in a report prepared June 11, 2007 in connection with the W. R.
           Grace & Co. bankruptcy.  Dr. Haber also found the reports generated on behalf of
           RTS or based on RTS data to be unreliable.  Exhibit 2, "Diagnostic Practices in a
           Litigation Context: Screening Companies And The Doctors They Employed,"
           Steven E. Haber, M.D., F.C.C.P., June 11, 2007.  Both plaintiffs and defendants
           in the asbestos (and silica) litigation have hired Dr. Haber and/or his partners at
           the Texas Occupational Medicine Institute as medical experts.

       b.  Reports by DR. BALLARD and by RTS have been banned by numerous asbestos
           personal injury bankruptcy trusts, including: the JM Trust (in or about September
           2005); the Celotex and Eagle-Picher trusts (in or about October 2005); the Keene

44

trust (in or about April 2006); the Babcock and Wilcox trust (in or about July 2006), the Plibrico trust (in or about October 2006); and the Owens Corning, U.S. Gypsum and Armstrong trusts (in or about May 2008). The trust policies banning their reports are attached in Exhibit 3.

c.  Some of the Defendants herein were witnesses in the civil RICO actions brought by Owens Corning against screening companies and associated parties, and later settled, including an action brought in the United States District Court for the Southern District of Mississippi.  Exhibit 4, First Amended Complaint in *Owens Corning v. Glenn E. Pitts, et al.*, Civil Action No. C-96-2095 (E.D. La.), and Exhibit 5, Complaint in *Owens Corning v. William T. McNeese and Pulmonary Function Laboratory, Inc.*, Civil Action No. 3:97CV29 (S.D. Miss.).

d.  FOSTER has asserted his rights against self-incrimination under the Fifth Amendment to the U.S. Constitution in response to questions about his involvement in silica litigation screening on March 8, 2006 before the U.S. House of Representatives Oversight and Investigations Subcommittee of the Energy and Commerce Committee; and in civil asbestos or silica litigation depositions in October 2006, August 2007 and October 2007.

e.  DR. BALLARD has asserted his rights against self-incrimination under the Fifth Amendment to the U.S. Constitution in response to a subpoena for the production of documents in MDL1553 on November 29, 2005, in March 2006 before the U.S. House of Representatives Oversight and Investigations Subcommittee of the Energy and Commerce Committee, in February 2007 and March 2007 in civil asbestos litigation to questions about his involvement in asbestos and silica

litigation screening and in response to a subpoena for production of documents on December 5, 2005 in the federal asbestos MDL875.

f.  DR. SEGARRA personally conducted screenings performing B reads, interpreted PFTs, performed physical examinations and rendered diagnoses on at least 4,900 individuals in 23 states without being licensed to practice medicine in those states. Exhibit 6, Deposition Exhibit 6, Deposition of Dr. Jay Segarra, *In re W.R. Grace & Co.* (November 20, 2006 S.D. Miss.).

g.  DR. SEGARRA was excluded as an expert in an asbestos personal injury case in the State of Washington based upon his practice of medicine without a license and reliance on reports generated by RTS using unlicensed and uncertified x-ray and PFT equipment and technicians.  Exhibit 7, Order in *In re Certain Asbestos Cases (ACR XXIV Cases)*, No. 89-2-18455-9-SEA, October 15, 2002 (Super. Ct., King County, Washington).

h.  Upon information and belief, the PFT equipment used by RTS, and the computer hard drives on which the original electronic copies of RTS' PFTs are stored, are in the custody of the United States Postal Service or the United States Attorney's Office for the Southern District of New York pursuant to a subpoena issued in or about 2006.

THIS 12th day of February, 2009

RESPECTFULLY SUBMITTED:

NATIONAL SERVICE INDUSTRIES, INC.
f/d/b/a NORTH BROTHERS, INC., PLAINTIFF


MARCY B. CROFT
ATTORNEY FOR PLAINTIFF


MARCY B. CROFT, MS. BAR NO. 10864
WALTER G. WATKINS, JR., MS. BAR NO. 6988
ASHLEY E. CALHOUN, MS. BAR NO. 101303
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
200 SOUTH LAMAR STREET, SUITE 100
JACKSON, MISSISSIPPI 39201
TELEPHONE:          (601) 960-8600
FACSIMILE:          (601) 960-8613


OF COUNSEL:
DAVID M. SETTER (Pro Hac)
JOHN M. SEEBOHM (Pro Hac)
JEANETTE S. EIRICH (Pro Hac)
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
1775 SHERMAN STREET, SUITE 1900
DENVER, COLORADO 80203
TELEPHONE:          (303) 837-6400
FACSIMILE:          (303) 318-9669

## EXHIBITS

Exhibit 1: Predicate Acts List

Exhibit 2: "Diagnostic Practices in a Litigation Context: Screening Companies And The Doctors They Employed," Steven E. Haber, M.D., F.C.C.P., June 11, 2007

Exhibit 3: Trust Bans (RTS and Ballard)

Exhibit 4: First Amended Complaint in *Owens Corning v. Glenn E. Pitts, et al.*, Civil Action No. C-96-2095 (E.D. La.)

Exhibit 5: Complaint in *Owens Corning v. William T. McNeese and Pulmonary Function Laboratory, Inc.*, Civil Action No. 3:97CV29 (S.D. Miss.)

Exhibit 6: Deposition Exhibit 6, Deposition of Dr. Jay Segarra, *In re W.R. Grace & Co.* (November 20, 2006 S.D. Miss.)

Exhibit 7: Order, *In re Certain Asbestos Cases (ACR XXIV Cases)*, No. 89-2-18455-9-SEA, October 15, 2002 (Super. Ct., King County, Washington)