**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

| | | |
|---|---|---|
| **NATIONAL SERVICE INDUSTRIES, INC.,** | ) | |
| **F/D/B/A NORTH BROTHERS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:09CV83HTW-LRA** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JAY T. SEGARRA, M.D.** | ) | |
| **RESPIRATORY TESTING SERVICES, INC.** | ) | |
| **CHARLES E. FOSTER** | ) | |
| **J. MICHAEL FITZGERALD, ESQ.** | ) | |
| **CHRISTOPHER LINN TAYLOR** | ) | |
| **JAMES W. BALLARD, M.D.** | ) | |
| **PHILLIP H. LUCAS, M.D.** | ) | |
| **JOHN DOE DEFENDANTS 1-20** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF RESPONSE IN OPPOSITION**
**TO MOTIONS TO DISMISS OF DEFENDANTS SEGARRA, FITZGERALD,**
**BALLARD AND LUCAS**

Plaintiff, National Service Industries, Inc. f/d/b/a North Brothers, Inc. ("NSI"), through its counsel, Forman Perry Watkins Krutz & Tardy LLP, submits this Memorandum in support of its Response in Opposition to Motions to Dismiss of Defendants Dr. Jay T. Segarra, J. Michael Fitzgerald, Dr. James W. Ballard and Dr. Phillip H. Lucas[1] and, in support, states as follows:

## I.    INTRODUCTION

Collectively, Defendants Segarra, Fitzgerald, Ballard and Lucas' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenge virtually every

---

[1] This Memorandum also applies to the joinders by the Defendants in the pending motions to dismiss based on Federal Rule of Civil Procedure 12(b)(6).

aspect of NSI's Complaint.  The Defendants threw everything they could at the wall to see what sticks.  Their arguments not only ignore NSI's well-pled allegations in its Complaint and the applicable law to the pleading of NSI's claims, but also overlook the overwhelming nature of the mass asbestos litigation.  NSI has more than sufficiently pled each of its claims, and the accrual of its claims within the applicable statutes of limitation.  Further, NSI pled its allegations of fraud with more than adequate particularity in view of the massive fraud committed by the Defendants in tens of thousands of underlying asbestos personal injury cases.  The Defendants' motions to dismiss pursuant to Rule 12(b)(6) must be denied and the matter needs to proceed to discovery to expeditiously reach trial.

### A.    Standard of Review of the Motions Pursuant to Rule 12(b)(6)

The standard of review of a motion seeking dismissal under Rule 12(b)(6) is well settled:

> A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure challenges a complaint on the basis that it fails to state a claim upon which relief can be granted.  Rule 12(b)(6) motions to dismiss are disfavored and rarely granted.  To avoid dismissal, the plaintiff's pleadings must show specific, well-pleaded facts, not mere conclusory allegations.  The court must accept the well-pleaded facts as true and view them in the light most favorable to the plaintiff.  A court cannot dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  The court focuses on whether the plaintiff has a right to offer evidence to support his claims, rather than on whether he will succeed on those claims.

*Strong v. Dept. of Army*, 414 F.Supp.2d 625, 629 (S.D. Miss. 2005) (Wingate, C.J.) (internal citations and quotations omitted).  "The requisite pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6) [requires a plaintiff to] … plead facts to state a claim to relief that is plausible on its face… 'Plausible' grounds

require enough fact[s] to raise a reasonable expectation that discovery will reveal evidence to support the claim.  Thus, the allegations must be enough to raise a right to relief above the speculative level."  *Carter v. Jackson Public School Dist.*, 2008 WL 4187480, at *2 (S.D. Miss.) (Wingate, C.J.) (internal citations and quotations omitted).

**B.**    **NSI's Claims Involve a Massive Fraud Arising From the Largest Mass Tort Litigation in History**

The United States Supreme Court, state legislatures and scholarly commentators all have found that mass asbestos litigation has overwhelmed our civil justice system. The Defendants' attacks pay no heed to the fact that the asbestos litigation in which the Defendants' fraud scheme arose and was perpetrated was uniquely susceptible to fraudulent claiming in mass settlements that tort defendants, including NSI, reasonably entered into to resolve liabilities in scores of thousands of cases that have bankrupted numerous companies.  This Court's review of the sufficiency of NSI's allegations should be in light of these observations, as well as the observations about the burdens of the mass asbestos litigation.

The Defendants' arguments treat the underlying tens of thousands of asbestos personal injury lawsuits brought against NSI as typical single personal injury lawsuits, and likewise treat the claims based on the fraud scheme alleged in NSI's Complaint as one case at a time "garden variety" fraud and misrepresentation claims.  Defendants ignore that the volume of underlying asbestos claims brought against NSI are part of the "asbestos-litigation crisis" recognized by the Supreme Court in 1997 when it reviewed and denied a proposed class action settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S.

591, 597 (1997).[2]  Two years later, the Court reiterated the dilemma by denying another proposed class settlement, finding that the settlement was "prompted by the elephantine mass of asbestos cases." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999).  The *Ortiz* Court stated that the asbestos litigation "defies customary judicial administration."  *Id.*

Similarly, some state legislatures responded to the overwhelming mass of asbestos cases with medical criteria legislation were motivated to do so precisely because of the unique burdens the litigation has created within those states' civil justice systems. For example, legislation in Ohio became effective in September 2004, requiring, among other things, that certain medical criteria be met, including competent medical authority for claimed injuries.  The legislation was in response to a legislative finding that "[t]he current asbestos personal injury litigation system is unfair and inefficient, imposing a severe burden on litigants and taxpayers alike."  *Ackison v. Anchor Packing Co.*, 120 Ohio St.3d 228, 229, 897 N.E.2d 1118, 1122 (2008).

Observations of the burdens imposed on the justice system by the mass of mostly non-malignant asbestos related claims, and the potential for fraud in asbestos "litigation screenings," have also been made in several law review articles.  For example, Patrick M. Hanlon and Anne Smetak, chronicled the history of the litigation in 2007, and stated:

> Asbestos litigation also poses special costs due to fraud and abuse.  The clearest examples come from lawyer-sponsored screening programs that recruit tens of thousands of mostly bogus asbestosis and other non-cancer claims.

[2] The Supreme Court quotes findings of the Ad Hoc Committee on Asbestos Litigation, appointed by The Chief Justice back in September 1990: "'The most objectionable aspects of the asbestos litigation can be briefly summarized: dockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.' Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation 2-3 (March 1991)."  *Id.* at 598.

Patrick M. Hanlon & Anne Smetak, *Asbestos Changes*, 62 N.Y.U. ANN. SURV. AM. L. 525, 529 (2007) (footnote omitted).  These authors describe how the recruitment of clients through mass screenings flourished in the state of Mississippi in the 1990s, and increased dramatically in the late 1990s.  "Most of the claims were filed on behalf of non-cancer claimants … and almost all of these … claims were solicited through lawyer-sponsored screening programs."  *Id*. at 551-52.

Professor of Law Lester Brickman of Benjamin N. Cardozo School of Law of Yeshiva University, who has written extensively on mass tort litigation, including asbestos litigation, made similar observations.  In 2008, he wrote about the use of "litigation screenings" in mass tort litigation, noting that "[l]ittle has been written … about medical records … which are commoditized and sold in wholesale quantities by a comparative handful of doctors who are not engaged in good faith medical practice."  Lester Brickman, *The Use of Litigation Screenings in Mass Torts: A Formula For Fraud?*, 61 SMU L. REV. 1221, 1225 (2008).  He described that litigation screenings are "an 'entrepreneurial' response to highly profitable opportunities that arise in certain mass tort litigations" which should not be confused with "medical" screenings:

> Litigation screenings have no intended health benefits.  The sole objective of such screenings is to identify litigants and generate the medical reports that will qualify the litigants for compensation.  To process the thousands of potential litigants that have been attracted to attend, most screenings use an assembly line procedure in which the tasks to be performed are divided into component parts.  As Judge Jack has noted, dividing the screening tasks among multiple providers can serve to insulate each from liability for fraud since no one thereby takes full responsibility for the medical reports and each provider can claim that he had no reason to doubt the validity or veracity of the work of others that he relied upon.  Each of the providers who profit from the screening—paralegals, litigation doctors, medical technicians … and the owners and employees of the screening companies are motivated by substantial, and even enormous, financial incentives.  They are acutely aware that if the screenings do not generate a

sufficiently high percentage of litigants, the lawyers, who have contracted for the screenings, will simply hire others who can do the job more effectively.

*Id.* at 1226-27 (footnote omitted).  Professor Brickman described how a massive volume of claims is needed not only to make the process profitable, but also to assure that the venture is successful:

> [L]itigation screenings enable plaintiffs' lawyers to overwhelm defendants by filing hundreds and thousands of suits, thus making it a practical impossibility for the defendants to take any significant percentage of the cases to trial and coercing defendants into large-scale settlements of, at best, dubious claims.  Adding to the pressure that screenings can generate, is the availability of jurisdictions where judges and sometimes juries have a strong disposition to favor the interests of litigants and their lawyers and a track record of awarding substantial punitive damages.
>
> \*       \*       \*
>
> The only way to avoid a bet-the-company scenario was to settle all of the cases.  Thus, the mass production of claims led to the mass settlement of claims.
>
> \*       \*       \*
>
> One condition that is a *sine qua non* for litigation screenings is the availability of a cadre of doctors willing to "manufacture diagnoses for money"—that is, willing, for a fee, to provide whatever medical reports are required to qualify a substantial percentage of those screened for compensation from bankruptcy trusts or defendants in the tort system.

*Id.* at 1229-31 (footnotes omitted).  Professor Brickman also outlined how the civil justice system has failed to deal effectively with this practice of manufacturing diagnoses for money, although in theory a doctor's reliability as an expert could be challenged in a *Daubert* proceeding.  Discovery which is typically limited to only a small number of cases on a court's docket, however, prevents defendants from obtaining data to effectively challenge doctors who have diagnosed hundreds and even thousands of claimants based on failing to comply with accepted medical standards, and based on diagnosing disease at rates far higher than clinical studies and other medical literature would support. *Id.* at 1315-16.

These observations and findings by United States Supreme Court, legislatures and scholarly commentators describe what can and has happened in mass tort litigation, including asbestos litigation, and provide the context for NSI's claims. This Court's review of the sufficiency of NSI's pleadings must necessarily include a recognition that mass asbestos litigation is not handled like one-time-only personal injury cases, and that the mass volume of lawsuits brought against asbestos tort defendants such as NSI has resulted in pre-trial processes that were breeding grounds that allowed fraudulent doctors and screeners to shield from disclosure the information needed to prove the fraudulent practices they used to generate tens of thousands of claims. This is the litigation environment in which the asbestos lawsuits were brought against and settled by NSI.

## II.    NSI'S RICO ALLEGATIONS ARE SUFFICIENT TO STATE COGNIZABLE CLAIMS

NSI has sufficiently pled its civil claim based on mail and wire fraud pursuant to The Racketeer Influenced and Corrupt Organizations Act ("RICO" or "RICO Act"), 18 U.S.C. §§ 1961-1968. All elements of NSI's claim pursuant to 18 U.S.C. § 1962(c) have been adequately pled, and the Complaint provides sufficient notice to the Defendants of the x-ray interpretations and diagnoses of asbestos-related disease that are challenged by NSI as false and fraudulent.

A civil RICO claim pursuant to §1962(c) arises when a person employed by or associated with an enterprise engaged in or affecting interstate commerce conducts or participates, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity. *Bridge*, 128 S.Ct. at 2137-38; *see also Alcorn County v. United States Interstate Supplies, Inc.*, 731 F.2d 1160, 1167-68 (5th Cir. 1984), *overruled on other grounds*. This private right of action extends to any person injured in his

business or property "by reason of" a RICO violation. *Bridge*, 128 S.Ct. at 2138; *Alcorn County*, 731 F.2d at 1167; 18 U.S.C. § 1964(c). Mail fraud and wire fraud, prohibited by 28 U.S.C. §§ 1341 and 1343, constitute RICO violations. 18 U.S.C. § 1961(1)(B) and § 1962. The terms of the RICO Act are to be "liberally construed to effectuate its remedial purposes." *Boyle v. United States*, 129 S.Ct. 2237, 2239 (2009).

The massive fraud and concealment alleged in NSI's Complaint, perpetrated by the Defendants' for the purpose profiting from the generation of false medical reports to support the filing and settlement of thousands of asbestos personal injury lawsuits, is the very conduct that the RICO Act is intended to reach.

## A.    Defendants' Association In Fact Enterprise Is Sufficiently Pled

A civil RICO claim pursuant to §1962(c) requires that the defendants be persons employed by or associated with an enterprise engaged in or the activities of which, affect interstate commerce. The definition in the RICO Act of a "person" includes both individuals and entities capable of holding interests in property. 18 U.S.C. § 1961(3). A RICO enterprise includes any group of individuals or entities "associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *Alcorn County*, 731 F.2d at 1167 (holding that an association of individuals and a corporation met the "very broad" definition of an association in fact enterprise). The "persons" must be distinct from the "enterprise." *Guidry,* 954 F.2d at 283.

The "enterprise" is also required to be separate and apart from the "pattern of racketeering activity," and to function as a continuing unit. *Brunig v. Clark*, 560 F.3d 292, 297 (5th Cir. 2009). The concept of an association in fact enterprise pursuant to §1962(c) is "expansive." *Boyle*, 129 S.Ct. at 2243. An association in fact enterprise is

simply "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.*, quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981). No hierarchy or chain of command is required, decisions may be made *ad hoc* and by any number of methods, different members may perform different roles at different times, and the enterprise need not have a name, regular meetings or other structural features. *Boyle*, 129 S.Ct. at 2245.

The allegations of NSI's Complaint, summarized in NSI's Response to the Defendants' Rule 12(b)(6) Motions to Dismiss, sufficiently plead that the Defendants' are RICO "persons" associated in fact in a RICO "enterprise." The individual Defendants are each identified as such, and Respiratory Testing Services, Inc. ("RTS") is alleged to be a corporation. Each Defendant is, therefore, adequately alleged to be a RICO "person."

The enterprise alleged is the association of the Defendants and others, rather than any of the Defendants alone, to provide some rare legitimate but mostly false medical reports. The enterprise is, therefore, adequately alleged to be separate from any of the individually named Defendants, as well as separate from the fraud scheme that constituted the pattern of racketeering activity. The §1962(c) enterprise alleged satisfies the Supreme Court's stated requirement of showing "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, *supra.* at 4.

**B.**    **Defendants Ignore the Specific Allegations That Show Participation in the Enterprise Through A Pattern of Racketeering Activity**

A civil RICO claim requires that the defendants have participated in the enterprise's affairs through a pattern of racketeering activity. *Alcorn County,* 731 F.2d at 1167-68; *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009). Mail fraud and wire fraud are both crimes that constitute racketeering activity. 18 U.S.C. § 1961(1)(B).

Fraudulent medical diagnoses, as opinions of specialized experts, are actionable. Restatement (Second) of Torts, Sec. 542, Comment f (1977). RICO requires at least two acts of racketeering activity (commonly referred to as "predicate acts") within a ten-year period. 18. U.S.C. § 1961(5). The pattern is established by showing multiple predicate acts that are related and demonstrate continuity. *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989). Racketeering acts are related if they have the same or similar purposes, results, participants, victims or methods of commission. *Id*. Continuity may be demonstrated "over a closed period by proving a series of related predicates extending over a substantial period of time" or, if the acts are continuing and have not yet extended over a substantial period, if the "threat of continuity is demonstrated." *Id*. at 242.

Predicate acts of mail and wire fraud are established by a defendant's participation in a scheme to defraud, with the intent to defraud, and the use of the United States mails (or private carriers) in furtherance of the scheme. 18 U.S.C. § 1341 and § 1343. "The substantive proscriptions of the RICO statute apply to insiders and outsiders[,] those merely 'associated with' an enterprise[,] who participate directly and indirectly in the enterprise's affairs through a pattern of racketeering activity. [Citations omitted.] Thus, the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978). A defendant causes the use of the mails or wires in furtherance of a fraud scheme if the defendant is connected to the scheme and the use of the mail or wires is reasonably foreseeable. *United States v. Richards*, 204 F.3d 177, 207 (5th Cir. 2000); *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1354 (5th Cir. 1985), *overruled on other grounds*. The mailings or wire transmissions need not contain any misrepresentations; other uses of

the mail and wires "incident to an essential part of the scheme" to defraud are also prohibited. *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989).

Rule 9(b)'s requirement of pleading circumstances of fraud with particularity applies to predicate acts of fraud in a RICO claim. *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138 (5th Cir. 1992). "[T]he particulars of 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby'" must be alleged. *Id.* at 1139. "The particularity demanded by 9(b) necessarily differs with the facts of each case." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (citation omitted). The purpose of Rule 9(b) is to provide the defendants with "adequate notice of the specific activity that the plaintiff claims constituted the fraud so that the accused party may file an effective responsive pleading."[3] *Lachmund v. ADM Inv. Serv.*, 191 F.3d 777, 783 (7th Cir. 1999).

NSI's Complaint, however, sufficiently alleges that the Defendants participated in the affairs of the enterprise alleged through a pattern of mail and wire fraud racketeering activity. As described in NSI's Response to the Rule 12(b)(6) motions, the Complaint is pled with particularity appropriate to the facts of the case and more than adequate to provide the Defendants with notice that the specific activity at issue is the generation of false reports of asbestos exposure, medical tests and x-ray interpretations purporting to find abnormalities caused by asbestos related disease, and false reports diagnosing asbestos related disease, for the purpose of supporting the filing and settlement of asbestos personal injury lawsuits against NSI and other tort defendants, as well as

---

[3] If the Court determines that NSI had not pled fraud with sufficient particularity, the appropriate remedy is to require the filing of an amended complaint. *See In re Burzynski*, 989 F.2d 733, 744 (5th Cir. 1993).

asbestos bankruptcy trust claims, in the predicate act cases identified in Exhibit V to the Complaint. Rule 9(b) does not require that the false statements contained in each of tens of thousands of reports be specifically alleged tens of thousands of times, although NSI could do so, if required. Such repetitious pleading would run afoul of the requirement of Rule 8(a)(2) that the allegations of a complaint provide a short and plain statement of the claim. Exhibit V provides detailed information as to the identity of the claimant in each underlying case defended and/or settled by NSI based upon the False Medical Reports and Diagnoses, the Defendant doctor who issued the report(s) on which the settlement was based, the state in which each claim was filed, the claimant's counsel who settled each claim, the dates of filing and service of the claim, the date of the agreement under which each claim was settled, and the date and amount of each settlement payment, if made. *See* RICO Statement at ¶ 5, and Exhibit 1.

The Complaint alleges the regular use of the mails and wire services in every predicate act case, either by the Defendants or others, caused by and reasonably foreseeable to the Defendants, as more fully described in the Response to the Rule 12(b)(6) motions. For each predicate act case, the mails and/or wires were used multiple times including, in particular, for the submission of the False Medical Reports and Diagnoses to NSI, and to deliver the payments in settlement by NSI to the personal injury plaintiffs' lawyers for the predicate acts cases. The mails were also used for multiple other purposes essential to the fraud scheme, including transmission of solicitation materials, screening records, reports and correspondence, x-rays, and billing for services.

The numerous predicate acts were related and demonstrate continuity. Each predicate act is related because, in each case, the enterprise generated False Medical

Reports and Diagnoses using the same or similar mass screening methods of generating false reports, including the use of the mail and wires in the ordinary course of the enterprise's business operations, the false reports, and the mailings and wire transmissions used to generate and submit the reports, caused injury to the same or similar victims, namely NSI, other tort defendants and bankruptcy trusts, and the personal injury plaintiffs and the courts that were misled, the mailings and wire transmissions were all for the purpose of profiting by providing medical evidence to obtain settlements paid by tort defendants and bankruptcy trust payments, and were caused by one or more of the Defendants in every case through their participation in the enterprise.

The predicate acts of mail and wire fraud also demonstrate continuity based on the substantial time over which they occurred. The mailings and wire transmissions continued for more than ten years, from before the filing of complaints against NSI beginning in back to 1990 and up until 2008 when NSI last made payments on claims supported by the submissions of the false reports.

Further, NSI's allegations specifically as to each Defendant's participation in the enterprise and in concealment of the fraud scheme, and as to the methods and means of the fraud scheme, are more than sufficiently particular to place each named Defendant on notice of the specific activity that NSI claims constituted the fraud so that each of the Defendants may file an effective responsive pleading. These extensive, particularized allegations are described in NSI's Response to the Defendants' Rule 12(b)(6) Motions to Dismiss. The Defendants simply ignore that they are provided sufficient information to respond effectively.

Dr. Ballard complains that NSI uses examples of his cases of false x-ray interpretations and diagnoses, and apparently believes it would be more appropriate to set forth the contents of each and every report in which Dr. Ballard falsely reported x-ray changes caused by asbestos related disease, or diagnosed asbestos related disease, but such a voluminous and repetitious pleading would violate Rule 8(a)(2).  The examples alleged at ¶¶ 166-171 of the Complaint, together with the other specific allegations in the paragraphs referenced above and NSI's other allegations about the fraud scheme and the conduct of the enterprise, as well as Dr. Haber's report, provide notice of Dr. Ballard's specific actions that NSI claims constituted his role in the fraud scheme so that he may file an effective responsive pleading.  No more is required.  The cases cited by Dr. Ballard for the propositions that pleading fraud by examples or based upon information and belief is improper simply do not hold such pleading to be improper.  *See Hart v. Bayer Corp.*, 199 F.3d 239 (5th Cir. 2000) (the court does not address pleading by example or on information and belief); *Furman v. Cirrito*, 828 F.2d 898, 900 (2d Cir. 1987) (RICO complaint "based almost entirely on information and belief" nevertheless carefully reviewed for adequacy of pleading alleged criminal wrongdoing); *Philan Ins. Ltd. v. Frank B. Hall Co., Inc.*, 712 F.Supp. 339, 342 (S.D.N.Y. 1989) (fraud allegations peculiarly within opposing party's knowledge may be pled on information and belief).

The Defendants' motions to dismiss ignore not only the allegations specifying each Defendant's role in the fraud, including identification of the specific claims which contained their false reports, but also extensive allegations as to how the fraud was perpetrated and concealed in the mass asbestos litigation.  NSI's Complaint, together with the further detailed information in its RICO Statement, and the exhibits attached to both,

sufficiently meet the particularity required by Rule 9(b) and the short and plain pleading mandated by Rule 8(a)(2).

### C.    NSI Has Adequately Pled Injury By Reason of the RICO Violations

The requirement under the RICO Act that the plaintiff's injury to business or property be "by reason of" the defendants' RICO violations requires a plaintiff to establish factual ("but for") causation as well as legal (proximate) causation. *Ocean Energy II v. Alexander & Alexander, Inc.*, 868 F.2d 740, 744 (5th Cir. 1989) (citations omitted); *see Anza v. Ideal Steel Corp.*, 547 U.S. 451 1991 (2006); 18 U.S.C. § 1964(c). Although a RICO plaintiff's reliance on the defendants' misrepresentations establishes causation, a RICO plaintiff is not required to plead or prove its reliance on the defendants' misrepresentations to establish proximate cause in a RICO claim predicated on mail fraud. *Bridge*, 128 S.Ct. at 2144. The Fifth Circuit has recognized the holding of Bridge, and overruled any contrary holdings. *St. Germain*, 556 F.3d at 263. As for the compensable injury, alleging expenses that result from the fraud scheme is sufficient pleading of injury to business or property. *R.A.G.S. Couture, Inc.*, 774 F.2d at 1354.

NSI's Complaint contains sufficient allegations of the direct injury it sustained by reason of the Defendants' scheme to defraud. Dr. Ballard makes the spurious argument that NSI seeks to recover injuries sustained as a shareholder of North Brothers, Inc., and that it seeks recovery of damages sustained by other asbestos tort defendants or others. NSI plainly alleges that it **formerly** did business as North Brothers, Inc., that the claims were brought against NSI and that NSI paid money in settlements and incurred defense and settlement administration expenses as a result of the False Medical Reports and Diagnoses generated by the Defendants through their RICO enterprise. Complaint ¶¶ 3,

6, 9, 10, 29 and 199-200. NSI simply does not allege it is a shareholder of North Brothers, because it is not. NSI's well-pled allegations are accepted as true for purposes of the Defendants' motions to dismiss.

The settlements paid by NSI in these fraudulent cases are more than $80,000,000, and are set forth on a case by case basis in Exhibit V to the Complaint. NSI alleges its reliance on the false diagnoses and x-ray interpretations generated by the Defendants' RICO enterprise in making settlement payments, although reliance by NSI is not required for the RICO claims. In addition, the false statements were plainly relied upon by the individuals falsely diagnosed with disease (and their attorneys) because they filed and settled lawsuits against NSI based upon the false reports, and the courts in which the cases were filed also accepted the lawsuits as legitimate claims of asbestos related disease in requiring NSI and other tort defendants to defend against the claims.

### D.    NSI's Allegations Support an Inference that the Defendants Conspired to Violate the RICO Act

Allegations of a "contract, combination …, or conspiracy" are subject to Rule 8(a)(2)'s short and plain statement requirement that a complaint have "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp.,* 550 U.S. at 545 (addressing Sherman Act conspiracy claim); *see also United States v. Morado,* 454 F.2d 167, 174 (5th Cir. 1972) (proof of agreement may rest upon inferences drawn from relevant and competent circumstantial evidence, ordinarily the acts and conduct of the alleged conspirators); *United States v. Felts,* 497 F.2d 80, 82 (5th Cir. 1974) ("Although some members of the conspiracy did not engage in every transaction, such proof is not required to establish a conspiracy"). Rule 9(b) does not apply to the pleading of a conspiracy. NSI's Complaint alleges more than sufficient facts from which an agreement

16

by each of the defendants to commit multiple acts in furtherance of the RICO fraud scheme may be inferred, and the conspiracy claim against the Defendants is therefore adequately pled.

NSI's Response to the Rule 12(b)(6) motions describes the allegations of the Complaint as to each Defendant which are more than sufficient to suggest an agreement was made by each to conduct, direct or participate, directly or indirectly, in the affairs of the enterprise through the commission of two or more predicate acts of mail and wire fraud. The Defendants' close associations and course of conduct imply a degree of coordination from which an agreement may be implied and which satisfies NSI's pleading requirement under Rule 8(a)(2). All of the specifically pled facts described in the Response are relevant to show that Defendants Segarra, Ballard, Lucas and Fitzgerald participated in the affairs of the enterprise through the commission of multiple acts of mail and wire fraud.

NSI is not privy to the agreements actually reached by Defendants Segarra, Ballard, Lucas, Fitzgerald, and the other Defendants to participate in the affairs of the RICO enterprise through acts of mail and wire fraud, but the pleading requirements of Rule 8(a)(2) do not demand such knowledge. The specific acts of these Defendants alleged in Section II.B, above, and the additional allegations of the Complaint described here, are sufficient allegations that each of these Defendants made just such an agreement, and therefore conspired to violate RICO, with resulting injury to NSI.

### III.    NSI'S CLAIMS ARE NOT TIME-BARRED

Among their numerous pleas for dismissal, Defendants assert that NSI's claims are time-barred. Defendants suggest that the Court should blame NSI for the fraud they

inflicted on it.  In doing so, the Defendants essentially argue: "Shame on NSI for not catching our fraud earlier."  These arguments ignore the complexity of their fraud, the environment in which they were able to perpetrate the massive fraud, and the impact of their fraudulent concealment.  The issues that bear on the statute of limitations defense raised by Defendants' motions present questions of fact, not deficiencies in pleading.  NSI's well-pled allegations are accepted as true, and the issues raised in Defendants' motions are not ripe for determination.

**A.    NSI's RICO Claims Are Not Time-Barred Under the "Injury Discovery" Rule Because NSI Could Not Have Discovered Defendants' Fraudulent Activities With Reasonable Diligence**

There is no dispute that a four-year statute of limitations applies to the RICO claims in this case.  *See DeShazo v. Nations Energy Co., Ltd.*, 286 Fed.Appx. 110, 114-15 (5th Cir. 2008).  It is equally clear that the "injury discovery" rule can extend the statute of limitations.  According to the "injury discovery" rule, a civil RICO claim accrues when the plaintiff discovers, or should have discovered, the injury.  *Rotella v. Wood*, 528 U.S. 549, 556 (2000).  *See also Love v. National Med. Ents.*, 230 F.3d 765, 773 (5th Cir. 2000) (noting *Rotella*'s adoption of Fifth Circuit's injury discovery rule).

While the point when a plaintiff "should have discovered" an injury is not precisely defined, the Fifth Circuit has clarified the standard as whether through "reasonable diligence" a plaintiff would have discovered the injury.  *DeShazo*, 286 Fed.Appx. at 114 (equating RICO's "injury discovery" rule with common law discovery rule standard of "reasonable diligence").  Moreover, the Fifth Circuit has noted that under the doctrine of fraudulent concealment, "the limitations period is tolled until the plaintiff discovers, or with reasonable diligence should have discovered, the concealed fraud."

*Love*, 230 F.3d at 779.

## 1. __The Defendants' arguments raise fact questions under the "injury discovery" rule.__

One issue before the Court is whether the allegations of the Complaint could support NSI's contention that it was reasonable that NSI only realized it was victimized after it paid out millions of dollars in asbestos settlements. The Defendants argue that because the matters were brought in litigation, NSI had opportunities to investigate the claims individually for fraud, and NSI's failure to uncover the fraud before settlement was essentially NSI's fault. Thus, the Defendants claim the four-year statute of limitations was not tolled.[4] These arguments, however, not only fail to recognize the holdings of *Love* and misapply the "injury discovery" accrual rule, but also ignore NSI's well-pled allegations, including those of fraudulent concealment, in the Complaint and supporting RICO Statement (which must be considered true and construed in a light most favorable to NSI). They also disregard the nature of the mass asbestos litigation.

The Defendants' arguments simply raise questions of fact from NSI's allegations of Defendants' efforts to conceal the fraud alleged, including: (1) when NSI had actual knowledge of the fraud alleged sufficient to put it on notice that it might be a victim of that conduct, triggering a duty to exercise reasonable diligence to discover whether it had been injured; and (2) when did NSI know (or should have known) that it suffered an injury caused by the fraudulent conduct alleged. *See Love*, 230 F.3d at 777 and 780. NSI contends that the document productions in asbestos MDL 875 in 2006 first triggered

---

[4] The defendants have varying positions on when NSI was injured. For example, Dr. Ballard asserts that NSI was injured at the time of service of the underlying fraudulent claims. Dr. Segarra and Mr. Fitzgerald instead argue the point of injury was when NSI actually "settled" the claims.

NSI's duty to investigate its possible injury, and only thereafter did it learn of its injury caused by the alleged fraud. Complaint ¶¶ 11, 196.

In *Love*, the Court considered a variety of RICO statute of limitations issues, including whether a party was reasonably diligent in determining whether it was injured by fraud. *Love*, 230 F.3d at 778. In that case, the RICO plaintiff, Blue Cross, alleged a healthcare provider had defrauded it by purposefully misdiagnosing patients, misrepresenting services provided, and determining the length of medical care based on the amount of available insurance coverage. *Id.* at 769. Blue Cross alleged fraudulent concealment of the activities and that it did not learn of the scheme until just before it filed suit. The defendant countered that Blue Cross was time barred as through reasonable diligence it should have known of the alleged fraud.

The facts showed that more than four years before Blue Cross filed suit, the state attorney general had investigated the defendant for the same fraudulent activity, that a high-ranking Blue Cross official had been closely involved in that investigation, and that Blue Cross had even been asked to join in a suit with other insurers. *Id.* at 768. Against this backdrop, the district court granted the defendant's motion for summary judgment. On appeal, the Fifth Circuit disagreed, found that there were genuine issues of material fact as to whether Blue Cross exercised reasonable diligence, and held that summary judgment was inappropriate.

> Appellees contend further that the fraudulent concealment doctrine does *not* apply because, in 1991, [Blue Cross] knew facts that would have alerted any reasonable person to investigate and pursue its claims. Appellees maintain that the evidence conclusively establishes that [Blue Cross] did *not* then act with reasonable diligence, because, when it exercised such diligence in 1995, by sending questionnaires to patients, it discovered its alleged injury. As discussed, there is a material fact issue whether [Blue Cross] exercised reasonable diligence to determine whether

> it was a victim of Appellees' allegedly fraudulent conduct. Accordingly, summary judgment concerning fraudulent concealment was inappropriate.

*Id.* at 779-80.  The Fifth Circuit made clear, in a matter where Blue Cross knew far more about the fraud scheme against it than NSI knew of the Defendants' fraud here, that the issues of fraudulent concealment and reasonable diligence are jury questions.

### 2.  The statute did not begin to run until after NSI was on inquiry notice of its injury by the fraud.

In addition to enunciating the "injury discovery" accrual rule as Fifth Circuit law, the *Love* decision makes it clear that a plaintiff can be placed on notice of the *possibility* that it *may* suffer injury from fraudulent conduct without triggering the statute of limitations period.  Instead, to start the statute of limitations a plaintiff must be aware, or with reasonable diligence should have been aware, of *actual* injury.  *Id.* at 777.  To trigger the statute of limitations, there must be knowledge of an actual injury rather than knowledge of the possibility of injury.

In *Love*, it was undisputed that Blue Cross learned of the defendants' scheme and of allegations of fraud in 1991, five years before it brought its claim, although it did not yet know all of the methods by which it was conducted.  *Id.* at 777-78.  Although Blue Cross was plainly on notice of the possibility that it had been a victim of the fraud more than four years before it brought its RICO claim, the court held that summary judgment was improper.  *Id.* at 779.  The court found that it could not conclude, as a matter of law, that Blue Cross' efforts to investigate whether it had been injured "were not reasonably diligent."  *Id.*  Thus, under the Fifth Circuit's "injury discovery" accrual rule, the statute of limitations does not begin to run when a plaintiff is merely put on inquiry notice that it has possibly been injured by fraud.  *See also Tello v. Dean Witter Reynolds, Inc.*, 494

F.3d 956, 968 (11th Cir. 2007); *Law v. Medco Research, Inc.*, 113 F.3d 781, 785 (7th Cir. 1997).[5]

Judge Jack's *Daubert* ruling in late June 2005 and the subsequent document productions in the asbestos MDL 875 in 2006 may have, at best, first put NSI on inquiry notice of the *possible* injury caused by fraud. But the time by which NSI should have discovered that it had been actually injured as a result of the Defendants' fraudulent conduct is a date after mid-2006. The allegations of NSI's Complaint unequivocally plead and create a justiciable issue as to the accrual of NSI's claims and the running of the statute of limitations. The Defendants' motions point to questions of fact to be determined, but provide no basis for dismissals pursuant to Rule 12(b)(6).

### 3. <u>Decisions from other courts explain the difficulties in discovering injury from fraud in mass tort litigation settlements.</u>

Cases from other jurisdictions persuasively illustrate the rationale for the *Love* decision. For example, a case from the Southern District of New York with striking similarities to the present action on the same issue explains why discovery of injury, despite reasonable diligence, is so challenging in the mass asbestos tort setting. *See G-I Holdings, Inc. v. Baron & Budd*, 238 F.Supp.2d 521 (S.D.N.Y. 2002).

In *G-I*, the plaintiff ("GAF"), a traditional asbestos tort defendant (now bankrupt), brought RICO claims against attorneys who had brought personal injury claims against it and with whom GAF had settled ("Baron & Budd"). GAF alleged that Baron & Budd had falsified exposure affidavits for asbestos plaintiffs by simply filling out the product

---

[5] That inquiry notice alone does not start the running of the statute under the "injury discovery" rule in RICO cases is appropriate because fraud is frequently the basis for RICO claims. As the Supreme Court has noted in its acknowledgment of a Circuit split, discovery accrual rules "extend accrual periods for plaintiffs who could not reasonably obtain certain key items of information. The use of a discovery rule may reflect the fact that a high percentage of civil RICO cases, unlike typical antitrust cases, involve fraud claims." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 191 (1997) (citations omitted). *See also Texas v. Allan Const. Co. Inc.*, 851 F.2d 1526, 1529 (5th Cir. 1988) ("fraud is, by its very nature, self-concealing").

identification information and site exposure themselves, without consulting their clients – the alleged affiants. *G-I*, 238 F.Supp.2d at 529-30. Baron & Budd then used those fraudulent affidavits to submit claims and ultimately obtained settlements based on these fraudulent affidavits. *Id.* at 530. When GAF subsequently discovered this information seven years later, it brought RICO claims against Baron & Budd. *Id.* at 540. Baron & Budd moved to dismiss, claiming that the RICO claims were time-barred based on GAF's failure to investigate the authenticity of the affidavits in the underlying litigation showed a lack of reasonable diligence. *Id.* at 541. The district court rejected those arguments. In reaching its decision, that court found:

> While this may be the case, the Defendants are not persuasive in arguing that the decision [...] not to investigate each claim and try each case was a business decision that prevents any reasonable reliance as a matter of law on sworn affidavits filed "[a]s a prerequisite to implementation of certain mass settlements." Compl. ¶ 76. After making the decision to settle, there was no perceived need to determine the verity of each and every affidavit. In fact, to do so would obviate the rationale behind the mass settlements. Thus, the mere fact that GAF, through its agent, *could* have investigated each and every claim does not in the situation presented here mean that it was unreasonable in relying on the affidavits at issue.

*Id.* at 541-42.

For similar reasons as in *G-I*, Judge Jack noted, in silica MDL 1553, the nearly impossible predicament mass tort defendants face in determining the veracity of each claim:

> The Court finds that filing and then persisting in the prosecution of silicosis claims while recklessly disregarding the fact that there is no reliable basis for believing that every Plaintiff has silicosis constitutes an unreasonable multiplication of the proceedings. When factoring in the obvious motivation-overwhelming the system to prevent examination of each individual claim and to extract mass settlements-the behavior becomes vexatious as well.

Ex. A to Complaint, at 82.

**4.  The CSX case relied on by Defendants is distinguishable and contrary to the Fifth Circuit "injury discovery" rule.**

In making their arguments for dismissal, Defendants rely heavily on the West Virginia district court decision in *CSX Transportation, Inc. v. Gilkison*, 2008 WL 858176 (N.D.W.Va. 2008).  In that case, the district court dismissed as time-barred the RICO claims of the plaintiff, a traditional asbestos defendant, against an asbestos plaintiffs' law firm for submitting fraudulent asbestos claims.  In coming to that decision, the court found that the RICO plaintiff was on inquiry notice of the fraud in the underlying litigation.  *Id.* at *4.  However, as discussed above, "inquiry notice" does not alone start the running of the statutory limitation period, but instead triggers the duty to exercise reasonable diligence.  The *CSX* case is contrary to the "injury discovery" accrual rule applied in the Fifth Circuit.   The *CSX* case is also distinguishable from the present case because the issue of fraudulent concealment was not addressed by the court.

Further, *CSX* dealt with only nine underlying cases that were the subject of an early mediation order that the court found afforded access to medical records, including x-ray films and x-ray interpretation reports, from which the defendant in the underlying cases could have discovered the fraud.  *Id.*  In contrast, the Defendants' false medical reports were not submitted to NSI until after settlement agreements were entered into, and before the individual claims were paid.  RICO Statement at ¶ 5.b.i.  NSI did not have access to the Defendants' false medical reports at the time the tens of thousands of underlying lawsuits were filed.  In addition, NSI was not provided with the body of records from which the fraud could be discovered when the claims were filed, settled and paid (*e.g.*, asbestosis reports submitted while contradictory silicosis reports on the same individual withheld, Complaint ¶¶ 177, 179, 181 and 193; information and records

24

revealed in MDL 1553 and MDL 875 not previously available, Complaint ¶¶ 11 and 196), and numerous efforts were made to conceal the fraud, as well.

   **5.   The facts of this case, including the Defendants' concealment, show NSI's claims were brought within the statutory period.**

Applying these principles to the present case, the Defendants' statute of limitations arguments must fail.  As a result of the lack of access to information that would have revealed the essential facts necessary to file suit, in part because of the Defendants' fraudulent concealment of their actions, NSI was unable to discover that it likely paid fraudulent claims, much less its discovery of a massive fraudulent diagnosing scheme.  To properly resolve this issue, the unique nature of the mass asbestos litigation system must be considered, as the New York district court addressed in *G-I*.  As Judge Jack noted, the filing of thousands of claims in mass tort litigation is intended to "overwhelm[] the system to prevent examination of each individual claim and to extract mass settlements."  Ex. A to Complaint, at 82.  This is exactly the environment NSI faced when it was sued in tens of thousands of cases, and entered into mass settlements.

As alleged in NSI's Complaint, this complex and unique system, coupled with the Defendants' active concealment, prevented NSI from discovering the Defendants' fraudulent diagnoses, as well as the fraudulent practices that led to the false diagnoses. The sheer volume of plaintiffs and settlements, just as Judge Jack described, precluded an examination of each of the tens of thousands of claims that NSI settled.  Even if NSI had been capable of looking at the merits of each of the tens of thousands of claims before settlement, discovery limitations in case management orders often prevented it from doing so.  Complaint, at ¶ 196.  As a result, NSI did not even receive the false reports

generated by the Defendants until after it entered into settlement agreements and shortly before it paid the individual claims.  RICO Statement at ¶ 5.b.i.

The Defendants recognized these inherent problems, and capitalized on them through their fraudulent concealment.  For example, Dr. Segarra gave vague and misleading testimony in hearings and depositions relative to his diagnoses, and refused (and continues to refuse) to produce inconsistent diagnostic records and other records that might have revealed the fraud.[6]  Defendant Foster actively concealed the fraud by deliberately allowing his asbestos screening records to be lost or discarded, by refusing to answer questions about his screening practices, and ultimately by claiming the Fifth Amendment privilege and refusing to testify.  Similarly, Dr. Ballard has given false and misleading testimony, delayed production of his records, made incomplete productions, and has continued to conceal his fraud by invoking the Fifth Amendment and refusing to testify.  Dr. Lucas has fraudulently concealed the claims against him by giving false and misleading testimony and intentionally allowing the destruction or disappearance of his records. Further, all of the Defendant doctors rendered contradictory diagnoses and concealed that fact in their reports stating findings only of asbestos related disease.

The invocation of the Fifth Amendment by several Defendants is highly significant.  *See* Complaint, at ¶¶ 188, 190; RICO Statement at pp. 45-46.  Obviously by their taking of the Fifth Amendment, NSI has been prevented from learning crucial information.  But perhaps more importantly for purposes of this response, the invocation of the Fifth Amendment allows the Court to draw inferences against the Defendants -- inferences that they did commit fraud and that they did conceal it from the plaintiffs.

---

[6] The active concealment by the Defendant doctors is described more fully in Section II.B, above.

> "[W]hile a person may refuse to testify during civil proceedings on the ground that his testimony might incriminate him ... his refusal to testify may be used against him in a civil proceeding." *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983). Thus, although a jury in a criminal case is not permitted to draw adverse inferences based on a defendant's invocation of his Fifth Amendment rights, it is well-settled that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."

*Hinojosa v. Butler*, 547 F.3d 285, 291 (5th Cir. 2008) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976). While a fact-finder could ultimately find insufficient evidence of such fraud, the assertion of the Fifth Amendment by several of the Defendants alone is sufficient to defeat a Rule 12(b)(6) motion in light of its stringent requirements.

Determination of the date by which NSI reasonably should have known of its injury from the Defendants' fraud scheme will require a fact intensive analysis, only possible after significant discovery. For example, NSI still has not had the opportunity to obtain or review many relevant documents because many of the Defendants' refusal to produce them in other litigation. *See* Complaint, at ¶¶ 179, 181-84; RICO Statement, at pp. 4, 17 and 20. If not for the production of some records by some of the Defendants in mid-2006 through the MDL 875 litigation, NSI would likely still not be aware of its injury – the settlement of fraudulent claims. No doubt, there is much about the Defendants' fraud still to be discovered, NSI simply did not have the records nor did it have access to the records necessary to find that the Defendants were engaged in fraud against NSI until at earliest after the 2006 document productions in MDL 875.

In stark contrast to the *CSX* case, NSI settled tens of thousands of claims instituted through the RICO enterprise. This was not a case where there were a discrete few plaintiffs, for whom all necessary documents were furnished and all of whom were

available for depositions as in *CSX*.  Instead, in light of the mass asbestos dockets, the underlying matters involved staggering numbers of plaintiffs, with incomplete and impossible discovery.  Accordingly, the Defendants' statute of limitations arguments must fail, particularly when considered in light of the exacting 12(b)(6) standard.

Additionally, reason dictates that the Defendants' extreme position on the responsibility to discover fraudulent activity cannot possibly be the law.  The Defendants assert that simply by being sued and/or settling mass tort claims, NSI should have had notice of its injury.  The mere existence of the well-recognized tort of fraudulent inducement to settle claims would be subsumed if Defendants' position were the law.  Under Defendants' view, a typical defendant in a lawsuit will always be on notice of potential fraud no later than when it actually settles a case.  If that were the case, then a fraud victim would always be charged with awareness of the fraud prior to the completion of the fraud.  The defendant in a lawsuit could never be damaged, and no liability could ever attach to a claim for fraudulent inducement to settle.  In effect, Defendants seek to void that well-established tort.

The RICO statute of limitations issues raised in Defendants' motions are not ripe for determination, and the Court should deny Defendants' motions to dismiss as they relate to the statute of limitations.

> **B.** **NSI's State Law Claims Are Not Time-Barred Because NSI Could Not Have Discovered Defendants' Fraudulent Activities With Reasonable Diligence**

In addition to seeking dismissal of NSI's RICO claims, the Defendants also seek dismissal of NSI's state law claims based on the statute of limitations.  The state law claims are governed by a general three-year statute of limitations.  Miss. Code Ann. §15-

1-49.  Just as with the RICO claims, the Mississippi statute of limitations begins to run at the time of injury.  *State Ind. Prods. Corp. v. Beta Tech., Inc.*, 2009 WL 1930038, at *2 (5th Cir. July 9, 2009).  Also, as for the RICO claims, the discovery rule tolls the statute of limitations until the injury could have been discovered with reasonable diligence.  *State Ind. Prods. Corp.*, 2009 WL 1930038, at *2.

Thus, the principles related to the statute of limitations on the state law claims are essentially the same as those for the RICO claims, only with a shorter prescription period.  NSI incorporates its arguments above for tolling the RICO statute of limitations under the above-stated principles and analysis.  NSI has adequately pled state law claims commenced within the three-year limitation period.

### C.    Even If The Injury Accrued When The Underlying Claims Were Filed Or Settled, This Action Was Filed Within Four Years Of Many Of Those Claims/Settlements

Even if the Defendants convince the Court that NSI should have known of the fraudulent activity at the time it was sued or when it settled the underlying cases, many of NSI's predicate act cases were nonetheless within four years of commencement of this case.  That is because the Fifth Circuit has adopted the "separate accrual" rule for RICO violations to hold that each separate injury from a RICO activity starts a new accrual period.  *Love*, 230 F.3d at 773.

> When a pattern of RICO activity causes a continuing series of separate injuries, the "separate accrual" rule allows a civil RICO claim to accrue for each injury when the plaintiff discovers, or should have discovered, that injury.

*Id.*

In *Love*, the Court considered whether a RICO plaintiff could be charged with a single statute of limitations accrual point for all injuries resulting from RICO activity,

even when underlying claims were made on a continuing basis. *Id.* at 772. The RICO defendant in that case sought to establish that the statute of limitations accrual was at the point of the earliest injury, regardless of how long the injuries went on or how many following injuries there were. In rejecting that argument, the Fifth Circuit adopted the "separate accrual" rule. The court reasoned that, "having adopted the 'injury discovery' rule, it would seem illogical to conclude that, under civil RICO, a plaintiff may not recover for injuries incurred within the limitations period, merely because they result from acts that are part of a continuing pattern of similar acts that caused other, similar injuries outside that period." *Id.* at 774. The court held that each payment by the plaintiff caused a separate injury. *Id.* at 775.

Defendants cannot dispose of NSI's RICO claims, even if they can establish the time of filing a claim or payment in settlement as the accrual point for NSI's underlying injuries. Many of the underlying claims were filed or paid less than four years before the filing of the Complaint. A list of filed and settled claims is attached as Exhibit V to the Complaint. That exhibit shows filing dates as late as March 16, 2006, and settlement payment dates as late as July 30, 2008. *See* Exhibit V to Complaint. Consequently, at a very minimum, numerous claims listed on Exhibit V must survive. The Defendants' simply ignore the Fifth Circuit's separate accrual rule.

## IV.    NSI'S ALLEGATIONS ARE SUFFICIENT TO STATE COGNIZABLE STATE COMMON LAW CLAIMS

The Defendants challenge the adequacy of NSI's pleading of its state law tort claims of fraud, negligent misrepresentation, and aiding and abetting fraud, as well as claiming that the claims are time-barred, that NSI lacks standing to assert the claims, and that NSI is barred from bringing its state law claims because it is not registered to do

business in Mississippi. The challenge under the statute of limitations is previously addressed in Section III.B. of this Memorandum, and the standing challenge, based on the unsupported argument that NSI is a shareholder of North Brothers, Inc., has also previously been addressed in Section II.C., at page 24. The remaining arguments are addressed below.

### A.    NSI's Fraud and Negligent Misrepresentation Claims Are Sufficiently Pled

The Defendants' motions claim that NSI has failed adequately to plead its reliance on the false representations alleged in the Complaint. The arguments ignore that NSI has expressly pled that it did rely on the False Medical Reports and Diagnoses as legitimate, and the reasons why it so relied. Complaint at ¶¶ 218-223 and 225-228. The claim that NSI did not reasonably rely on the reports and diagnoses as legitimate raises a fact question that cannot be resolved at the pleading stage. Notwithstanding, the Complaint contains specific allegations as to the Defendants' knowledge and intent that the reports and diagnoses would be used in litigation for the purpose of supporting claims and settlements, and would be relied upon by the claimants falsely diagnosed with asbestos related disease, their personal injury attorneys, as well as by NSI and others. In summary, in paying thousands of claims pursuant to reports generated by the Defendants first received by NSI after entering into settlement agreements, submitted by attorneys who had represented that the diagnoses were legitimate, NSI was entitled to assume that the diagnoses and the reports embodying the diagnoses by licensed physicians were legitimate. The Complaint has also pled the circumstances of fraud with the particularity required by Rule 9(b), as NSI has previously addressed at length in Section II.B., above. The same allegations apply to the negligent misrepresentation claim.

**B.**    **NSI's Aiding and Abetting Fraud Claim Is Cognizable and Sufficiently Pled**

Although the Mississippi has not yet expressly recognized a claim of aiding and abetting fraud, this District Court has predicted that it would. *Dale v. ALA Acquisitions, Inc.*, 203 F.Supp.2d 694, 700 (S.D. Miss. 2002) (recognizing claim pursuant to Restatement of Torts § 876(b)). NSI has pled the elements of the claim in Count Five of the Complaint (incorporating all previous allegations), and has pled the circumstances of fraud with sufficient particularity as previously described above. For the reasons set forth in *Dale*, *supra*, the motions to dismiss the claim of aiding and abetting fraud should be denied.

**C.**    **The Unsupported Claim That NSI Must Register To Do Business In Mississippi To Pursue Its State Law Claims Must Be Disregarded**

The argument is made by Dr. Ballard, without any factual support or basis in the allegations of NSI's Complaint whatsoever, that NSI has improperly brought state law claims in this Court because it does not have a certificate of authority to do business in Mississippi. Assuming without conceding that such registration were required to bring an action in this Court, the law in Mississippi is clear that the filing of the Complaint is not transaction of business within the state requiring registration by a foreign corporation. Miss. Code Ann. § 79-4-15.01(b)(1). *See Mississippi Ins. Guar. Ass'n v. Harkins*, 652 So.2d 732, 737 (Miss. 1995). Dr. Ballard presents no evidence to the Court that NSI transacts business in Mississippi, and this argument lacks any basis in law or fact. Further, even if NSI had failed properly to register to do business, the appropriate remedy would not be dismissal of its state law claims, but only a stay of the proceeding until a certificate of authority was obtained. Miss. Code Ann. § 79-4-15.02(c).

V.   **THE NOERR-PENNINGTON IMMUNITY DOCTRINE IS INAPPLICABLE TO FRAUDULENT LAWSUITS AND APPLICABILITY OF THE DOCTRINE CANNOT BE DETERMINED ON A RULE 12(b)(6) MOTION**

When applicable, the Noerr-Pennington doctrine provides immunity to liability to parties who petition the government for favorable action, even "in the form of administrative or legal proceedings." *Video Intern. Prod., Inc. v. Warner—Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988). This immunity does not, however, extend to "sham" litigation. *California Motor Transp. v. Trucking Unlimited*, 404 U.S. 508, 516 (1972). Successful litigation may still be a sham. *In re Burlington Northern, Inc.*, 822 F.2d 518, 534 (5th Cir. 1987).

NSI's Complaint alleges that the Defendants generated fraudulent medical records, reports and diagnoses to support tens of thousands of claims against NSI. The Ninth Circuit has identified three situations in which the sham litigation exception might apply: "first, where the lawsuit is objectively baseless and the defendants' motive in bringing it was unlawful, …; second, where the conduct involves a series of lawsuits 'brought pursuant to a policy of starting legal proceedings without regard to the merits' and for an unlawful purpose, …; and third, if the allegedly unlawful conduct 'consists of making intentional misrepresentations to the court …'" *Sosa v. DIRECTV, Inc.,* 437 F.3d 923, 938 (9th Cir. 2006) (internal citations omitted). "[L]itigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *Id.* (citations omitted). This is exactly the conduct alleged in the Complaint.

Nevertheless, inquiry whether the conduct alleged in the Complaint gives rise to the sham litigation exception is not appropriate for a Rule 12(b)(6) motion. *California*

*Motor Transp.*, 404 U.S. at 515.   "These issues can only be properly analyzed through a consideration of evidence outside of the pleadings and exhibits attached to said pleadings, and, as such, are not appropriately considered in the present Rule 12(b)(6) context." *Morrone Co. v. Barbour*, 241 F.Supp.2d 683, 690 (S.D. Miss. 2002).

The allegations of the Complaint plainly raise the sham litigation exception because, accepted as true, there is no immunity associated with the objectively baseless claims asserted against NSI.   Moreover, there is a question as to whether, under the facts, the doctrine would extend to the Defendants who were not parties to the underlying lawsuits.   The request for dismissal based upon the Noerr-Pennington doctrine is premature, and should be denied.

## VI.    CONCLUSION

NSI's Complaint sets forth allegations sufficient to state the RICO and state law claims contained therein.   The facts alleged also adequately plead claims accruing within the applicable statutes of limitations.   The defenses raised by the Defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) demonstrate questions of fact, but provide no basis for dismissal.   Therefore, NSI respectfully requests that the motions to dismiss pursuant to Rule 12(b)(6) be denied.

NATIONAL SERVICE INDUSTRIES, INC.
f/d/b/a NORTH BROTHERS, INC., PLAINTIFF

_____

MARCY B. CROFT
ATTORNEY FOR PLAINTIFF

MARCY B. CROFT, MS BAR NO. 10864
WALTER G. WATKINS, JR., MS BAR NO. 6988
ASHLEY E. CALHOUN, MS BAR NO. 101303
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
200 SOUTH LAMAR STREET, SUITE 100
JACKSON, MISSISSIPPI  392901
TELEPHONE:        (601) 960-8600
FACSIMILE:        (601) 960-8613

OF COUNSEL:
DAVID M. SETTER (Pro Hac)
JOHN M. SEEBOHM (Pro Hac)
JEANETTE S. EIRICH (Pro Hac)
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
1775 SHERMAN STREET, SUITE 1900
DENVER, COLORADO 80203
TELEPHONE:        (303) 837-6400
FACSIMILE:        (303) 318-9669

## CERTIFICATE OF SERVICE

I, the undersigned attorney, on behalf of the Plaintiff, NSI, do hereby certify that I have electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record.

THIS the 12th day of August, 2009.

MARCY B. CROFT